No. 21-8076

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT
_____

AMERICAN PETROLEUM INSTITUTE,

Petitioner-Appellant,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,

Respondents-Appellees.
_____

On Appeal from the U.S. District Court for the District of Wyoming
Case No. 19-cv-121-S
Hon. Scott W. Skavdahl, District Judge

_____

**OPENING BRIEF OF APPELLANT**
_____

Peter J. Schaumberg
James M. Auslander
BEVERIDGE & DIAMOND, P.C.
1900 N St., NW, Suite 100
Washington, DC 20036
Phone: (202) 789-6009
pschaumberg@bdlaw.com
jauslander@bdlaw.com
*Attorneys for Petitioner-Appellant American Petroleum Institute*

***ORAL ARGUMENT IS REQUESTED***

## CORPORATE DISCLOSURE STATEMENT

Per Fed. R. App. P. 26.1, Petitioner-Appellant American Petroleum Institute ("API") states that (a) it is a District of Columbia nonprofit trade organization that represents the U.S. oil and gas industry before the national executive, legislative, and judicial branches of government; (b) it represents over 580 member companies involved in all aspects of the oil and gas industry; and (c) it has no parent corporations and that no publicly held company owns any stock in it.

Dated:  February 28, 2022          ___ /s/  James M. Auslander _____
                                            James M. Auslander
                                            Beveridge & Diamond, P.C.
                                            *Attorney for Petitioner-Appellant American Petroleum Institute*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................v

GLOSSARY OF ACRONYMS AND ABBREVIATIONS.................... xi

STATEMENT OF RELATED CASES ...................................................1

STATEMENT OF JURISDICTION...................................................1

STATEMENT OF THE ISSUES PRESENTED........................................2

STATEMENT OF THE CASE ............................................................3

I.    Factual Background ..................................................................5

II.   Procedural History ...................................................................11

SUMMARY OF ARGUMENT ...........................................................13

STANDARD OF REVIEW ................................................................17

ARGUMENT .................................................................................19

I.    The District Court Erred by Uncritically Accepting ONRR's
      Unsupported Conclusions.......................................................19

II.   The District Court Erred by Deferring to the Rule's Legal Deficiencies
      as Policy Choices. ..................................................................22

III.  The District Court Erred by Upholding the Rule's Denial of Subsea
      Transportation Allowances.....................................................27

      A.    The District Court Erred by Equating All Subsea Bulk
            Movement of Oil and Gas with Non-Deductible Gathering...............29

      B.    The District Court Erred by Discounting Reliance Interests. .............35

IV.   The District Court Erred by Affirming The Rule's Categorical Denial of
      Full Transportation and Processing Allowances. ...........................36

V.    The District Court Erred by Approving Inflation of Federal Gas Royalty
      Value Based on Convenience of Gas Index-Based Values and on
      Unattainable Values.........................................................41

VI.    The District Court Erred by Sustaining the Rule's Federal Oil and Gas
         Default Provisions. ...........................................................................................46

VII.   The District Court Erred by Allowing ONRR to Supplant Valid Contracts..50

CONCLUSION .........................................................................................................53

STATEMENT REGARDING ORAL ARGUMENT ............................................53


D. Wyoming Order Upholding in Part and Reversing in Part
2016 Valuation Rule .....................................................................ATTACHMENT 1

D. Wyoming Judgment  ................................................................ATTACHMENT 2

D. Wyoming Order Granting Partial Preliminary Injunction ......ATTACHMENT 3

## TABLE OF AUTHORITIES

**Federal Cases**                                                                 **Page(s)**

*Becerra v. U.S. Dep't of the Interior*,
   276 F. Supp. 3d 953 (N.D. Cal. 2017).................................................................8, 9

*Black Butte Coal Co. v. United States*,
   38 F. Supp. 2d 963 (D. Wyo. 1999).....................................................................23

*California Co. v. Udall*,
   296 F.2d 384 (D.C. Cir. 1961)............................................................................33

*California v. U.S. Dep't of the Interior*,
   381 F. Supp. 3d 1153 (N.D. Cal. 2019)........................................................ 10, 26

*Cont'l Oil Co. v. U.S.*,
   184 F.2d 802 (9th Cir. 1950) ..............................................................................23

*Devon Energy Prod. Co. v. Gould*,
   421 F. Supp. 3d 1213 (D. Wyo. 2019)................................................................21

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016)....................................................................... 4, 18, 19, 27

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)................................................................................. 20, 36

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*,
   141 S. Ct. 974 (2021)..........................................................................................27

*Humana of Aurora, Inc. v. Heckler*,
   753 F.2d 1579 (10th Cir. 1985) ..........................................................................20

*Indep. Petroleum Ass'n of Am. v. Armstrong*,
   91 F. Supp. 2d 117 (D.D.C. 2000)......................................................................23

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
   92 F.3d 1248 (D.C. Cir. 1996)............................................................................40

*Indep. Petroleum Ass'n of Am. v. DeWitt,*
   279 F.3d 1036 (D.C. Cir. 2002) .................................................. 23, 25

*Kretni Development Co. v. Consolidation Oil Corp.,*
   74 F.2d 497 (10th Cir. 1934) ...............................................................34

*Landgraf v. Usi Film Prods.,*
   511 U.S. 244 (1994).............................................................................36

*Marathon Oil Co. v. Andrus,*
   452 F. Supp. 548 (D. Wyo. 1978)........................................................36

*Marinello v. United States,*
   138 S. Ct. 1101 (2018).........................................................................49

*MCI Telecom. Corp. v. Am. Tel. & Tel. Co.,*
   512 U.S. 218 (1994).............................................................................43

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)...............................................................................20

*Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.,*
   56 F.3d 1243 (10th Cir. 1995) .............................................................21

*N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.,*
   248 F.3d 1277 (10th Cir. 2001) ...........................................................17

*New Mexico ex rel. Richardson v. BLM,*
   565 F.3d 683 (10th Cir. 2009) .............................................................28

*New Mexico v. U.S. Dep't of the Interior,*
   854 F.3d 1207 (10th Cir. 2017) ...........................................................43

*Olenhouse v. Commodity Credit Corp.,*
   42 F.3d 1560 (10th Cir. 1994) .......................................... 4, 17, 18, 19, 20, 21, 22

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015)...............................................................................18

*Renewable Fuels Ass'n v. U.S. Env't Prot. Agency,*
   948 F.3d 1206 (10th Cir. 2020) ...........................................................27

*Sac & Fox Nation v. Norton*,
   240 F.3d 1250 (10th Cir. 2001) ..........................................................................17

*Santa Fe Energy Prod. Co. v. McCutcheon*,
   90 F.3d 409 (10th Cir. 1996) ..............................................................................17

*United States v. Gen. Petroleum Corp. of California*,
   73 F. Supp. 225 (S.D. Cal. 1946)........................................................................23

*United Techs. Corp. v. U.S. Dep't of Def.*,
   601 F.3d 557 (D.C. Cir. 2010).............................................................................18

*Watt v. Alaska*,
   451 U.S. 259 (1981).............................................................................................32

*Wyoming v. U.S. Dep't of the Interior*,
   493 F. Supp. 3d 1046 (D. Wyo. 2020)......................................................... 17, 27

**Federal Administrative Cases**

*Arco Oil and Gas Co.*,
   109 IBLA 34 (1989) .............................................................................................24

*Kerr-McGee Corp.*,
   147 IBLA 277 (1999) .............................................................................. 32, 33, 34

*Murphy Exploration and Prod. Co.*,
   147 IBLA 386 (1998) ...........................................................................................34

*Shell Oil Co.*,
   52 IBLA 15 (1981) ...............................................................................................24

**Statutory Authorities**

5 U.S.C. § 701 et seq.............................................................................................1
5 U.S.C. § 705 ......................................................................................................9
5 U.S.C. § 706(2) .................................................................................................2
5 U.S.C. § 706(2)(A)...........................................................................................17
5 U.S.C. § 706(2)(C)...........................................................................................17
5 U.S.C. § 706(2)(E) .............................................................................................4
28 U.S.C. § 1291 ..................................................................................................1

28 U.S.C. § 1331 ..................................................................................1

30 U.S.C. § 226 ..................................................................................15

30 U.S.C. § 226(b)(1)(A) ...................................................................42

30 U.S.C. § 1701 ................................................................................26

30 U.S.C. § 1711 ................................................................................26

30 U.S.C. § 1712(a) ...........................................................................26

30 U.S.C. § 1713 ................................................................................51

30 U.S.C. § 1720a ..............................................................................26

30 U.S.C. § 1721(a) .........................................................................5, 7

30 U.S.C. § 1724(c)(2) .........................................................................5

43 U.S.C. § 1337 ................................................................................15

43 U.S.C. § 1337(a)(1)(A) .................................................................42

## Rules and Regulations

30 C.F.R. § 250.1301(c) .....................................................................32

30 C.F.R. § 1206.20 ........................................ 5, 27, 35, 37, 51, 52

30 C.F.R. § 1206.56 ...........................................................................40

30 C.F.R. § 1206.102(c)(2)(ii)(A) (2015) .........................................48

30 C.F.R. § 1206.102(c)(2)(ii)(B) (2015) .........................................48

30 C.F.R. § 1206.104(c) .....................................................................48

30 C.F.R. § 1206.104(c)(2) .................................................................52

30 C.F.R. § 1206.104(g) .....................................................................50

30 C.F.R. § 1206.104(g)(2) .................................................................51

30 C.F.R. § 1206.105 ..........................................................................46

30 C.F.R. § 1206.109(a) .....................................................................50

30 C.F.R. § 1206.109(c)(2) (2015) ....................................................38

30 C.F.R. § 1206.110(a) ................................................................ 25, 37

30 C.F.R. § 1206.110(a)(1)(ii) ................................... 5, 27, 35, 53

30 C.F.R. § 1206.110(a)(2)(ii) ...........................................................35

30 C.F.R. § 1206.110(d)(1) ................................... 5, 36, 41, 53

30 C.F.R. § 1206.110(d)(2) .................................................................37

30 C.F.R. § 1206.110(f)(2) .................................................................52

30 C.F.R. § 1206.110(f)(3) .................................................................48

30 C.F.R. § 1206.111(d) .....................................................................50

30 C.F.R. § 1206.141(c) .....................................................................41

30 C.F.R. § 1206.141(c)(1)(i) .............................................................43

30 C.F.R. § 1206.141(c)(1)(ii) ............................................................44

30 C.F.R. § 1206.141(c)(1)(iv) ...........................................................44

30 C.F.R. § 1206.141(c)(2) ............................................................. 45

30 C.F.R. § 1206.142(d) .....................................................................42

30 C.F.R. § 1206.142(d)(1)(i) ................................................................43
30 C.F.R. § 1206.142(d)(1)(ii) ...............................................................44
30 C.F.R. § 1206.142(d)(1)(iv) ..............................................................44
30 C.F.R. § 1206.142(d)(3) ....................................................................45
30 C.F.R. § 1206.143(c)(2) .....................................................................52
30 C.F.R. § 1206.143(c)(3) .....................................................................48
30 C.F.R. § 1206.143(g) ..........................................................................50
30 C.F.R. § 1206.143(g)(2) .....................................................................51
30 C.F.R. § 1206.144 ...............................................................................46
30 C.F.R. § 1206.149(a) ..........................................................................50
30 C.F.R. § 1206.152(a) ................................................................... 25, 37
30 C.F.R. § 1206.152(a)(2)(ii) ................................... 5, 27, 35, 53
30 C.F.R. § 1206.152(e)(1) (2015) .........................................................48
30 C.F.R. § 1206.152(e)(1) ........................................... 5, 36, 41, 53
30 C.F.R. § 1206.152(e)(2) .....................................................................37
30 C.F.R. § 1206.152(g)(2) .....................................................................52
30 C.F.R. § 1206.152(g)(3) .....................................................................48
30 C.F.R. § 1206.153(d) ..........................................................................50
30 C.F.R. § 1206.156(c)(3) (2015) .........................................................38
30 C.F.R. § 1206.158(c)(3) (2015) .........................................................38
30 C.F.R. § 1206.158(d)(2) (2015) .........................................................37
30 C.F.R. § 1206.159(a) ................................................................... 25, 37
30 C.F.R. § 1206.159(c)(2) ........................................... 5, 37, 41, 53
30 C.F.R. § 1206.159(c)(3) ........................................... 5, 37, 41, 53
30 C.F.R. § 1206.159(c)(4) ........................................... 5, 37, 41, 53
30 C.F.R. § 1206.159(e)(2) .....................................................................52
30 C.F.R. § 1206.159(e)(3) .....................................................................48
30 C.F.R. § 1206.160(c) ..........................................................................50
30 C.F.R. § 1206.172(d)(1)(iii) ..............................................................45
30 C.F.R. § 1206.259(a) ..........................................................................50
30 C.F.R. § 1218.50(a) ...............................................................................5
30 C.F.R. § 1218.202(a)-(e) .......................................................................5
30 C.F.R. part 1206 ....................................................................................2
30 C.F.R. part 1212 ..................................................................................51
30 C.F.R. part 1241 ....................................................................................5
30 C.F.R. part 1290 ..................................................................................49


52 Fed. Reg. 4,732 (Feb. 13, 1987) ........................................................48
53 Fed. Reg. 1,184 (Jan. 15, 1988) .....................................................5, 23
53 Fed. Reg. 1,230 (Jan. 15, 1988) ...........................................................5
63 Fed. Reg. 38,355 (July 16, 1998) .......................................................30

64 Fed. Reg. 43,506 (Aug. 10, 1999)...................................................................7

65 Fed. Reg. 14,021 (Mar. 15, 2000)..................................................................7

80 Fed. Reg. 24,794 (May 1, 2015) ..................................................... 7, 24, 40

81 Fed. Reg. 43,338 (July 1, 2016)......................................................................1

82 Fed. Reg. 11,823 (Feb. 27, 2017) .................................................................9

82 Fed. Reg. 36,934 (Aug. 7, 2017)..................................................................10

85 Fed. Reg. 62,054 (Oct. 1, 2020)...................................................................11

85 Fed. Reg. 62,016 (Oct. 1, 2020)...................................................................10

86 Fed. Reg. 4,612 (Jan. 15, 2021)....................................................................11

86 Fed. Reg. 9,286 (Feb. 12, 2021) ..................................................................11

86 Fed. Reg. 20,032 (Apr. 16, 2021) ................................................................11

86 Fed. Reg. 31,196 (June 11, 2021) ................................................................11

86 Fed. Reg. 54,045 (Sep. 30, 2021) ................................................................11


Fed. R. App. P. 4(a)(1)(B) ..................................................................................1

Fed. R. App. P. 28(a)(4) ......................................................................................1

Fed. R. Civ. P. 41(a)(1)(A)(i) ...........................................................................12


10th Cir. R. 28.2(C)(3)........................................................................................1

## Additional Authorities

*Form ONRR-2014*,
   https://www.onrr.gov/reportpay/PDFDocs/2014.pdf. .............................5


*ONRR Reporter Letters*,
   https://www.onrr.gov/DearRep.htm  (June 13, 2019) ..........................10

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to 10th Cir. R. 28.2(C)(4), the following is a glossary of acronyms and abbreviations used in this brief.

| | |
|---|---|
| APA | Administrative Procedure Act |
| Aplt. App. | Appellant's Appendix |
| API | American Petroleum Institute |
| IBLA | Interior Board of Land Appeals |
| MLA | Mineral Leasing Act |
| MMS | Minerals Management Service |
| OCS | Outer Continental Shelf |
| OCSLA | Outer Continental Shelf Lands Act |
| ONRR | Office of Natural Resources Revenue |

## STATEMENT OF RELATED CASES

Pursuant to 10th Cir. R. 28.2(C)(3), API states that Federal Respondents-Appellees filed a prior cross-appeal, Case No. 21-8077, which was voluntarily dismissed by this Court's Order dated January 7, 2022.  There are no other prior or related appeals.

## STATEMENT OF JURISDICTION

Pursuant to Fed. R. App. P. 28(a)(4)(A)-(D):

(A) The district court had subject matter jurisdiction over this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., and 28 U.S.C. § 1331;

(B) This Court has appellate jurisdiction over this appeal pursuant to 28 U.S.C. § 1291;

(C) The filing dates establishing the timeliness of this appeal include the following: (i) on September 8, 2021, the district court issued an Order upholding in part and reversing in part the Office of Natural Resources Revenue ("ONRR") 2016 Valuation Rule, 81 Fed. Reg. 43,338 (July 1, 2016) (the "Rule") (Appellant's Appendix ("Aplt. App.") 63-97); (ii) on September 8, 2021, the district court entered a final judgment (Aplt. App. 98-99); and (iii) on November 3, 2021, API filed a timely notice of appeal pursuant to Fed. R. App. P. 4(a)(1)(B) (Aplt. App. 100-101) from the part of the Order and judgment upholding the federal oil and gas valuation provisions of the Rule.

1

(D) This appeal is from a final judgment that disposed of all parties' claims.

## STATEMENT OF THE ISSUES PRESENTED

Whether ONRR acted arbitrarily and capriciously or *ultra vires* under the APA, 5 U.S.C. § 706(2), and governing federal oil and gas leasing statutes, in rewriting longstanding federal oil and federal gas royalty valuation regulations at 30 C.F.R. Part 1206 via the 2016 Rule's:

1.      Sudden and unexplained redefinition of non-deductible "gathering" costs for subsea bulk movement of oil and gas to preclude deduction of lessees' transportation costs from downstream sales prices to determine royalty value at the lease, thereby improperly inflating royalty value;[1]

2.      Imposition of inflexible caps on transportation and processing allowances that lessees are entitled to deduct to determine the value of production, regardless of lessees' reasonable, actual costs to transport or process federal oil and gas production, thereby improperly inflating royalty value;[2]

3.      Premium assessed for index-based valuation of federal gas based on that method's alleged administrative convenience, reliance on unattainable values, and improper location adjustments, thereby improperly inflating royalty value;[3]

_____

[1] This is one of the ultimate issues in the case, was raised in the Petition for Review, and was ruled on below.  *See* Aplt. App. 29; Aplt. App. 72-77.
[2] This is one of the ultimate issues in the case, was raised in the Petition for Review, and was ruled on below.  *See* Aplt. App. 28; Aplt. App. 77-79.
[3] This is one of the ultimate issues in the case, was raised in the Petition for Review, and was ruled on below. *See* Aplt. App. 29; Aplt. App. 79-83.

2

4.      "Default provisions" and unbounded triggering circumstances enabling limitless and standardless after-the-fact re-valuation by ONRR of federal oil and gas lessees' production;[4] and

5.      Disregard and displacement of lessees' valid contracts.[5]

## STATEMENT OF THE CASE

The district court recognized that ONRR's 2016 Rule "effectively changed how royalties owed to the federal government were calculated on oil, gas, and coal produced from federal lands and offshore leases as well as coal produced from Indian lands." Aplt. App. 99. The district court vacated the Rule's provisions regarding royalty valuation of federal and Indian coal based on their legal shortcomings. Yet, the district court did not apply the same level of scrutiny to the Rule's provisions regarding valuation for royalty purposes of oil and gas production from federal leases.

The district court upheld each of the Rule's challenged oil and gas provisions based solely on a few conclusory sentences by ONRR in the Rule's preamble, and on the proposition that ONRR has "discretion" to make "policy" choices to establish royalty value. In so doing, the district court failed to respond to most of API's arguments. Most problematically, the district court overlooked

---

[4] This is one of the ultimate issues in the case, was raised in the Petition for Review, and was ruled on below. *See* Aplt. App. 26-27; Aplt. App. 86-89.
[5] This is one of the ultimate issues in the case, was raised in the Petition for Review, and was ruled on below. *See* Aplt. App. 27-28; Aplt. App. 83-86.

(1) the lack of support for the Rule in the administrative record; (2) the Rule's conflict with basic tenets of federal royalty valuation established by the federal mineral leasing statutes and decades of agency implementation and case law consistent with statute; and (3) the Rule's numerous internal inconsistencies.  In fact, ONRR itself has repeatedly recognized the core flaws in its own Rule.

These deficiencies are contrary to dictates of reasoned agency decisionmaking required under the APA.  The Rule's "conclusory statements" and "unexplained inconsistency," parroted by the district court, render it legally deficient.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212, 224 (2016) ("This lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law.").  Also, ONRR fell far short of the requisite "substantial evidence" to save the Rule.  *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1576, 1580-81 (10th Cir. 1994); 5 U.S.C. § 706(2)(E).  Indeed, if ONRR's meager and unfounded statements here suffice, it is difficult to envision on what basis future ONRR or other federal agency actions will be found to violate the APA.

The Rule's one-sided restructuring of federal oil and gas royalty valuation is arbitrary and capricious, unsupported, and *ultra vires*.  This Court thus should reverse the district court and vacate the Rule's federal oil and gas provisions as well.  At a minimum, the Court should vacate the Rule's indisputably severable provisions foreclosing deductions long-established as necessary to properly

4

determine royalty value consistent with lessees' statutory and contractual obligations—namely, the Rule's blanket denial of offshore subsea transportation (30 C.F.R. §§ 1206.20, 1206.110(a)(1)(ii), and 1206.152(a)(2)(ii)) and arbitrarily hard caps on transportation and processing allowances (30 C.F.R. §§ 1206.110(d)(1) & (2), 1206.152(e)(1) & (2), and 1206.159(c)(2), (3), & (4)).

## I.    FACTUAL BACKGROUND

Generally, federal oil and gas lessees must value their production and report and pay royalties by the end of the calendar month following the production month.[6]  30 U.S.C. § 1724(c)(2); 30 C.F.R. § 1218.50(a).  Untimely or insufficient royalty payments are subject to underpayment interest or potentially other consequences of noncompliance.  *See* 30 U.S.C. § 1721(a); 30 C.F.R. § 1218.202(a)-(e); 30 C.F.R. part 1241.

In 1988, the agency adopted its first set of comprehensive regulations governing oil and gas valuation.[7]  *See* 53 Fed. Reg. 1,184, 1,186 (Jan. 15, 1988) (oil); 53 Fed. Reg. 1,230, 1,259 (Jan. 15, 1988) (gas).  Existing administrative and

---

[6] Lessees typically use Form ONRR-2014.  *See* https://www.onrr.gov/reportpay/PDFDocs/2014.pdf.

[7] ONRR's predecessor, the Minerals Management Service ("MMS") promulgated the 1988 regulations.  Over the last 40 years, responsibility for administering the federal royalty program has passed through three agencies: the U.S. Geological Survey (1946-1981); MMS (1981-2011); and ONRR (2011-present).  *See also* Aplt. App. 35 (district court preliminary injunction Order recognizing ONRR currently administers the royalty program).  We refer to these agencies collectively as "ONRR" or "the agency" unless otherwise noted.

judicial precedents had already established the principle that, under the federal

mineral leasing statutes and the lease terms requiring payment of royalty on the

"value of production," if a lessee sold production at a point remote from the lease

or unit and computed royalty on the basis of the sales price at that point, the lessee

could deduct the cost of transporting the oil or gas to the distant point of sale in

calculating the royalty value "at the lease."  *See infra* Argument Section II.

Consistently, the 1988 rules codified full transportation and processing allowances

necessary to calculate royalty value at the lease.  53 Fed. Reg. at 1,257 ("The MMS

believes generally that royalty should be free of cost.  However, values may need

to be adjusted for transportation and/or processing to determine value at the

lease.").

The 1988 rules also afforded more certainty to lessees in the first instance in

establishing value, and removed the agency from routine and unbounded initial

valuation determinations.  53 Fed. Reg. at 1,248 (regulations intended to "allow[]

the lessee some certainty in determining its own value without dependence upon

[ONRR] to establish the value."); *id.* at 1,250 ("MMS is satisfied that ultimately

the lessee will be able to determine the proper royalty value for its gas.").  In doing

so, the agency addressed lessees' frustration with paying royalties on what they

thought was the proper value, and then years later receiving agency demands for

additional royalties that were based on the agency's re-determinations of royalty

6

value, and assessments of substantial amounts of underpayment interest at the high statutory rate under 30 U.S.C. § 1721(a).

This regulatory scheme has largely endured and was well-understood by industry and the agency alike. The federal oil valuation regulations were amended in 2000 to adopt an index-based valuation methodology in lieu of "benchmarks" for valuation of non-arm's-length dispositions, and as an option to chasing gross proceeds under arm's-length sales to the downstream sale points. The agency made this change because the NYMEX price and Alaska North Slope price had become reliable index-based methods to value crude oil production. 65 Fed. Reg. 14,021, 14,022, 14,068 (Mar. 15, 2000). The Indian gas valuation regulations were amended in 1999, 64 Fed. Reg. 43,506, 43,515 (Aug. 10, 1999), and the Indian oil valuation regulations were amended in 2015, 80 Fed. Reg. 24,794, 27,904, 24,805 (May 1, 2015), to reflect more reliance on index-based values and certain royalty valuation terms unique to Indian oil and gas leases. The 2016 Rule and this appeal do not involve Indian oil and gas royalty valuation.

The Rule on appeal turned back the clock 30 years on royalty valuation. As the district court acknowledged, "ONRR intend[ed] that the final regulations will be revenue neutral." Aplt. App. 66. Yet, the proposed Rule included sea changes to royalty valuation, with increased financial burdens, fueled by unsubstantiated concerns. API and other affected stakeholders provided voluminous comments on the proposed Rule's federal oil and gas provisions, including detailed legal

arguments and economic analyses, but to no avail.  *E.g.*, AR_1450; AR_301.  The
district court understated that ONRR "enacted most of the amendments first set
forth by ONRR in its proposed rule."  *See* Aplt. App. 67.  In fact, ONRR made
almost no substantive changes between the proposed and final Rule.  The district
court's earlier preliminary injunction opinion captured nearly all of these minor
alterations.  Aplt. App. 51-52.  The Rule's preamble text responding to comments
provided scant or no reasoning for retaining the Rule as proposed.  The result was
a Rule with new provisions that clearly were outliers in the decades of federal
royalty valuation.

Unsurprisingly, shortly after finalizing the Rule, ONRR began to publicly
recognize the Rule's significant defects, in line with commenters' prior warnings.
ONRR represented in another court that the "[p]roblems with the Rule surfaced
soon after publication."  Fed. Defs. Cross-Mot. for Summ. J, *State of California v.
U.S. Dep't of the Interior*, No. 5498, ECF No. 57, at 3 (N.D. Cal. Oct. 10, 2018).
Though ONRR conducted "trainings," they largely mirrored the Rule or reflected
confusion even within the agency, rather than providing meaningful
implementation guidance in response to widespread industry questions.  *See, e.g.*,
*Becerra v. U.S. Dep't of the Interior*, 276 F. Supp. 3d 953, 956 (N.D. Cal. 2017)
("trainings revealed some confusion about the Rule . . . . ONRR responded that it
could not provide guidance before the January 1, 2017 effective date and could not
guarantee guidance by the end of February"); 82 Fed. Reg. 36,934, 36,935 (Aug. 7,

2017) ("The feedback we received through the training sessions and guidance requests revealed certain unforeseen defects in, or unintended consequences of, portions of the [2016] Valuation Rule.  Lessees raised multiple questions that ONRR had not previously considered and was not prepared or able to answer . . . .").  The district court overlooked such ONRR concerns with its own Rule, even during the same Obama Administration that adopted it.

These pervasive shortcomings precipitated not only the present litigation, but also multiple agency efforts to replace the Rule.  Under 5 U.S.C. § 705, before the first royalty reports under the Rule were due, ONRR "postponed the effectiveness of the [Rule] pending judicial review."  82 Fed. Reg. 11,823, 11,824 (Feb. 27, 2017).  ONRR did so to "preserve the regulatory status quo" because it "f[ound] that justice so requires."  *Id.* at 11,823.  Despite ongoing litigation challenging the Rule in the district court, environmental groups and the States of California and New Mexico (Intervenors-Respondents here) then ventured to a different forum, the U.S. District Court for the Northern District of California, to vacate ONRR's postponement.  That court found that ONRR had misinterpreted the first sentence of 5 U.S.C. § 705 in lieu of engaging in a new rulemaking.  *Becerra*, 276 F. Supp. 3d at 965-66.  Yet, that court denied Plaintiffs' request to reinstate the Rule because the agency was undertaking such a repeal rulemaking.  *Id.* at 967.

ONRR then completed the full notice-and-comment rulemaking process to

9

repeal the Rule. 82 Fed. Reg. 36,934 (Aug. 7, 2017) ("Repeal Rule"). The Repeal Rule was based on acknowledged legal defects in the 2016 Rule, many of which are the same issues API has raised in this litigation. The same parties again sued in the Northern District of California to vacate the Repeal Rule. The California court agreed and ruled against ONRR on summary judgment, finding the Repeal Rule deficient under the APA because it required more explanation and public process. *California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1179 (N.D. Cal. 2019). Notably, the court's opinion did not address the reinstated Rule's merits, or the consequences of its abrupt implementation. Nor did it even mention specific key Rule provisions central to the current litigation, such as ONRR's reversal of oil and gas subsea transportation allowances and inflated index methodology. It also dismissed other claims against the Repeal Rule. *Id.* at 1178.

Following vacatur of the Repeal Rule, ONRR announced in a "Dear Reporter" letter that the Rule now applies to "all oil, gas, and coal production from January 1, 2017, forward," and full compliance must occur by January 1, 2020. *See* ONRR Reporter Letters, https://www.onrr.gov/DearRep.htm (June 13, 2019). ONRR thus required lessees to come into compliance retrospectively for the last two and a half years and prospectively by January 1, 2020.[8] ONRR twice extended

---

[8] ONRR then reissued the 2016 Rule in the same form and with retroactive effect. *See* 85 Fed. Reg. 62,016 (Oct. 1, 2020). ONRR took this ministerial step to ensure the Code of Federal Regulations reflected the reinstatement of the Rule following the California district court order vacating the 2017 Repeal Rule. *Id.*

10

the deadline because it had afforded insufficient time for compliance.  *See id.*
(Nov. 20, 2019 and June 30, 2020).

ONRR then proposed a rule amending many of the disputed Rule provisions
for future production.  85 Fed. Reg. 62,054 (Oct. 1, 2020).  ONRR there again
acknowledged the merits of API's arguments in this litigation.  ONRR considered
public comments and then published that final rule.  86 Fed. Reg. 4,612 (Jan. 15,
2021).  However, before that rule's effective date, the incoming Administration
subsequently twice delayed, summarily proposed to withdraw, and then did
withdraw that rule.  86 Fed. Reg. 9,286 (Feb. 12, 2021); 86 Fed. Reg. 20,032 (Apr.
16, 2021); 86 Fed. Reg. 31,196 (June 11, 2021); 86 Fed. Reg. 54,045 (Sept. 30,
2021) (final rule).  As a result of these actions, ONRR retained the 2016 Rule's
federal oil and gas provisions that had been subject to extensive criticism by the
agency itself as well as by interested stakeholders.

## II.    PROCEDURAL HISTORY

API and coal Petitioners first filed petitions in the district court more than
five years ago amid their and their members' concerns with the Rule's departure
from longstanding federal royalty valuation principles.[9]  At ONRR's request, the
district court stayed those cases while ONRR reevaluated the Rule in light of its

---

[9] *API v. U.S. Dep't of the Interior*, No. 16-316 (D. Wyo. filed Dec. 29, 2016);
*Cloud Peak Energy Inc., et al. v. U.S. Dep't of the Interior*, No. 16-315 (D. Wyo.
filed Dec. 29, 2016); *Tri-State Generation and Transmission Ass'n, Inc., et al. v.
U.S. Dep't of the Interior*, No. 16-319 (D. Wyo. filed Dec. 29, 2016).

11

acknowledged shortcomings and the filed litigation. *API*, No. 16-316, ECF No. 15
(Mar. 24, 2017). After ONRR adopted the final Repeal Rule that reinstated the
pre-2016 regulations, API and the coal Petitioners voluntarily dismissed their
litigation without prejudice. *Id.*, ECF No. 23 (Nov. 3, 2017); Fed. R. Civ. P.
41(a)(1)(A)(i).

After the California court vacated the Repeal Rule, API and the coal
Petitioners refiled their 2016 Rule challenges in the district court. Shortly
thereafter, all Petitioners moved for a preliminary injunction of the Rule. On
October 8, 2019, the district court granted the motion with respect to the Rule's
coal provisions, but denied it with respect to the Rule's oil and gas provisions,
pending receipt of a complete administrative record and merits briefing. Aplt.
App. 61-62 ("The findings and conclusions set forth herein 'do not constitute a
determination on the merits, but are preliminary findings in the context of the
limited evidence presented at the hearing for a preliminary injunction.'") (citation
omitted).

After merits briefing by the parties, the district court declined oral argument,
and entered an order and judgment on September 8, 2021. Aplt. App. 63-99. The
district court permanently vacated the Rule's coal provisions under the APA. Aplt.
App. 97. Those provisions were found "arbitrary and capricious, an abuse of
discretion, and otherwise not in accordance with law." *Id*. However, the district

court denied and dismissed API's challenge to the Rule's federal oil and gas

provisions.  *Id.*  API now appeals to this Court.  *See* Aplt. App. 100-101.

## SUMMARY OF ARGUMENT

ONRR's 2016 transformation of its federal oil and gas royalty valuation

regulations is arbitrary, capricious, and *ultra vires*.  The district court improperly

licensed ONRR to pay lip service to established, undisputed tenets of royalty

valuation—including that the value of production for royalty purposes must be

established at the lease—while simultaneously violating them; to summarily

eschew decades of consistent agency practice; and to ultimately inflate and inject

needless uncertainty into royalty valuation.  This Court should reverse.

In essence, based on its upfront observation that the Mineral Leasing Act

("MLA") and Outer Continental Shelf Lands Act ("OCSLA") lack an express

definition of "value," the district court (1) inferred that ONRR has free rein to

inflate federal oil and gas royalty valuation whenever and however it sees fit; and

(2) deemed API's challenge as merely to the "wisdom" of "policy choices" by

ONRR.  Both propositions are incorrect.  Despite extensive briefing on point, the

district court was silent on the legality of ONRR's unsupported departure from

decades of consistent valuation principles, and on the stricter scrutiny to be applied

in this circumstance.  The district court wholly deferred to ONRR's unfounded

"belief" that its reversal in position was "better," instead of addressing key

arguments and authorities presented by API.  Indeed, each time the district court

13

stated that ONRR "explained" its position, it pointed to nothing more than conclusory sentences in the Rule's preamble.  The Northern District of California vacated ONRR's 2017 Repeal Rule on the basis of ONRR's "conclusory" statements, yet the district court here unquestioningly accepted them to affirm the 2016 Rule.  ONRR's contentions in the 2016 Rule should receive no less scrutiny.

Core provisions of the Rule cannot withstand proper scrutiny.  *First*, as a matter of law, the Rule nowhere explains or substantiates why all subsea movement of bulk oil and gas on the deepwater Outer Continental Shelf ("OCS") that was formerly deductible transportation to determine value at the lease is suddenly non-deductible gathering.  No prior case—court or administrative—has deemed such OCS movement beyond the adjacent lease, and as far as 50 miles toward available markets, as "gathering."  API's comments on the Rule and briefing refuted all authority ONRR and the district court did cite, with no response by either ONRR or the district court.   Moreover, despite recognizing deepwater lessees' reliance on deductible transportation costs in investing billions of dollars over the last 20-plus years for ongoing operations, the district court simply accepted ONRR's incongruous finding that ONRR's reversal in position would not affect existing operations.

*Second*, another arbitrary and categorical denial of proper deductions is the Rule's imposition of hard caps on transportation and processing allowances, despite higher actual costs the lessee incurs in providing those value enhancements

14

to production.  The district court conceded that certain lessees thus could not deduct legitimate transportation or processing costs, but paid them no heed simply because "the vast majority" of lessees do not incur such costs, ignoring the improper burden placed on those lessees who do.  The district court also failed to harmonize those provisions with allowed deductions for verified reasonable, actual costs in other sections of the Rule, or with ONRR's rejection of such inflexible limits for valuing federal and Indian coal and Indian oil.

*Third,* the Rule's index methodology effectively imposes an arbitrary pay royalty on the highest price available anywhere standard.  But ONRR statutorily may collect royalty only on the value of the production, not some theoretical but unattainable value, or a value that includes an enhancement for convenience of using an index-based method.  30 U.S.C. § 226; 43 U.S.C. § 1337.  The district court recognized that the Rule requires royalty to be paid based on a convenience fee or on a value lessees cannot obtain for their production, yet inexplicably endorsed it.  That is patently unlawful.

*Fourth*, the Rule's various "default provisions" and countless triggers contradict the Rule's stated goal of "simplicity, certainty, clarity, and consistency" in royalty valuation elsewhere touted by the district court.  The Rule's default provisions devolve federal oil and gas royalty valuation into a high-stakes guessing game at lessees' sole risk of determining a royalty value that ONRR several years later may deem inadequate, without even demonstrating error in the lessees'

15

valuations under the regulations. The default provisions render lessees unable to meaningfully appeal ONRR's substitute valuations due to lack of access to ONRR's data that the agency will use to make its value determinations. To be sure, ONRR's largely unbridled discretion under the default provisions defeats the purpose and need of having regulations in the first place.

*Fifth*, the Rule eviscerates undisputedly valid federal oil and gas contracts that merely are not fully signed by all parties, or that diverge by more than 10 percent from a sales price or transportation or processing cost that ONRR circularly and after-the-fact defines as "unreasonably low" or "unreasonably high," respectively. These arbitrary standards defy actual business practices and fail to justify the extreme remedy of ONRR unilaterally levying its own valuation.

Accordingly, this Court should reverse and vacate the Rule's federal oil and gas provisions. The Rule's flaws are so fundamental and pervasive as to warrant the complete vacatur of those provisions. The legality of the pre-Rule regulatory system under the governing statutes has never been questioned, and those regulations are well-understood based on decades of practice. If the Court considers a partial remedy, however, the Court may readily sever the challenged provisions on transportation and processing allowances, apart from other Rule provisions that more comprehensively specify pre-allowance valuation methodologies for federal oil and gas.

16

## STANDARD OF REVIEW

Appellate review in this Circuit is de novo.  This Court "owe[s] no deference to the district court's decision." *Sac & Fox Nation v. Norton,* 240 F.3d 1250, 1260 (10th Cir. 2001); *see also Santa Fe Energy Prod. Co. v. McCutcheon*, 90 F.3d 409, 413 (10th Cir. 1996) ("[o]nce appealed, the district court's decision is afforded no particular deference").  "Our standard of review of the lower court's decision in an APA case is de novo." *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.,* 248 F.3d 1277, 1281 (10th Cir. 2001).

Under the APA, courts "shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).  Judicial review of ONRR's Rule is based on the law and administrative record.  *See Olenhouse v. Commodity Credit Corp*, 42 F.3d 1560, 1575 (10th Cir. 1994).  "These standards require the reviewing court to engage in a 'substantial inquiry.'" *Id.* at 1574 (10th Cir. 1994).  As the same district court found in another case, "[t]he agency must provide a reasoned basis for its action and the action must be supported by the facts in the record." *Wyoming v. U.S. Dep't of the Interior*, 493 F. Supp. 3d 1046, 1061 (D. Wyo. 2020) (citing *Olenhouse*, and vacating 2016 Interior agency rule on flaring of gas from federal and Indian leases).

"Agency action is arbitrary if not supported by 'substantial evidence' in the administrative record." *Id.* (citing *Olenhouse*). "Evidence is not substantial if it is overwhelmed by other evidence . . . or if it constitutes mere conclusion." *Olenhouse*, 42 F.3d at 1581. Courts "do not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (internal citation omitted).

An "'[u]nexplained inconsistency" in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice'" and receives no deference. *Encino Motorcars*, 579 U.S. at 22. The Supreme Court has made clear that the agency's burden is greater when reversing its longstanding position that engendered reasonable reliance by the regulated community.

> [T]he APA contains a variety of constraints on agency decisionmaking—the arbitrary and capricious standard being among the most notable. As we held in *Fox Television Stations*, and underscore again today, the APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary and capricious to ignore such matters.

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) (citations and quotations omitted); *see also Encino Motorcars*, 579 U.S. at 222 (in cases of policy reversals, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy") (citation omitted).

18

## ARGUMENT

## I.    THE DISTRICT COURT ERRED BY UNCRITICALLY ACCEPTING ONRR'S UNSUPPORTED CONCLUSIONS.

The district court did not hold ONRR to its burden of providing substantial evidence and reasoned explanations to justify its Rule's restructuring of federal oil and gas royalty valuation.  The district court referenced in passing this Circuit's seminal *Olenhouse* decision, but failed to apply its standards for APA review of ONRR's Rule.  Aplt. App. 70.  Rather, the district court essentially rehashed its preliminary injunction opinion written before receiving the complete administrative record, and simply restated ONRR's *ipse dixit*.  Like in *Encino Motorcars*, here "the Department said almost nothing" beyond "conclusory statements" to justify a "regulation that is inconsistent with the Department's longstanding earlier position."  *See* 579 U.S. at 223-24. (2016).  The district court erroneously excused this failing.

The district court's quoted snippets from the Rule's preamble comprise the *entirety* of ONRR's proffered justification and evidence for the Rule.  The parties agreed in October 2019 that ONRR "should lodge the complete administrative record."  *Cloud Peak*, No. 19-120, ECF No. 69 at ¶ 7.[10]  ONRR obtained multiple stays of this litigation over the course of a year to produce that record prior to

---

[10] All ECF citations to the present litigation are to the lead case docket in the district court, No. 19-120, unless otherwise noted.

merits briefing.  *See id.*, ECF Nos. 66, 70, 75, 80.  The resulting administrative

record contains not a single document with legal analysis or factual data supporting

the Rule, and the district court and ONRR cited to none.  Indeed, ONRR's

administrative record consists principally of public comments, non-substantive

communications, and duplicate files.

As demonstrated in the above standard of review discussion, ONRR's "mere

conclusion" is insufficient to uphold the Rule.  *Olenhouse*, 42 F.3d at 1581.  That

is, ONRR cannot just disavow and cast aside prior findings and understandings

without providing a reasoned basis supported by concrete evidence.  The law

requires that the Rule and its administrative record *"show"*—not just *say*—that

"there are good reasons for the new policy."  *F.C.C. v. Fox Television Stations,

Inc.*, 556 U.S. 502, 515-16 (2009) (emphasis added); *see also Humana of Aurora,

Inc. v. Heckler*, 753 F.2d 1579, 1583 (10th Cir. 1985) ("The connection between

the rule-making record and the action ultimately taken is too attenuated to uphold

the regulation.").

Even where discretion exists, the Supreme Court has "frequently reiterated

that an agency must cogently explain why it has exercised its discretion in a given

manner."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.

Co.*, 463 U.S. 29, 48 (1983).  As this Court similarly has made clear, "the grounds

upon which the agency acted must be clearly disclosed in, and sustained by, the

record. . . . The agency must make plain its course of inquiry, its analysis and its

20

reasoning." *Olenhouse*, 42 F.3d at 1575; *see also Devon Energy Prod. Co. v. Gould*, 421 F. Supp. 3d 1213, 1222 (D. Wyo. 2019) (quoting *Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.*, 56 F.3d 1243, 1250 (10th Cir. 1995) (order vacating ONRR Director decision).  ONRR thus must demonstrate that its Rule rests on substantial evidence, is administratively workable, and respects industry reliance interests.

The Rule, however, offers nothing more than bald conclusions devoid of factual evidence or legal explanation.  As such, the district court erred in relying on them.  For example, whereas the district court averred that ONRR "explained" its hard caps on allowances, the district court could only point to ONRR's (erroneous) bottom-line conclusion that they were "adequate" and "ensure a fair return to the public and to limit ONRR's administrative costs."  Aplt. App. 78.  Similarly, the district court stated that the Rule's inflated index-based valuation of federal gas was "advanced with supporting data and reasons after a full consideration of the matter," but pointed to no such data or reasons in the record.  Aplt. App. 82.  The district court additionally acceded to ONRR's assertion that "the default provision will always establish a reasonable value of production **using market-based transaction data**," without any question of why or how that would necessarily occur.  Aplt. App. 88 (emphasis in original).  Nor is it enough that the Rule dismissed API's and other commenters' identification of the Rule's flaws when it

was proposed.  *Perez*, 575 U.S. at 96 ("An agency must consider and respond to significant comments received during the period for public comment.").

ONRR did not identify substantial evidence and sufficiently explain the basis for adopting key changes to federal oil and gas royalty valuation.  Thus, these changes are not the product of a reasoned agency decisionmaking process and are legally deficient under the APA.  The district court impermissibly gave ONRR a pass, and should be reversed.  *See Olenhouse*, 42 F.3d at 1565 ("[Courts] must find and identify substantial evidence to support the agency's action and may affirm agency action, if at all, only on the grounds articulated by the agency itself.").

## II.    THE DISTRICT COURT ERRED BY DEFERRING TO THE RULE'S LEGAL DEFICIENCIES AS POLICY CHOICES.

The district court downplayed as ONRR "policy choices" the Rule's departure from core legal tenets of royalty valuation.  Aplt. App. 96.  But the Rule's legal flaws are not simply poor policy choices.  The district court inferred that ONRR had latitude to write the Rule on a blank slate because "value" of production is not statutorily defined.  Aplt. App. 66 ("Additionally, as the statutes do not define the 'value' of the production, the DOI Secretary and ONRR possess the authority and discretion to do so.").  The district court points to no affirmative basis for such wide-ranging discretion.  More pointedly, that premise ignores ONRR's departure from bedrock legal principles of royalty valuation grounded in

statute and confirmed through longstanding agency interpretation and application of that statutory authority.

Most notably, the district court does not dispute the foundational federal mineral valuation principle that valuation must occur at the lease, and not at some distant point downstream from the lease without an allowance for the full reasonable, actual costs of enhancing the production's value by moving it nearer to a market. This principle is rooted in uniform agency practice and court decisions in the many decades since Congress enacted the MLA and OCSLA. Indeed, case law recognized this principle that valuation must be "at the lease" even before adoption of the first agency regulations in 1988 expressly providing for transportation and processing allowances. *See United States v. Gen. Petroleum Corp. of California*, 73 F. Supp. 225, 235, 254, 258 (S.D. Cal. 1946), *aff'd sub. nom., Cont'l Oil Co. v. U.S.*, 184 F.2d 802, 820 (9th Cir. 1950) ("royalties were to be calculated at values at the wells, not at the . . . destination"). The same core principle endures to this day.[11] ONRR cogently explained this principle of

---

[11] *See, e.g.,* 53 Fed. Reg. at 1,186 (prior oil valuation final rule stating that "[ONRR] believes that costs incurred by a lessee to transport lease production to a delivery point off the lease increases its value and, therefore, is a recognized deduction."); *Indep. Petroleum Ass'n of Am. v. Armstrong*, 91 F. Supp. 2d 117, 119 (D.D.C. 2000) ("the essential bargain embodied in federal and Indian leases entitled the lessor to a royalty based upon the value of production at the lease"), *aff'd in part, rev'd in part on other grounds sub. nom., Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036 (D.C. Cir. 2002); *Black Butte Coal Co. v. United States*, 38 F. Supp. 2d 963, 971 (D. Wyo. 1999) (same principles for federal coal

valuation "at the lease" in amendments to its Indian oil transportation allowance

regulations in 2015, just one year before the 2016 Rule:

> In essence, transportation allowance accounts for the
> costs that a lessee must incur to move its production to a
> market and, therefore, captures the value at the lease. The
> lessor shares in this expense because the lessor reaps the
> benefit of selling its lease production at a market rather
> than at the wellhead. If the lessor were to take its
> royalties in kind (i.e. in barrels of oil), the lessor would
> then incur all of the cost of transporting the oil
> production to a market to sell the oil. To comply with this
> provision, for decades ONRR's regulations have allowed
> a lessee to deduct its transportation costs to calculate the
> value of their Indian oil production when it sells that oil
> at a location remote from the lease. See 53 FR 1184 (Jan.
> 15, 1988) (promulgating rule incorporating transportation
> allowances to determine the value of Federal and Indian
> oil production, for royalty purposes). ONRR has
> consistently allowed transportation costs because
> transporting oil to market off of the lease increases the
> value of the oil. Courts have upheld the use of
> transportation allowances as a means to calculate the
> value of oil production for royalty purposes.

80 Fed. Reg. 24,794, 24,799 (May 1, 2015) (citations omitted).

Tellingly, the Rule purports to uphold this basic tenet of royalty valuation.

*See* Aplt. App. 106 ("For example, nothing in this final rule changes the

Department's requirement that, for purposes of determining royalty, the value of

crude oil produced from Federal leases is determined at or near the lease."); Aplt.

App. 170 ("the Department reaffirms that the value, for royalty purposes, of crude

---

lease production); *Arco Oil and Gas Co.*, 109 IBLA 34 (1989); *Shell Oil Co.*, 52
IBLA 15 (1981).

oil and natural gas produced from Federal leases . . . is determined at or near the lease"). The Rule also left unchanged preexisting regulations allowing deduction of the "reasonable, actual costs" of transportation and processing. *See* 30 C.F.R. §§ 1206.110(a) (oil transportation); 1206.152(a) (gas transportation); 1206.159(a) (gas processing). But the Rule's unqualified denial of proper and full allowances, regardless of operating conditions, undercuts that principle. Indeed, inflexibly barring a lessee from taking a full allowance for its actual costs to move production to market necessarily yields a greater value than at the lease, and thus results in paying more royalty than actually owed under the MLA and OCSLA.

Thus, affording full regulatory transportation and processing allowances is not merely a matter of ONRR "discretion," but rather is legally required to determine valuation of federal oil and gas for royalty purposes consistent with the federal mineral leasing statutes. Despite being fully briefed on summary judgment, the district court failed to resolve the internal conflict between the Rule preamble's statements and the Rule's actual provisions, or to address this historical context of ONRR's rulemaking. The district court citation of *Indep. Petroleum Ass'n of Am. v. DeWitt* does not help ONRR, as that case *overturned* the agency's purported exercise of discretion in denying certain transportation allowances (i.e., unused firm demand charges for oil and gas pipelines). 279 F.3d 1036, 1042-43 (D.C. Cir. 2002). Like the agency's rationale there, the Rule offers little more than "raw ipse dixit" for its inflation of federal oil and gas royalty value. *Id.* at 1042. The district

court also cited the Federal Oil and Gas Royalty Management Act. *See* Aplt. App. 88. But that statute confers no valuation authority; it is an accounting, auditing, and enforcement statute for whatever royalties already are due under ONRR's adopted valuation regulations under the agency's MLA and OCSLA rulemaking authority. 30 U.S.C. § 1701, 1711, 1712(a).[12] For these reasons, any of the Rule's provisions that upend the principle of valuation at the lease are not simply policy choices available to the agency, but rather are legally indefensible.

The district court's overly deferential reference to "Executive branch prerogative to define and make changes in policy" also starkly conflicts with the Northern District of California's refusal to do so with the 2017 Repeal Rule on the same subject matter. *See* Aplt. App. 96-97. That court found the requisite "level of detail is lacking in the [Repeal Rule], which merely recites conclusions" rather than "any detailed analysis, supported by evidence." *California*, 381 F. Supp. 3d at 1173. Regarding ONRR's discussion of administrative costs, the court found "that conclusory statement—unsupported by facts, reasoning or analysis—is legally insufficient." *Id.* at 1169. It further found other "conclusory assertions are inadequate, given that the ONRR failed to provide any data or analysis to support them." *Id.* at 1170. The district court at a minimum should have held ONRR to

---

[12] Further supporting this point, other than its penalty provisions, that statute does not even apply to federal or Indian coal leases. 30 U.S.C. § 1720a.

26

the same "obligation to explain the inconsistencies between its prior findings" and its Rule. *See id.* at 1168.

In any event, deference is not owed to reasons inconsistently applied within the Rule as further discussed *infra*, or that ONRR itself has repeatedly disavowed as discussed *supra*.[13]  Such "unexplained inconsistency" violates the APA. *Encino Motorcars*, 579 U.S. at 212; *see also Wyoming v. U.S. Dep't of the Interior*, 493 F. Supp. 3d 1046, 1084 (D. Wyo. 2020) (same); *Renewable Fuels Ass'n v. U.S. Env't Prot. Agency*, 948 F.3d 1206, 1255 (10th Cir. 2020) (same), *cert. granted sub nom. on other grounds*, *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 974 (2021).

## III.    THE DISTRICT COURT ERRED BY UPHOLDING THE RULE'S DENIAL OF SUBSEA TRANSPORTATION ALLOWANCES.

The Rule assigns its greatest economic impact to its blanket re-definition of the costs of deepwater movement of bulk federal oil and gas over many miles as being for non-deductible "gathering" rather than deductible transportation. 30 C.F.R. §§ 1206.20, 1206.152(a)(2)(ii), & 1206.110(a)(2)(ii).  As a result, the cost of "any" such movement from a wellhead on a lease to an off-lease platform *anywhere* on the OCS is categorically ineligible for a transportation deduction in valuing production, no matter the distance production is moved toward market.  30

---

[13] To be sure, the Rule's coal valuation provisions that both the district court and ONRR in this litigation found misguided were no less a "choice" in 2016 than the rest of the Rule.

C.F.R. § 1206.20.  Lessees cannot even *request* such an allowance, or *preserve* such an allowance for ongoing operations on already existing leases.

The district court blessed ONRR's two stated reasons for this blanket prohibition of any such allowance: "because it had effected its purpose of encouraging deepwater leasing in the past and to apply more uniformly the 'gathering' definition to all resources."  Aplt. App. 74.  Both reasons are wrong.  The Rule and administrative record fail to support either that all deepwater bulk movement necessarily is "gathering," or that transportation deductions for such costs are now obsolete.  By instead disregarding the unique context in the deepwater OCS for long-distance movement of production, and ongoing reliance by lessees, ONRR's Rule both "entirely failed to consider an important aspect of the problem" and "failed to base its decision on consideration of the relevant factors."  *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009).

To be clear, the key problem is not merely ONRR's reversal in position, but its creation of an arbitrary, categorical prohibition in its regulations.  While not all subsea movement must be transportation, proclaiming that *no* subsea movement to the first platform can *ever* qualify for a transportation allowance, no matter the distances or other facts involved, is arbitrary and capricious given the substance and history of this issue and the unique circumstances on the OCS.  At a minimum,

to ensure that value is properly established at the lease, lessees must retain

flexibility to claim and defend such transportation deductions case-by-case.

### A.  The District Court Erred by Equating All Subsea Bulk Movement of Oil and Gas with Non-Deductible Gathering.

There is no dispute that what historically were recognized as gathering costs

are non-deductible.  The main fallacy in the Rule's redefinition of "gathering,"

however, is that it simply presumes, without support, that *no* subsea bulk

movement of oil and gas on the deepwater OCS ever can qualify as transportation.

Though ONRR's prior position on subsea transportation, captured in its 1999

"Deep Water Policy," licensed no gathering allowance, it is unnecessary for this

Court to presently decide that issue.  It suffices that it was incumbent on ONRR in

its Rule to justify ONRR's unyielding departure from its long-held interpretation

and vast expansion of "gathering," and the Rule failed to do so.  It was not for the

district court to supply or excuse that justification.

The district court, like the Rule, failed to grapple with the actual terms of the

"Deep Water Policy."  The Policy expressly specified that "[t]o qualify for a

transportation allowance, the movement must be to a facility that is not located on

a lease adjacent to the lease on which the production originates."  Aplt. App. 237.

It foreclosed allowances in determining the royalty value of oil or gas moved

within a deepwater lease or to any of the eight surrounding leases "with at least one

point of contact with the producing lease/unit."  *Id.*  It recognized that such

"[m]ovement prior to a central accumulation point is considered gathering." *Id.*
The Rule proffered no evidence of OCS lessees claiming gathering allowances, or
of the agency turning a blind eye in enforcement over the many ensuing years.
Tellingly, the Deep Water Policy was never challenged while in effect.

The agency's prior interpretation did not appear out of wholecloth; it was
well-grounded and well-vetted, unlike the cursory Rule provisions.  In July 1998,
during its rulemaking process resulting in valuation rule amendments for federal
oil in 2000, the agency specifically "requested comments on the definition of
'gathering' as related to deepwater leases involving subsea production without a
platform but with long-distance movement of bulk production."  65 Fed. Reg.
14,022, 14,046 (Mar. 15, 2000) (final rule); *see also* 63 Fed. Reg. 38,355, 38356-
57 (July 16, 1998) (further supplementary proposed rule).  The submitted
comments, including those from API, explained at length why such costs are more
appropriately deemed allowable transportation costs.  The comments explained
that the historical concept of gathering from onshore or shallow water
development, wherein field processes take place on or near the lease, failed to
translate to the deepwater OCS where it is infeasible and undesirable to construct
platform facilities on every lease.  In these areas, a subsea manifold or other
collection point can effectively serve the function of the first surface facility.[14]

_____

[14] *See, e.g.*, Science Direct, quoting Yong Bai, Qiang Bai, Subsea Engineering
Handbook (Second Edition), 2019, at 1.4.1 ("Subsea manifolds are installed on the

30

Subsea pipelines also entail greater costs and risks borne solely by the lessee, including those for fabrication, installation, operation, and maintenance.  To deny transportation allowances for subsea pipelines necessary to bring production across greater distances to shared platforms, and toward markets, would frustrate royalty valuation at the lease and arbitrarily discriminate based on the technology utilized.

In response, the agency ultimately determined it was unnecessary to redefine gathering to include subsea transportation.  Rather, the agency in 1999 issued the Deep Water Policy resolving the issue by confirming that movement of oil or gas long distances on the deepwater OCS may qualify as transportation.  *See* AR_80016-17.  A year later, the agency's final rule acknowledged this guidance and did not revise the regulatory definition of gathering to include such movement.

The district court was silent on this history and the unique features of the deepwater OCS compared to onshore.  OCS lease blocks are approximately 9 square miles each.[15]  Inherent physical and cost barriers preclude lessees from constructing platforms or central production facilities on every OCS lease.  Moreover, the government's express regulatory preference is to minimize the

---

seabed within an array of wells to gather production or to inject water or gas into wells."), https://www.sciencedirect.com/topics/engineering/subsea-manifold#:~:text=Overview%20of%20Subsea%20Engineering&text=The%20man ifold%2C%20as%20shown%20in,water%20or%20gas%20into%20wells.
[15] Bureau of Safety and Environmental Enforcement Glossary (defining "Block"), https://www.bsee.gov/newsroom/library/glossary#:~:text=Blocks%20are%20porti ons%20of%20OCS,square%20miles%20or%202%2C304%20hectares.

number of OCS platforms and facilities for the efficient exploration, development, and production of offshore oil and gas resources, and to facilitate marine safety. *See* 30 C.F.R. § 250.1301(c). Given the relative paucity of OCS surface facilities, movement of production from the subsea manifold may necessitate long travel distances to the first platform or central production facility, including joint platforms or tie-back facilities. Further bolstering the Deep Water Policy, it was clarified contemporaneously with the new technological advances supporting expanded deepwater OCS development beginning in the mid- to late-1990s. *See, e.g.*, *Watt v. Alaska*, 451 U.S. 259, 272-73 (1981) ("The Department's contemporaneous construction carries persuasive weight . . . . The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference.").

The district court relied on *Kerr-McGee Corp.*, 147 IBLA 277 (1999). Aplt. App. 75-76. ONRR's proposed Rule preamble likewise asserted: "Under Kerr-McGee, almost all of the movement the Deep Water Policy allows as a transportation allowance is, in actuality, non-deductible 'gathering' under ONRR's current valuation regulations." Aplt. App. 185. But that administrative case stands for no such thing. The agency was aware of the earlier *Kerr-McGee* decision when subsequently issuing its Deep Water Policy. Moreover, the Interior Board of Land Appeals ("IBLA") there merely denied retroactive transportation allowances for production from "adjacent leases." *Kerr-McGee*, 147 IBLA at 283 ("We agree

that, even though production is moved across lease boundaries, because it is treated and sold on adjacent leases the costs of moving it there are properly regarded as gathering, not transportation. . . . We conclude that MMS correctly determined that Kerr-McGee was not entitled to reimbursements for the costs of gathering and accumulating the gas under the circumstances of this case."). As quoted above, this principle of close proximity or adjacency inherent in the concept of gathering is expressly reflected in the Deep Water Policy's exclusion of allowances for leases with at least one point of contact with the producing lease. Aplt. App. 237. Indeed, in *Kerr-McGee*, the agency itself took the position that transportation involved moving production "remote from the lease or field."[16] 147 IBLA at 282.

No case holds otherwise. The Rule cited *California Co. v. Udall*, 296 F.2d 384 (D.C. Cir. 1961), but that case has nothing to do with gathering, transportation, or OCS leases. Indeed, that court made clear that the Secretary was *not* claiming royalty for long-range movement of oil and gas, unlike the Rule now does. *Id.* at 387 ("Let us here insert a cautionary parenthesis. *No transportation costs are involved in this case.* The Secretary is *not* here claiming that costs incurred in moving gas from the field in the neighborhood of the wells to a *distant* selling

---

[16] The Rule elsewhere recognizes that transportation adjustments are needed for index valuation because "index pricing points are normally located off of the lease and, frequently, are at lengthy distances from the lease," but inexplicably ignores the same concept in foreclosing subsea transportation allowances for bulk oil and gas to travel lengthy distances. Aplt. App. 82; Aplt. App. 111-112.

point are includable in the royalty base. This gas was conditioned by the seller and

delivered to the purchaser in the field within a *short distance* of the wells.")

(emphasis added).  In a subsequent case citing *Kerr-McGee*, the IBLA further

clarified that "we in general have no objection" to the proposition that "'gathering'

refers only to well head and in-field movement of production."  *Murphy*

*Exploration and Prod. Co.*, 147 IBLA 386, 393, 396 (1998) (disallowing

transportation cost deductions because the Section 6 leases pre-dating OCSLA

stated "no gathering or other charges are made chargeable to the lessor" in

calculating royalty); *cf. Kretni Development Co. v. Consolidation Oil Corp.*, 74

F.2d 497, 500 (10th Cir. 1934) ("It may be conceded for the purpose of this case

that a lessee is obligated to put forward a reasonable effort to market gas produced

on the leased premises, but certainly that duty does not extend to the point of

providing pipe line facilities ninety miles in length at a large outlay of money with

an extending financial hazard due to possible exhaustion of the supply and other

frequently encountered factors, in order to reach a market at which the product

may be sold.").

Under the APA, ONRR cannot simply declare something that properly was

recognized as "transportation" for many years to now be "gathering," or ignore

relevant facts on the OCS.  That is especially true because the weight of authority

supports OCS transportation allowances for movement beyond the adjacent lease.

The district court was not free to ignore such authority and summarily affirm the

Rule's novel contrary interpretation.  Nor are such blanket denials valid just because they will be "consistent" or "reliable" for ONRR to render.  *See* Aplt. App. 76; Aplt. App. 105.  Moreover, any "administrative benefit" from forgoing these allowances does not outweigh the lost deductions, as evidenced by the fact that industry is challenging the Rule.  *See* Aplt. App. 76.  The Court accordingly should reject the Rule's changes to the definition of "gathering" in 30 C.F.R. § 1206.20, and corresponding changes to §§ 1206.152(a)(2)(ii) and 1206.110(a)(2)(ii).

## B.     The District Court Erred by Discounting Reliance Interests.

The district court admitted that "the Deep Water Policy undoubtedly engendered serious reliance interests within the industry."  Aplt. App. 74-75.  But the district court then brushed those serious reliance interests aside by summarily stating that "the policy has largely served its original purpose of incentivizing deepwater leasing and development."  Aplt. App. 76.

This claim is unsupported and indefensible.  Over the last two decades, companies have significantly expanded their activities into deeper water, collectively investing many billions of dollars on lease bonus bids, exploration, and development. In making those investment decisions at the time, these companies properly relied on their future ability to claim and justify transportation allowances where warranted for subsea movement of produced oil and gas.  Those *same* operations are ongoing, and those *same* companies still need those allowances for current production, and for years to come, to recoup those prior investments.

35

It is arbitrary for ONRR to acknowledge that the transportation allowance was an "incentive" to induce leasing and development activity, and then to retroactively pull it back after lessees reasonably relied on it and were in the midst of a multi-year recoupment of their investment. The Supreme Court requires ONRR to provide a more detailed justification "when its prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary or capricious to ignore such matters." *Fox*, 556 U.S. at 515; *see also Marathon Oil Co. v. Andrus,* 452 F. Supp. 548, 549 (D. Wyo. 1978) ("This Court cannot lose sight of the general rule that, when the executive department charged with the execution of a statute gives a construction to it and acts upon that construction for many years, the Court looks with disfavor upon a change whereby parties who have contracted in good faith under the old construction may be injured by a different interpretation."); *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 264 (1994) ("Retroactivity is not favored in the law.") (citation omitted). But the district court, like ONRR, precisely ignored such reliance matters. That was error.

## IV.  THE DISTRICT COURT ERRED BY AFFIRMING THE RULE'S CATEGORICAL DENIAL OF FULL TRANSPORTATION AND PROCESSING ALLOWANCES.

In addition to bulk subsea transportation, the Rule improperly places other artificial and inflexible constraints on oil and gas transportation and processing allowances for production from federal leases onshore and on the OCS. 30 C.F.R. §§ 1206.110(d)(1) (oil transportation allowance), 1206.152(e)(1) (gas

transportation allowance), 1206.159(c)(2) (gas processing allowance). First, regardless of the reasonable and actual costs a lessee incurs, the Rule flatly precludes any transportation allowance that exceeds 50 percent of the value of the oil or gas, or from seeking a gas processing allowance that exceeds 66.67 percent of the value of each gas plant product.[17] *Id.* Second, the Rule forecloses any extraordinary processing allowance against the value of processed residue gas. *See* former 30 C.F.R. § 1206.158(d)(2) (2015).[18] Third, the Rule immediately revokes ONRR's preexisting approvals of justified allowances in excess of these limits. 30 C.F.R. §§ 1206.110(d)(2), 1206.152(e)(2), 1206.159(c)(3) & (c)(4). The Rule bars lessees from even seeking such allowances when operational circumstances so warrant.

These newly inflexible caps are arbitrary and unsupported. The Rule, like the preexisting regulations, elsewhere expressly allows adjustments to royalty value for "reasonable, *actual*" costs of transporting and processing federal oil and gas. 30 C.F.R. §§ 1206.110(a), 1206.152(a), and 1206.159(a) (emphasis added). Moreover, the Rule did *not* deny that a lessee *may* necessarily incur actual costs exceeding the caps. But the Rule nowhere explains why such costs above the caps

---

[17] "Gas plant product" is defined as "separate marketable elements, compounds, or mixtures, whether in liquid, gaseous, or solid form, resulting from processing gas, excluding residue gas." 30 C.F.R. § 1206.20.

[18] For clarity, citations herein to the regulations superseded by the 2016 Rule are preceded by "former," and cite the immediately preceding 2015 version of the Code of Federal Regulations.

can never be deductible as reasonable, actual costs under the Rule. Nor does the Rule explain why *already proven and approved* allowances for such costs—upon which lessees have relied in structuring and conducting ongoing operations—are suddenly non-deductible marketable condition costs.

ONRR's rules have long included the initial 50 percent limit for transportation allowances and the 66.67 percent limit for processing allowances as a check to prevent lessees from over-claiming allowances. But the prior rules provided lessees an opportunity to obtain an allowance for their full transportation or processing costs exceeding those initial limits by demonstrating to the agency that their costs were reasonable and necessary. The Rule deprives lessees of that opportunity.

This new inflexibility contradicts the regulations' prior recognition that some oil and gas lessees necessarily incur costs that exceed costs in more traditional and fully developed areas of operation, and thus fully justify higher allowances. *See* former 30 C.F.R. §§ 1206.109(c)(2) (oil transportation allowance), 1206.156(c)(3) (gas transportation allowance), 1206.158(c)(3) (gas processing allowance) (2015). In general, more remote fields may incur higher transportation costs, while low-quality reservoirs may incur higher processing costs. The opportunity for lessees to seek higher allowances acknowledged the unique gas composition, complex gas processing plant designs, and high unit costs associated with atypical gas producing fields. Real world market scenarios, as

recently evidenced during the COVID-19 pandemic, also exist where oil and gas
pricing fluctuates (sometimes to very low levels) yet the lessee's costs to transport
or process production do not. This scenario includes where a preexisting
agreement prescribes transportation or processing costs in terms of rates that do not
fluctuate based on market prices for gas. The Rule's inflexible caps are
particularly problematic for crude oil or natural gas that may be exported overseas
where transportation costs are always more significant as a proportion of the
delivered sales price. As a hypothetical example, in a situation where a lessee
receives $0.50 (a low price) for sale of its gas, but has a transportation contract that
requires the lessee to pay $0.40 to transport that gas to the sales point, the Rule
would inflexibly cap the lessee's claimed transportation allowance at $0.25. Thus,
that lessee would only be able to claim 62.5 percent ($0.25/$0.40) of its
reasonable, actual costs as its transportation allowance, artificially raising the
federal royalty value above the value at the lease by the 37.5 percent differential.

The district court's opinion did nothing to reconcile these gaps with the caps.
Again, the district court did not question that valuation properly occurs at the lease.
It is ineluctable that the Rule cannot yield value at the lease when it arbitrarily
prohibits lessees from deducting the *full* reasonable and actual transportation costs
from sales prices in distant markets, or the *full* reasonable and actual processing
costs from the enhanced value of post-processing gas plant products.

The district court repeated the Rule's *non sequitur* that these hard caps satisfy the "vast majority of [industry's] situations."  Aplt. App. 79.  That is no justification for denying allowances, or even the *opportunity* to ask, in situations that *do* so qualify.  This disparate treatment is unjustified and violates the APA. *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996) ("[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.").  Nor does the Rule explain how denying deserved allowances correlates with "provid[ing] fair return of royalty to the public."  *See* Aplt. App. 79.  Further, the Rule provides no evidence to support what ONRR "believes" regarding these caps.  *See* Aplt. App. 78.

The Rule's inflexible caps for federal oil and gas allowances create still more unexplained inconsistency, as API briefed but the district court overlooked. The Rule *rejected* inflexible caps for federal and Indian coal allowances, with no justification for treating federal oil and gas differently in the same Rule.  Aplt. App. 121-122.  Additionally, the Rule contravenes ONRR's contemporaneous *rejection* of such fixed allowance caps for Indian oil valuation.  *See* 80 Fed. Reg. 24,794, 24,801 (May 1, 2015) (retaining "a lessee's ability to request approval to exceed the 50-percent limitation on transportation allowances."); 30 C.F.R. § 1206.56.  This double standard is an unexplained inconsistency fatal to the Rule.

Furthermore, the Rule again undercuts lessees' reasonable reliance interests by terminating all pre-Rule ONRR approvals of higher allowances, even where

lessees already have fully justified them. This result is impermissibly retroactive. The lessees in these fields already made investment decisions based upon the economics of these operations, including the ability to obtain full allowances for necessary transportation and processing costs. ONRR has provided no rationale or evidence that it is unable to review, decide, or renew a requested transportation or processing allowance greater than 50 percent or 66.67 percent, respectively, where warranted. In addition to ensuring that value is determined at the lease, preservation of the longstanding opportunity to justify extraordinary allowances preserves certainty and fairness in the valuation process, which also is critical for the U.S. consumers and workers that benefit from domestic production. Therefore, 30 C.F.R. §§ 1206.110(d)(1) & (2), 1206.152(e)(1) & (2), and 1206.159(c)(2), (3), & (4), should be vacated as well.

## V. THE DISTRICT COURT ERRED BY APPROVING INFLATION OF FEDERAL GAS ROYALTY VALUE BASED ON CONVENIENCE OF GAS INDEX-BASED VALUES AND ON UNATTAINABLE VALUES.

Under the prior regulations, lessees that sold gas in downstream markets were required to base the royalty value on the downstream sales price less applicable transportation and processing allowances, an often complex, and sometimes even impossible, calculation. The Rule introduces an alternative index-based methodology. There is no dispute that the Rule adds a premium to valuation of federal gas based on an index, and that this premium is based solely on the perceived greater administrative convenience to the lessee of index-based valuation

41

compared to chasing gross proceeds to the first arm's-length sales point and then calculating applicable allowances back to the lease. 30 C.F.R. §§ 1206.141(c) (unprocessed gas), 1206.142(d) (residue gas and gas plant products). The Rule's preamble admits that this methodology results in a value "consistently higher" than a value based on gross proceeds. Aplt. App. 112. The issue is not if ONRR may adopt index-based prices for royalty valuation. Rather, any such prescribed methodology must be legally and factually supported. The Rule's index method is neither, and thus its artificial adders should be vacated.

The Rule enlarges federal gas royalty value in two key ways: (1) selection of unattainable gas index pricing points, and (2) arbitrary adjustments to index prices to reflect location differentials between the lease and the market point where the index is established. In effect, the Rule adopts a "highest price available anywhere standard" for index-based valuation. But nothing in the Rule justifies this result.

The MLA and OCSLA authorize ONRR to assess royalty only on the "value of the production." 30 U.S.C. § 226(b)(1)(A); 43 U.S.C. §§ 1337(a)(1)(A), (C), & (F). The district court identifies no statutory authority for ONRR to obtain additional revenue for the Treasury based solely on an upcharge for the purported convenience to the lessee of the methodology used to value the production. The gas did not become more valuable in the marketplace simply because the lessee may report to ONRR using a methodology entailing fewer "burdens" to implement. This legal shortcoming is fatal to the Rule and alone warrants vacatur.

42

*See MCI Telecom. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994)

(agencies are "bound, not only by the ultimate purposes Congress has selected, but

by the means it has deemed appropriate, and prescribed, for the pursuit of those

purposes"); *New Mexico v. U.S. Dep't of the Interior*, 854 F.3d 1207, 1224 (10th

Cir. 2017) ("Regardless of how serious the problem an administrative agency seeks

to address . . . it may not exercise its authority in a manner that is inconsistent with

the administrative structure that Congress enacted into law.") (quotations and

citations omitted) (overturning Interior regulations on Indian gaming compacts).

The district court conceded that the Rule's version of index valuation "does

not fully represent the realities of the situation" and a lessee may be "not able to

actually sell its gas based on that index price." Aplt. App. 81-82. But the district

court summarily found that the Rule's index is not "unreasonably inflated," based

solely on an "offset" of "administrative savings" to lessees. Aplt. App. 81. But

greater "simplicity" is true of any index-based method. Wholly absent is any

explanation of the Rule's specific index methodology.

Specifically, where a lessee "can only transport" gas to one published index

pricing point (e.g., market center), the Rule mandates use of the "highest reported

monthly bidweek price for that index pricing point for the production month." 30

C.F.R. §§ 1206.141(c)(1)(i), 1206.142(d)(1)(i). The Rule nowhere justifies why it

requires the "highest" price (instead of an average or median, for example).

Also problematically, where a lessee "can transport gas" to "more than one"

published index pricing point, the Rule requires the lessee to utilize "the highest reported monthly bidweek price for the index pricing points to which your gas *could* be transported for the production month, *whether or not there are constraints for that production month*." 30 C.F.R. § 1206.141(c)(1)(ii), 1206.142(d)(1)(ii) (emphasis added). In other words, even if a pipeline to another index point with a higher price were at full capacity, and the lessee could not possibly transport its gas to that index point instead of the lower-priced market where it actually transported its gas, the Rule assesses royalty value on this mythical, actually unattainable value. Again, the Rule fails to justify its use of the "highest" price among indexes, or the "highest" monthly price for that index. The Rule also does not explain what "can transport" means, or how it comports with physical pipeline hookups or contracts. Moreover, it is arbitrary for the Rule to base valuation on unattainable hypotheticals that simply would yield more royalty for ONRR, notwithstanding actual constraints on gas movement for a given production month.

The district court also failed to identify any record evidence supporting the Rule's further inflation of index prices via arbitrary and unsubstantiated location differentials that are part of index-based valuation. To purportedly adhere to the principle of value at the lease, the Rule includes a fixed location differential provision (in lieu of a transportation allowance) intended to account for the difference in value of gas at the lease versus at the market center where the index price is established. 30 C.F.R. §§ 1206.141(c)(1)(iv), 1206.142(d)(1)(iv). Under

the Rule, to implement the location differential, onshore lessees must reduce the applicable index price by 10 percent, and OCS lessees must employ a 5 percent reduction, but in no event may the reduction be less than 10 cents per MMBtu or more than 30 cents per MMBtu. 30 C.F.R. § 1206.141(c)(1)(iv). Moreover, lessees "may not take any other deductions" under the Rule's index methodology. 30 C.F.R. §§ 1206.141(c)(2), 1206.142(d)(3).

But these particular prescribed adjustments are outdated and lack any record support. As API commented on the proposed Rule containing the same provisions, these fixed adjustments mirror those for Indian gas index valuation in ONRR regulations adopted *17 years earlier*, and which never had application to federal onshore or OCS lease production. *See* 30 C.F.R. § 1206.172(d)(1)(iii). The district court merely cited ONRR's one-sentence response that, based on "transportation rate data" ONRR analyzed, these fixed adjustments are "a reasonable reduction to the index price." Aplt. App. 82. ONRR did not include this data or its analysis in the administrative record. Because this fixed adjustment methodology is outdated, distorted, and unsupported in the record, the resulting royalty value does not effectively represent value at the lease.

It is no answer to call the Rule's index valuation method an "option" that federal gas lessees may decline. *See* Aplt. App. 80. Purportedly, the Rule's entire thrust in adopting an index-based methodology at all was ONRR's recognition of the difficulties inherent in the alternative of chasing gross proceeds. Moreover, the

index's frequency of usage does not ameliorate its facial arbitrariness. While an index-based methodology presents advantages for *both* ONRR and lessees in certain circumstances, namely by avoiding common disputes in "unbundling" deductible and non-deductible production costs and by simplifying auditing and compliance, ONRR cannot impose an arbitrary premium on the value of production for federal oil and gas lessees to utilize that "option." Simply put, the opportunity for more administrative convenience in calculating royalty value does not increase the market value of the gas on which royalty is owed, and is not a valid ground to increase royalty payments. The Rule is thus unlawful under the APA, MLA, and OCSLA.

## VI.    THE DISTRICT COURT ERRED BY SUSTAINING THE RULE'S FEDERAL OIL AND GAS DEFAULT PROVISIONS.

The Rule's "default provisions" and numerous associated triggers enable ONRR to second-guess lessee valuations in myriad circumstances where ONRR may disagree with a lessee's valuation, even where lessees have substantially complied with the valuation regulations. 30 C.F.R. §§ 1206.105 (federal oil), 1206.144 (federal gas). Rather than rationally directing lessees to correct any errors made in applying applicable regulatory standards when valuing their production, the Rule allows ONRR to completely cast aside what the lessees' value calculation should have been and instead interject ONRR's own royalty value. *Id.* (ONRR may "decide[] that we will value your [oil or gas] for royalty purposes.").

ONRR may "consider[] *any* information that [ONRR] deem[s] relevant," even factors lessees cannot use under the Rule. *Id.* (emphasis added).

The default provisions raise a number of problems and contradictions within the Rule that the district court wholly failed to address. First, they yield the opposite of the Rule's purported "greater simplicity, certainty, clarity, and consistency in product valuation" that the district court elsewhere found "significant." Aplt. App. 79. Second, they countermand the district court's recognized principle that valuation is the role of lessees, not ONRR. Aplt. App. 95 ("Lessees are responsible, in the first instance, for accurately calculating and paying royalties."). Third, they do not justify why ONRR can use factors that the Rule withholds from lessees. *Compare* Aplt. App. 170 ("ONRR proposes to eliminate current benchmarks" for federal gas) *with* Aplt. App. 175 (Rule "allows ONRR to consider any criteria we deem relevant, as well as criteria similar to the current gas valuation benchmarks"). Fourth, the Rule is unclear on who within ONRR and the audit agencies, and at what level, has authority to invoke the default provisions. Rather than ONRR itself imposing an entirely different (and presumably higher) value for royalty purposes, lessees should instead be allowed to correct their own alleged valuation errors under the applicable regulations and report and pay royalty accordingly.

The Rule's countless triggers for the default provisions further enable ONRR to substitute its preferred (ostensibly higher) value in nearly any situation.

47

Previously, to displace a lessee's valuation of production sold non-arm's-length, ONRR had to affirmatively "determine[] that the lessee has improperly applied the regulations."  52 Fed. Reg. 4,732, 4,736 (Feb. 13, 1987) (proposed rule preamble); former 30 C.F.R. § 1206.152(e)(1) (2015).  And previously, for arm's-length transactions where value generally was based on the lessee's gross proceeds under its sales contract, the agency had to show that the lessee "acted unreasonably or in bad faith" before displacing the lessee's valuation.  Former 30 C.F.R. § 1206.102(c)(2)(ii)(A) & (B) (2015).  But under the Rule, ONRR can now bypass the lessee's chosen valuation methodology and insert its own valuation if "for any reason" ONRR believes it cannot determine that a lessee properly paid royalty or applied an allowance for federal oil or gas.  30 C.F.R. §§ 1206.104(c) (federal oil sales), 1206.110(f)(3) (federal oil transportation allowance), 1206.143(c)(3) (federal gas sales), 1206.152(g)(3) (federal gas transportation allowance), § 1206.159(e)(3) (federal gas processing allowance).  Thus, ONRR might invoke the default provision if a lessee so much as inadvertently inputs an incorrect product code, sales type, or other non-value-based field on its Form ONRR-2014 royalty report, in the course of reporting thousands of lines of royalty data each month to ONRR.  This reservation of broad authority to second-guess valuation eliminates all certainty to the lessee in determining at the outset how much royalty it owes on its federal oil and gas production, and in particular deprives the lessee of the ability in the first instance to determine its royalty value.

The district court's characterization of the default provisions as a "reasonable fallback method" contradicts the Rule's plain text. Aplt. App. 88. As explained above, there is nothing "reasonable" about them. Nor does the Rule label them a "fallback." Similarly, the district court's attempt to cabin the default provisions to "when the primary methodologies fail" offers no comfort because the Rule allows ONRR to unilaterally make that determination and displace the lessee's valuation under the default provisions for almost any reason. Aplt. App. 88-89. In any event, such litigation assurances cannot control over the terms of the Rule itself. *See Marinello v. United States*, 138 S. Ct. 1101, 1109 (2018) (courts may not rely on "the assumption that the Government will use [prosecutorial power] responsibly"). ONRR must follow its regulations, and they are not any less arbitrary if ONRR somehow chooses to ignore them.

Nor does an administrative appeal pathway redeem the default provisions. Aplt. App. 88. The district court wholly failed to respond to API's arguments regarding potentially futile appeals of ONRR default provision valuations, unlike situations where a lessee is defending its own valuation on appeal. Nothing in the Rule or in 30 C.F.R. part 1290 compels ONRR to share the basis for its substitute methodology with the lessee. And ONRR may be legally precluded from doing so where the agency value is based on confidential sales information the agency receives from other producers in the area. The district court did not refute ONRR's inability to share such confidential lessee information. *See* 30 C.F.R.

49

§§ 1206.109(a), 1206.149(a), 1206.259(a).  Thus, regardless if ONRR relies on

such information, it will be unavailable to an appellant to meaningfully challenge

ONRR's substitute valuation, which deprives the lessee of due process in the

appeal.  The federal oil and gas default provisions thus render the Rule arbitrary

and capricious.

## VII.  THE DISTRICT COURT ERRED BY ALLOWING ONRR TO SUPPLANT VALID CONTRACTS.

The Rule allows ONRR to cast aside valid contracts—even arm's-length

contracts—in two instances: (1) agreements lacking all parties' written signatures;

and (2) agreements with sales prices that ONRR deems "unreasonably low" or

with transportation or processing costs that ONRR deems "unreasonably high" and

therefore purportedly overstate allowable deductions.  Both provisions are

arbitrary.  Nor does the Rule or district court rationalize the drastic remedy of

ONRR's unilateral revaluation of production in these circumstances.

The Rule unconditionally refuses to recognize "all contracts, contract

revisions, or amendments" unless signed by "all parties to the contract."  30 C.F.R.

§§ 1206.104(g) (federal oil sales), 1206.111(d) (federal oil transportation),

1206.143(g) (federal gas sales), 1206.153(d) (federal gas transportation),

1206.160(c) (federal gas processing).  The Rule's new requirement is not about the

writing, but the full written signatures.  And the Rule's consequence for not fully

signed written contracts is that ONRR may trigger the default provisions and

utilize whatever royalty value ONRR prefers.  *E.g.,* 30 C.F.R. §§ 1206.104(g)(2), 1206.143(g)(2).

The mere absence of a fully signed contract is an invalid reason for ONRR to negate an arm's-length agreement and its legally-valid, contract-based value—which the district court elsewhere touts "as the best indication of market value." Aplt. App. 80.  Incongruously with the concept of rejecting contracts not fully signed, the Rule itself defines "contract" to include "any oral or written agreement" that "is enforceable by law and that, with due consideration, creates an obligation." 30 C.F.R. § 1206.20.  Legal enforceability thus is the proper standard to evaluate contracts, not whether they are physically signed.  As API has explained, many current agreements among oil and gas producers and other parties active in the oil and gas marketplace exist only electronically or via email exchanges, renew automatically, or include terms that obviate written signatures.  For example, oil and gas can be sold on a spot basis with confirmation of terms exchanged by emails.  The Rule and administrative record fail to link any valuation accuracy or auditing concerns to not-fully-signed yet legally enforceable contracts.  That is unsurprising since, even absent the Rule, lessees remain responsible for retaining sufficient records and justifying their reporting and payment during an audit.  *See* 30 U.S.C. § 1713; 30 C.F.R. part 1212.

Going further, the Rule allows ONRR to jettison even fully-signed arm's-length contracts containing sales prices, or transportation or processing costs, that

51

ONRR believes are unreasonable, and instead use ONRR's own preferred value. 30 C.F.R. §§ 1206.104(c)(2), 1206.143(c)(2), 1206.110(f)(2), 1206.152(g)(2), 1206.159(e)(2). To determine what is unreasonable, the Rule's "10 percent" threshold is entirely circular because it defines what is "unreasonable" based on what is "reasonable." Nor does the Rule explain at all how the lowest reasonable price or highest reasonable allowance cost is to be determined, or who has the right to make that determination. Thus, the district court's finding that "[n]either is ONRR's 'unreasonably low' determination untethered, as it is tied to the lowest reasonable measures of market price" makes no sense and is not legally sustainable. *See* Aplt. App. 86.

And while the district court found that "[API has] not shown it to be a reasonable guide," as an initial matter ONRR appears to have pulled the 10 percent threshold out of thin air. *See id.* Certain arm's-length sales, transportation, and processing contracts, depending upon the lack of fully developed transportation and processing infrastructure in the areas of operations, could legitimately vary by more than 10 percent from any such "reasonable measures." Or for production months with low commodity price markets, a producer may reasonably be forced to temporarily sell at a low price to secure its continuing sales. The Rule's supposed metric also is unverifiable, because it is unilaterally and retroactively determined by ONRR without standards, and relies on confidential sales and cost

information that only ONRR possesses and cannot share with lessees.  For these

reasons, too, the Rule should be vacated.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's

partial affirmance of the Rule, and vacate the Rule's federal oil and gas valuation

provisions as well.  At a minimum, the Court should vacate the following readily

severable provisions of the Rule:  30 C.F.R. §§ 1206.20, 1206.110(a)(1)(ii),

1206.152(a)(2)(ii), 1206.110(d)(1) & (2), 1206.152(e)(1) & (2), and

1206.159(c)(2), (3), & (4).

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 10th Circuit Rule 28.2(C)(4), API respectfully requests that oral

argument be held in this appeal.  First, this appeal is of significant importance to

the regulated community in valuing federal oil and gas production for royalty

purposes going forward.  Second, this appeal presents pressing legal issues

regarding ONRR's upending of established tenets of royalty valuation and inflation

of royalties owed.  Third, ONRR's own shifting statements impugning the Rule

undercut any deference owed to it.  Third, the district court's decision threatens to

render APA review of federal rulemakings toothless so long as the agency offers

conclusory assertions that its rule is better.  Finally, the district court declined oral

argument on the parties' merits briefing.  Aplt. App. 64 n.1.

Dated this 28th day of February, 2022.

> */s/ Peter J. Schaumberg*
> Peter J. Schaumberg *pro hac vice*
> James M. Auslander *pro hac vice*
> Beveridge & Diamond, P.C.
> 1900 N Street, NW, Suite 100
> Washington, D.C. 20036
> Phone: (202) 789-6009
> Fax: (202) 789-6190
> pschaumberg@bdlaw.com
> jauslander@bdlaw.com
> *Attorneys for Petitioner-Appellant American*
> *Petroleum Institute*

54

**CERTIFICATE OF COMPLIANCE OF BRIEF**

I certify, pursuant to Fed. R. App. P. 32(g)(1), that the foregoing Opening

Brief of Appellant complies with the type-volume limitation of Fed. R. App. P.

32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P.

32(f) and 10th Cir. R. 32(B), this document contains 12,923 words, as computed

by Microsoft Word. This document complies with the typeface requirements of

Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P.

32(a)(6) because this document has been prepared in a proportionally spaced

typeface of Times New Roman, 14 point font.

*/s/ James M. Auslander*
Beveridge & Diamond, P.C.
*Attorney for Petitioner-Appellant American*
*Petroleum Institute*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 28th day of February 2022, a true and correct copy of the foregoing Opening Brief of Appellant has been electronically filed with the Clerk of the Court using the CM/ECF System, which sent notice of such filing to counsel of record.

*/s/ James M. Auslander*
Beveridge & Diamond, P.C.
*Attorney for Petitioner-Appellant American Petroleum Institute*

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing Opening Brief of Appellant, as submitted in Digital Form via the court's ECF system, is an exact copy of the written document filed with the Clerk (if required to file additional hard copies) and has been scanned for viruses with Symantec Endpoint Protection, Version 14(14.2), and, according to the program, is free of viruses. In addition, I certify all required privacy redactions have been made.

*/s/ James M. Auslander*
Beveridge & Diamond, P.C.
*Attorney for Petitioner-Appellant American Petroleum Institute*

# ATTACHMENT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING



CLOUD PEAK ENERGY INC.; NATIONAL MINING
ASSOCIATION; and WYOMING MINING ASSOCIATION,

       Petitioners,

    v.

UNITED STATES DEPARTMENT OF THE INTERIOR; *et al.*,

       Respondents.

**No. 19-CV-120-SWS**
**(Lead Case)**

---

AMERICAN PETROLEUM INSTITUTE;

       Petitioner,

    v.

UNITED STATES DEPARTMENT OF THE INTERIOR; *et al.*,

       Respondents.

No. 19-CV-121-SWS
(Joined Case)

---

TRI-STATE GENERATION AND TRANSMISSION ASS'N,
INC.; BASIN ELECTRIC POWER COOPERATIVE; and
WESTERN FUELS-WYOMING, INC.,

       Petitioners,

    v.

DAVID BERNHARDT, in his official capacity as Secretary
of the U.S. Department of Interior; *et al.*

       Respondents.

No. 19-CV-126-SWS
(Joined Case)

---

## ORDER UPHOLDING IN PART AND REVERSING IN PART 2016 VALUATION RULE

These joined cases come before the Court under the Administrative Procedure Act (APA), 5 U.S.C. § 706, for review of a rule promulgated in 2016 by the Office of Natural Resources Revenue (ONRR), which effectively changed how royalties owed to the federal government were calculated on oil, gas, and coal produced from federal lands and offshore leases as well as coal produced from Indian lands. The administrative record has been submitted (Doc. 80), and the matter fully briefed by the parties.[1] (Docs. 89, 97, 102, 106.[2]) Additionally, the Court also considered the parties' briefing on Federal Respondents' Motion for Final Judgment (Docs. 87, 88, 95, 96, 98, 101) as part of the record in this case. Consistent with its earlier partial preliminary injunction (Doc. 67), the Court finds the new valuation methods for oil and gas are sufficiently supported, but the new valuation methods for federal and Indian coal must be vacated.

## BACKGROUND

Oil, gas, and coal producers often enter into leases with the federal government or Indian tribes to extract natural resources from onshore federal lands, offshore federal areas, and Indian lands. *California v. United States Dep't of the Interior*, 381 F. Supp. 3d 1153, 1158 (N.D. Cal. 2019). Of relevance here, these areas are regulated by federal law, including the Mineral Leasing Act (MLA), 30 U.S.C. § 181 *et seq.* (as to onshore federal lands), the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 *et seq.* (as to offshore federal areas), and 25 U.S.C. § 396 *et seq.* (as to Indian and allotted lands).

---

[1] The Court concludes oral argument would not materially assist in the consideration of this review. *See* Local Civil Rule 83.6(c). The Court carefully considered the parties' extensive briefing and reviewed the more than 1,100 documents comprising the administrative record (Doc. 80). Consequently, the Court has all the information necessary to render its decision.

[2] All citations to the record are to the lead case, Case No. 19-CV-120, unless otherwise noted.

Federal law requires the lessees to pay royalties to the federal government based on the "value" of the fossil fuels extracted. *E.g.*, 30 U.S.C. § 207(a) (federal coal); 30 U.S.C. § 226(b)(1)(A) (onshore federal oil and gas); 43 U.S.C. § 1337(a)(1) (offshore federal oil and gas from the Outer Continental Shelf). For oil and gas extracted from onshore federal lands, lessees are statutorily required to pay royalty of "not less than 12.5 percent in amount or value of the production removed or sold from the lease." 30 U.S.C. § 226(b)(1)(A). For offshore oil and gas extracted from the Outer Continental Shelf, royalty is owed "at not less than 12½ per centum fixed by the Secretary in amount or value of the production saved, removed, or sold." 43 U.S.C. § 1337(a)(1)(A). For coal extracted from federal lands, royalty is owed "in such amount as the Secretary shall determine of not less than 12½ per centum of the value of coal as defined by regulation." 30 U.S.C. § 207(a). There is no equivalent statutory language for coal extracted from Indian lands, but regulations treat it essentially identical to coal from federal lands.

Congress requires the Department of Interior (DOI) Secretary to collect the royalties owed to the United States on those leases. 30 U.S.C. § 360; 30 U.S.C. § 1711; 30 U.S.C. § 1751. To that end, the DOI Secretary is required to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes" of the various leasing statutes. 30 U.S.C. § 189 (MLA); 43 U.S.C. § 1334 (OCSLA). Relatedly, the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) directed the DOI Secretary to establish "a comprehensive inspection, collection and fiscal and production accounting and auditing system to provide the capability to accurately determine oil and gas royalties, interest, fines, penalties, fees,

deposits, and other payments owed, and to collect and account for such amounts in a timely manner." 30 U.S.C. § 1711(a). The DOI Secretary in turn created Respondent Office of Natural Resources Revenue (ONRR), previously known by other designations, and delegated the royalty accounting tasks to ONRR. Additionally, as the statutes do not define the "value" of the production, the DOI Secretary and ONRR possess the authority and discretion to do so.

In May 2011, ONRR published two advance notices of proposed rulemaking. The first sought public comments and suggestions concerning potential changes to how federal oil and gas were valued for royalty purposes. *Federal Oil and Gas Valuation*, 76 Fed. Reg. 30878 (May 27, 2011) (AR 214-217[3]). The second requested public comments and suggestions regarding potential changes to how Federal and Indian coal was valued. *Federal and Indian Coal Valuation*, 76 Fed. Reg. 30881 (May 27, 2011) (AR 218-221). For each, ONRR said it intended to

> provide regulations that would offer greater simplicity, certainty, clarity, and consistency in production valuation for mineral lessees and mineral revenue recipients; be easy to understand; decrease industry's costs of compliance; and provide early certainty to industry and ONRR that companies have paid every dollar due. The ONRR intends that the final regulations will be revenue neutral.

79 Fed. Reg. at 30878, 30881 (AR 214, 218.)

Following the comment periods as well as six public workshops, ONRR published a proposed rule in January 2015 ("the Proposed Rule"), which sought to change how federal oil, gas, and coal as well as Indian coal would be valued when calculating royalties.

---

[3] Citations to the administrative record take the following format: (AR [Bates Number].)

*Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform*, 80 Fed. Reg. 608 (Jan. 6, 2015) (AR 771-839). In July 2016, following an extended public comment period, ONRR then published the final rule ("the 2016 Valuation Rule"), which enacted most of the amendments first set forth by ONRR in its proposed rule. *Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform; Final Rule*, 81 Fed. Reg. 43338 (July 1, 2016) (AR73963-74028). The 2016 Valuation Rule effectively changed how lessees calculate the value of the natural resources in order to pay royalties on oil, gas, and coal produced from federal lands and offshore leases as well as coal produced from Indian lands.

On December 29, 2016, Petitioners filed challenges to the 2016 Valuation Rule in this Court.[4] However, those Petitions were voluntarily dismissed in November 2017 due to ONRR's later "repeal" of the 2016 Valuation Rule. (16-CV-319, Doc. 23.) In early 2017, ONRR postponed the 2016 Valuation Rule's effective date and then undertook the rulemaking process to pass another rule ("the Repeal Rule") that repealed the 2016 Valuation Rule, leaving the former valuation methods unchanged. *Repeal of Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform*, 82 Fed. Reg. 36934 (Aug. 7, 2017). However, in October 2017, the States of California and New Mexico, joined by other groups as intervenor-plaintiffs, filed suit in the Northern District of California to challenge the Repeal Rule under the APA. *California v. United States Dep't of the Interior*, 381 F. Supp. 3d 1153, 1158 (N.D. Cal. 2019). On March 29, 2019, the

---

[4] *Cloud Peak Energy Inc., et al. v. USDOI*, Case No. 16-315; *API v. USDOI*, Case No. 16-316; and *Tri-State Generation and Transmission Ass'n, et al. v. USDOI*, Case No. 16-319.

Northern District of California granted summary judgment in the plaintiffs' favor, vacating the Repeal Rule after finding ONRR violated the APA when adopting it. *Id.* at 1179. In an all too familiar cycle, this effectively reinstated the now-not-repealed 2016 Valuation Rule.[5] In June 2019, ONRR issued a "Dear Reporter" letter that announced the 2016 Valuation Rule applies to "all federal oil and gas lessees and all federal and Indian coal lessees" from January 1, 2017 forward, and required full compliance to occur by January 1, 2020. (Doc. 23-3 p. 1.) "This means that lessees must come into compliance [with the new royalty calculation methods] retrospectively for the last two and a half years and prospectively by January 1, 2020." (Doc. 23 p. 11.[6])

Petitioners here either directly produce commodities and pay royalties on such production, represent those who do (such as trade associations), or are otherwise subject to the 2016 Valuation Rule (such as those who fall within the new "coal cooperative" definition). (Doc. 89 pp. 16-20.) They seek here to set it aside under the APA, arguing it is arbitrary and capricious and exceeds ONRR's authority. Shortly after filing this judicial review action, Petitioners moved for a preliminary injunction to avoid having to comply with the 2016 Valuation Rule during the pendency of the judicial review process. (Doc. 22.) After briefing and a hearing on the motion, the Court granted in part and denied in part the motion. *Cloud Peak Energy Inc. v. United States Dep't of Interior*, 415 F. Supp. 3d 1034, 1039 (D. Wyo. 2019). The Court preliminarily enjoined the 2016 Valuation

---

[5] *See State of Wyoming and State of Montana v. United States Department of the Interior, et al.*, 16-CV-0285, Order on Petitions for Review of Final Agency Action (D. Wyo. Oct. 8, 2020).
[6] The Court cites to the page numbers at the top of each page assigned to the document by the CM/ECF system, as opposed to the page numbers at the bottom of each page assigned by counsel.

Rule's application to federal and Indian coal royalties, which meant the pre-2016 valuation methodologies would continue to govern as to coal. *Id.* at 1053. The Court refused to preliminarily enjoin the 2016 Valuation Rule as to valuing federal oil and gas, *id.*, and those provisions have been in effect for the last year and a half.

As it sits now, Petitioners still ask that the entire 2016 Valuation Rule be vacated in its entirety as violating the APA. (Docs. 89, 106.) Federal Respondents now agree that at least certain provisions concerning coal valuation are unworkable and should be vacated, but contend the federal oil and gas provisions should remain untouched. (Doc. 97.) Respondent-Intervenors argue the 2016 Valuation Rule should be upheld in its entirety and the preliminary injunction should be dissolved. (Doc. 102.)

## STANDARD OF REVIEW OF AGENCY ACTION

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (internal quotation marks omitted). The Administrative Procedure Act includes a limited waiver of sovereign immunity that allows for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The APA sets forth the full extent of a court's authority to review an agency's action and provides in relevant part as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> ...
> (2)   hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A)   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

> ...
> (C)    in excess of statutory jurisdiction, authority, or
>        limitations, or short of statutory right[.]
>
> ...
> In making the foregoing determinations, the court shall review the whole
> record or those parts of it cited by a party, and due account shall be taken of
> the rule of prejudicial error.

5 U.S.C. § 706(2)(A), (C).  Reviewing agency action for its accordance with law is largely

straightforward.  In contrast, much has been written of the arbitrary-or-capricious standard.

When reviewing agency action under the arbitrary-or-capricious standard, the Court

focuses on the decision-making process, not on its wisdom or "correctness." *Olenhouse v.*

*Commodity Credit Corp.,* 42 F.3d 1560, 1575 (10th Cir. 1994).  Under this "narrow"

standard of review, the U.S. Supreme Court has said that

> an agency rule would be arbitrary and capricious if the agency has relied on
> factors which Congress has not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or the product
> of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29,

43 (1983).  "The duty of a court reviewing agency action under the 'arbitrary or capricious'

standard is to ascertain whether the agency examined the relevant data and articulated a

rational connection between the facts found and the decision made." *Olenhouse,* 42 F.3d

at 1574 (citing *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43).  The Court does not substitute

its judgment for the agency's and should "uphold a decision of less than ideal clarity if the

agency's path may reasonably be discerned." *F.C.C. v. Fox Television Stations, Inc.,* 556

U.S. 502, 513–14 (2009) (internal citations omitted).  When conducting this analysis, the

Court's inquiry "must be thorough, but the standard of review is very deferential to the agency." *Defs. of Wildlife v. Everson*, 984 F.3d 918, 934 (10th Cir. 2020) (quoting *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013)). Indeed, the Court must "presume that an agency action is valid unless the party challenging the action proves otherwise." *Id.* (quoting *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 (10th Cir. 2020)); *see also Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793 (10th Cir. 2010) ("In performing arbitrary and capricious review, we accord agency action a presumption of validity; the burden is on the petitioner to demonstrate that the action is arbitrary and capricious.").

## DISCUSSION

As at the preliminary-injunction stage, the Court will consider the 2016 Valuation Rule's oil and gas royalty provisions together due to their similarities.

1.  **As to the federal oil and gas provisions, Petitioners have not shown the 2016 Valuation Rule is arbitrary, capricious, an abuse of discretion, or unlawful.**

The Court separately considers and addresses each of Petitioners' arguments concerning the oil and gas provisions of the 2016 Valuation Rule.

### 1.1  ONRR did not exceed its legal authority by enacting the 2016 Valuation Rule as to the federal oil and gas provisions.

Petitioners alleged in the motion for preliminary injunction that ONRR exceeded its Congressionally-delegated authority by promulgating the 2016 Valuation Rule (Doc. 23 p. 19), but the Court rejected the argument at the time. *Cloud Peak Energy*, 415 F. Supp. 3d at 1045-46 (noting that Petitioners provided "little detailed argument on this issue"). In their reply brief, Petitioners appear to re-assert the same argument. (Doc. 106 p. 7

("Respondents again fail to meaningfully address, let alone rebut, Petitioners' legal and factual arguments for vacatur of the 2016 Rule as arbitrary and capricious and *ultra vires*.") To the extent Petitioners are again asserting ONRR acted outside its authority in enacting the 2016 Valuation Rule, that argument is again rejected as to the federal oil and gas provisions for the reasons previously set forth in the Court's preliminary-injunction order. *Cloud Peak Energy*, 415 F. Supp. 3d at 1045-46.   The Court will not vacate the 2016 Valuation Rule as a whole, or the oil-valuation and gas-valuation provisions, based on this argument because it does not find that ONRR exceeded its lawful authority.   The Court will proceed to examine the provision-specific arguments offered by the parties.

### 1.2    ONRR did not act arbitrarily and capriciously, abuse its discretion, or act unlawfully by discontinuing the "Deep Water Policy."

In the late 1990s, the production of oil and gas from deepwater areas of the Outer Continental Shelf (OCS) was being encouraged by the Government.  (Doc. 89 pp 46-47.)

> Because of the substantial costs associated with deepwater development, and to minimize the number of platforms needed for development, not every lease had its own platform facility for development purposes.  Rather, to move their bulk production, producers would connect a manifold located on the seafloor via a pipeline to a host platform on another lease that often was as far as 50 miles away.

(*Id.* p. 47.)   ONRR's predecessor issued "Guidance for Determining Transportation Allowances for Production from Leases in Water Depths Greater Than 200 Meters" in 1999, known as the "Deep Water Policy," which provided that moving the oil or gas from the seafloor manifold to the first offshore platform constituted a deductible "transportation" allowance rather than non-deductible "gathering."  (AR 1-2.)

As part of the 2016 Valuation Rule, ONRR revoked the Deep Water Policy by

redefining "gathering" to include movement from the seafloor to the platform and expressly disallowing such movement as transportation. 81 Fed. Reg. at 43340 (AR 73966); 30 C.F.R. § 1206.20 (defining gathering as "including any movement of bulk production from the wellhead to a platform offshore"); 30 C.F.R. § 1206.110(a)(1)(ii) ("For oil produced on the OCS, the movement of oil from the wellhead to the first platform is not [deductible] transportation."); 30 C.F.R. § 1206.152(a)(2)(ii) ("For gas produced on the OCS, the movement of gas from the wellhead to the first platform is not [deductible] transportation."). Thus, the raw gas and oil is generally extracted from multiple wells to the seafloor manifold and then directed to the host platform, all of which is now considered non-deductible "gathering" rather than "transportation."

Unsurprisingly, Petitioners take much affront to the loss of this deduction. Petitioners contend ONRR's "blatant reversal" "amounts to a naked money grab unsupported by authority or evidence." (Doc. 89 pp. 46, 48.) In the final 2016 Valuation Rule publication, ONRR explained its decision:

> The former Minerals Management Service [ONRR's predecessor] intended
> for the Deep Water Policy to incentivize deep water leasing by allowing
> lessees to deduct broader transportation costs than the regulations allowed.
> ONRR concluded that the Deep Water Policy has served its purpose and is
> no longer necessary. The regulations still allow offshore lessees to deduct
> considerable transportation costs to move oil and gas from the offshore
> platform to onshore markets. Rescinding this policy clarifies the meaning of
> gathering, which, in turn, provides a more consistent and reliable application
> of the regulations.

81 Fed. Reg. at 43340 (AR 73966). Further, in the Section-By-Section Analysis of the January 2015 Proposed Rule, ONRR explained the Deep Water Policy did not comply with its definition of "gathering" and "lessees have taken transportation allowances under the

Deep Water Policy, in some instances, for movement ONRR considers non-deductible 'gathering' under its regulations." 80 Fed. Reg. at 624 (AR 788). Accordingly, ONRR rescinded the Deep Water Policy because it had effected its purpose of encouraging deep water leasing in the past and to apply more uniformly the "gathering" definition to all resources.

Obviously, ONRR's act of revoking the Deep Water Policy constituted a change of position.

> To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books. *See United States v. Nixon*, 418 U.S. 683, 696, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). And of course the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates. This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. Sometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). It would be arbitrary or capricious to ignore such matters. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (emphases in original).

These requirements were satisfied here. ONRR certainly acknowledged that it was changing its position by revoking the Deep Water Policy, and doing so was within its authority. More to Petitioners' point, the Deep Water Policy undoubtedly engendered

serious reliance interests within the industry. (Doc. 89 p. 50 ("In turn, to justify their decisions over the last two decades to undertake the multi-billion dollar costs of deepwater OCS leasing and development, lessees reasonably relied on the ability to obtain deepwater OCS transportation allowances to recover the associated costs of this distant movement."); Doc. 23-4 ¶ 14.) ONRR acknowledged and considered these reliance interests. As ONRR explained in the Section-By-Section Analysis of the Proposed Rule, even under the Deep Water Policy, production movement to a central accumulation or treatment point was considered gathering, not transportation. 80 Fed. Reg. at 624 (AR 788); *see also Kerr-McGee Corp.*, 147 IBLA 277, 281 (1999) ("Gathering means the movement of lease production to a central accumulation and/or treatment point on the lease ... or ... off the lease ....") (quoting 30 C.F.R. § 206.151 (1995)). ONNR explained the issue was that "[u]nder the Deep Water Policy, ONRR considered a subsea manifold located on the OCS in deep water to be a 'central accumulation point' **regardless of whether it was actually a central accumulation or treatment point**." *Id.* (emphasis added). Thus, since it "issued the Deep Water Policy, lessees have been deducting the costs of moving bulk production from the subsea manifold to the platform where the oil and gas first surface," and lessees have even "attempted to expand the Deep Water Policy to deem subsea wellheads 'central accumulation points' and take transportation allowances from the sea bed floor to the first platform where the bulk production surfaces." *Id.* In changing its position and canceling the Deep Water Policy, ONRR explained that it believes this production movement is more accurately classified as non-deductible gathering instead of deductible transportation. *Id.* That is, the "central accumulation point" is the first platform. ONRR "determined that the

Deep Water Policy is inconsistent with our regulatory definition of gathering and Departmental decisions interpreting that term." *Id.*; *see Kerr-McGee*, 147 IBLA at 282 ("Kerr-McGee's gas was accumulated and rendered marketable at the processing platforms … and [] the gas was sold at those locations…. Accordingly, Kerr-McGee's gas was not marketable prior to arriving at [the platforms], and the pipelines by which it arrived there are properly considered 'gathering' lines.")

ONRR explained why it decided it was better to cancel the Deep Water Policy. ONRR concluded the policy has largely served its original purpose of incentivizing deepwater leasing and development. 81 Fed. Reg. at 43340 (AR 73966). It also determined, "Rescinding this policy clarifies the meaning of gathering, which, in turn, provides a more consistent and reliable application of the regulations." *Id.* Finally, it estimated eliminating the Deep Water Policy would "provide industry with an administrative benefit because they will no longer have to perform" the calculation, which often entailed a "significant" cost as "industry has often hired outside consultants to calculate their subsea transportation allowances." *Id.* at 43364 (AR 73990).

In sum, ONRR announced its intention to rescind the Deep Water Policy by disallowing production movement from the wellhead or seafloor manifold to the first offshore platform to be deductible. It then provided a reasoned explanation underlying its decision to change, that being primarily to more closely reflect reality, be more consistent in its "gathering" definition, and its belief that the incentives associated with the Deep Water Policy were no longer justified. Finally, ONRR explained why it believes canceling the Deep Water Policy is better, to increase consistency and simplify the reporting

calculations.  ONNR considered the relevant information and articulated a rational basis based on the relevant information for its decision to vacate the Deep Water Policy.  An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Fox Television Stations*, 556 U.S. at 515 (emphases in original); *see also Encino Motocars, LLC v. Navarro*, 136 S.Ct. 2117, 2125-26 (2016).  ONRR has done so here, and Petitioners have not established that ONRR acted arbitrarily or capriciously, abused its discretion, or exceed its lawful authority by rescinding the Deep Water Policy.

### 1.3  ONRR did not act arbitrarily and capriciously, abuse its discretion, or act unlawfully by implementing caps on transportation and processing allowances.

Petitioners next challenge ONRR's decision to place caps and restrictions on certain allowances applicable to federal oil and gas leases.  Specifically, the 2016 Valuation Rule precludes lessees from taking a transportation allowance exceeding 50 percent of the value of the oil or gas.  30 C.F.R. §§ 1206.110(d)(1) (oil) (AR 74002), 1206.152(e)(1) (gas) (AR 74010).  Additionally, it precludes lessees from taking a gas processing allowance that exceeds 66⅔ percent of the value of each gas plant product.  30 C.F.R. § 1206.159(c)(2) (AR 74013).  These capped allowances existed previously, but the 2016 Valuation Rule took away ONRR's discretionary authority to approve allowances exceeding these limitations.  *See, e.g.*, 80 Fed. Reg. at 614, 624 (AR 778, 788).

Petitioners contend these new hard limits prevent lessees from accounting for the

"reasonable and actual costs incurred." (Doc. 89 p. 56.)  They argue,

> These newly inflexible caps are arbitrary and unreasonable because it is
> ineluctable that the Rule cannot yield value "at the lease" when it arbitrarily
> prohibits lessees from deducting the *full* reasonable and actual transportation
> costs from sales prices in distant markets, or the *full* reasonable and actual
> processing costs from the enhanced value of post-processing gas plant
> products.

(*Id.* p. 57 (emphases in original).)

In the January 2015 Proposed Rule, ONRR explained its decision to hard cap the

transportation allowances as follows:

> To ensure a fair return to the public and to limit ONRR's administrative costs
> to process such requests [for exception], the proposed regulation eliminates
> the exception to the 50-percent limit.  ONRR believes the current 50-percent
> limit on transportation-related costs is adequate in the vast majority of
> transportation situations.

80 Fed. Reg. at 624 (AR 788).  ONRR's rationale concerning gas processing allowances

was similar:

> ONRR believes the current 66⅔ percent limit on processing-related costs is
> adequate in the vast majority of situations. To date, we only have approved
> two extraordinary processing cost allowances.  Given the age of the plants
> and improvements in technology, ONRR believes such extraordinary cost
> allowances no longer reflect current conditions.   Furthermore, ONRR
> believes the current 66⅔ percent limitation on gas plant products ensures a
> fair return to the public.

*Id.* at 627 (AR 791).

Further, in the Final Rule, ONRR expressly addressed the industry's argument that

the absence of the exception denies lessees the ability to deduct its actual and reasonable

transportation costs.  It noted that both the MLA and OSCLA require royalty payments of

at least 12.5 percent "in amount or value of production."  81 Fed. Reg. at 43343 (AR

73969).  As noted previously, "value" is not defined, "which gives the [DOI] Secretary considerable discretion to define the term 'value.'"  *Id*.  ONRR exercised its discretion by permitting these allowances, and it exercised the same discretion in capping the allowances.  *Id*.  Determining what is a reasonable allowance is within ONRR's expertise.

The Court finds it significant that a stated goal of the 2016 Valuation Rule was to "offer greater simplicity, certainty, clarity, and consistency" in valuing production.  81 Fed. Reg. at 43338 (AR 73964).  Eliminating case-by-case exceptions for transportation and gas-processing allowances reasonably advances this stated goal.

ONRR displayed awareness that it was changing these transportation and gas processing allowance provisions to create hard limitations and eliminate previously-available, case-by-case exceptions.  It explained that doing so conformed better to "the vast majority of [industry's] situations" while still balancing a fair return of royalty for the public.  The new limits also simplify both ONRR's and the industry's administrative burdens by eliminating application for and consideration of case-by-case exceptions. ONRR considered the relevant information and articulated a rational basis for its decision, which is all the law requires.  The changes are permissible under ONRR's authority, ONRR has expressed good reasons for the changes, and ONRR explained why it believes the changes are better.  Petitioners have not established that ONRR acted arbitrarily or capriciously, abused its discretion, or exceeded its lawful authority by disallowing exceptions to its transportation and gas-processing allowances.

### 1.4   ONRR did not act arbitrarily and capriciously, abuse its discretion, or act unlawfully by implementing a new index pricing option for non-arm's-length gas transfers.

In the 2016 Valuation Rule, ONRR implemented a new method for valuing gas sold in a non-arm's-length transaction. In brief, the new method requires producers to value such gas for royalty purposes equivalent to the "highest reported monthly bidweek price" for the production month, based on available index pricing points published in an ONRR-approved publication. 30 C.F.R. §§ 1206.141(c) (unprocessed gas), 1206.142(d) (processed gas). Petitioners argue this new method extracts "an arbitrarily inflated premium," improperly ignores "how gas actually flows and is sold," and is akin to a "convenience fee." (Doc. 89 p. 61.)

It is significant that the 2016 Valuation Rule first allows producers to value their gas under their or their affiliate's (or their affiliate's affiliate's, etc.) first arm's-length sale. 30 C.F.R. §§ 1206.141(b), 1206.142(c). "The first arm's-length sale may occur immediately, or may follow one or more non-arm's-length transfers or sales of the gas." 80 Fed. Reg. at 617 (AR 781). This conforms to the well-accepted principle that the "values established in arm's-length transactions are the best indication of market value." 81 Fed. Reg. at 43346 (AR 73972); *see E. I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 59 (1977) ("in a market economy, the value of any commodity is no more nor less than the price arm's-length bargainers agree on") (Brennan, J., dissenting). Thus, where an arm's-length sale occurs, immediately or eventually, gas will only be valued under the index pricing option where the lessee affirmatively elects such (for example, to avoid the administrative costs of tracing though numerous non-arm's-length transfers prior to the first arm's-length sale). 80 Fed. Reg. at 617 (AR 781).

The index pricing option "is based on publicly available index prices less a specified deduction to account for processing and transportation costs." *Id.* Petitioners argue the index pricing option is (1) over-inflated because it employs the highest index price, and (2) unrealistic because it requires the use of the highest available index price even if the gas did not actually go to that indexing price point. ONRR advanced this pricing option because it "simplifies the [former] valuation methodology and provides early certainty" for both ONRR and the royalty reporter. *Id.* In the Final Rule, ONRR explained why it believes using the "highest reported monthly bidweek price" is not unreasonably inflated:

> The value under an index-based valuation option is reasonable and justified because of the benefits that it affords to the lessee. Lessees have the burden of showing that none of the costs that they incur and deduct are costs to place their gas production in marketable condition. *Burlington Res. Oil & Gas Co. LP v. U.S. Dep't of the Interior*, No. 13-CV-0678-CVE-TLW, 2014 WL 3721210, at *12 (N.D. Okla. July 24, 2014). This burden includes separating or "unbundling" costs associated with putting production in marketable condition as discussed in *Burlington*. If the lessee chooses to use the index-based option, it will relieve the lessee of those responsibilities.

81 Fed. Reg. at 43347 (AR 73973). In other words, ONRR concluded the administrative savings available to lessees who use the index pricing option fairly offset the use of the "highest reported monthly bidweek price" as the valuation point, even if the lessee was not able to actually sell its gas based on that index price.

> This provision protects the interests of the Federal lessor, while also simplifying the royalty reporting process for industry. If this rule required a lessee to calculate royalty on the basis of the index pricing point(s) to which the gas did flow, we would require companies to trace production, potentially through a series of affiliated transactions, and determine what volumes of gas flowed to which index pricing points. This increases the burden for both industry and us. We retained this provision in the final rule because it is consistent with the administrative simplicity that the index-based method seeks to achieve.

*Id.*

Finally, Petitioners contend the 2016 Valuation Rule's fixed adjustments to the index prices are arbitrary and too limited. (Doc. 89 pp. 63-65.) "Under the Rule, to arrive at royalty value for their produced gas, onshore lessees must reduce the applicable index price by 10 percent, and OCS lessees must employ a 5 percent reduction, but in no event may the reduction be less than 10 cents per MMBtu or more than 30 cents per MMBtu," and "lessees 'may not take any other deduction' under the Rule's index methodology." (*Id.* p. 64 (citing 30 C.F.R. § 1206.141(c)(1)(iv) and quoting 30 C.F.R. § 1206.141(c)(2).)

ONRR provided these reductions to account for transportation costs because "index pricing points are normally located off of the lease and, frequently, are at lengthy distances from the lease." 81 Fed. Reg. at 43346 (AR 73972). It also "analyzed transportation rate data ... and determined that the rates, as proposed, are a reasonable reduction to the index price." *Id.*; *see also* 80 Fed. Reg. at 618 (AR 782) ("ONRR proposes these percent reductions based on the average gas transportation rates that lessees have reported to ONRR from 2007 through 2010 for OCS and all other areas.").

ONRR provided a reasoned explanation for the creation and scope of this index pricing option. While this valuation option does not fully represent the realities of the situation, ONRR freely admitted certain estimates and allowances were necessarily included. And these estimates and allowances were not arbitrary and were advanced with supporting data and reasons after a full consideration of the matter and the many comments to the proposed change. This is all that is required of ONRR. It considered the relevant

information and articulated a rational basis for its decision.  Promulgating the index pricing option in its current form is permissible under ONRR's authority, ONRR expressed good reasons for its creation and its scope, and it explained why it believes the index pricing option is superior to the discontinued valuation methodologies.  Petitioners have not established that ONRR acted arbitrarily or capriciously, abused its discretion, or exceeded its lawful authority by advancing the index pricing option in its current form for valuing non-arm's-length transfers of gas.

### 1.5   ONRR did not act arbitrarily and capriciously, abuse its discretion, or act unlawfully by requiring written, signed contracts.

The 2016 Valuation Rule required a lessee or its affiliate to "make all contracts, contract revisions, or amendments in writing, and all parties to the contract must sign the contract, contract revisions, or amendments" for all valuation methods.  30 C.F.R. §§ 1206.104(g)(1) (federal oil sales); 1206.143(g)(1) (federal gas sales); 1206.253(g)(1) (federal coal sales); 1206.453(g)(1) (Indian coal sales).  This requirement also applies to transportation and processing contracts.  *See, e.g.*, 30 C.F.R. §§ 111(d) (federal oil transportation); 30 C.F.R. § 1206.153(d) (federal gas transportation).  If a lessee or affiliate fails to meet this requirement, ONRR may determine the value of the production (or the transportation or processing allowance) under its default provisions.  81 Fed. Reg. at 43342 (AR 73968).  Petitioners contend this requirement fails to reflect "modern real world business practices."  (Doc. 89 p. 66.)  Moreover, argue Petitioners, this requirement contradicts the law, which recognizes the enforceability of oral and unsigned agreements.  (*Id.*)

ONRR discussed this new signed writing requirement in its January 2015 Proposed Rule:

> Lessees should provide to ONRR the actual, written contracts signed by all parties because those contracts document the very transactions on which the regulations require lessees to base values and allowances. Without the applicable sales, transportation, and/or processing contracts, neither the lessee nor ONRR can verify that Federal Royalties are properly paid.

80 Fed. Reg. at 622 (AR 786). And in the Final Rule, it responded to Petitioners' criticism thusly:

> We have the responsibility of auditing gross proceeds in order to ensure that they reflect the total consideration actually transferred, either directly or indirectly, from the buyer to the seller. Through this auditing process, we have found it difficult to verify the accuracy of lessees' royalty payments when the lessees enter into oral contracts.
>
> * * *
>
> Tracking email exchanges, letters, or other confirmations creates inefficiencies in our accounting and auditing systems, which limits our ability to fulfill FOGRMA's mandate to verify and account for royalty payments.

81 Fed. Reg. at 43342 (AR 73968).

As the Court previously said concerning this new signed writing requirement, "While this requirement may be unwieldy and problematic for lessees, ONRR has asserted good reasons underlying it. 'The Court is not free to second guess or review the *wisdom* of the agency's decision.'" *Cloud Peak*, 415 F. Supp. 3d at 1049 (quoting *Colorado Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1243 (D. Colo. 2012) (emphasis in *Salazar*)). ONRR explained that requiring written, signed contracts will greatly assist it in carrying out its statutory duty to collect and audit royalty payments. ONRR acknowledges that oral

contracts remain enforceable under the law, 30 C.F.R. § 1206.20, but ONRR desires a written, signed contract to accurately execute its accounting obligations. Petitioners disagree with ONRR's reasons underlying this new requirement, but those reasons are sufficient to show ONRR has not acted arbitrarily or exceeded its lawful authority in implementing the signed writing requirement.

Petitioners also attack the provisions that allow ONRR to ignore a written, signed contract and determine the value of certain production under the default provision where the oil or gas sales price is "unreasonably low." (Doc. 89 pp. 67-69.) The 2016 Valuation Rule provides that ONRR may determine the value of production where:

> You have breached your duty to market the oil for the mutual benefit of yourself and the lessor by selling your oil at a value that is unreasonably low. ONRR may consider a sales price to be unreasonably low if it is 10 percent less than the lowest reasonable measures of market price including, but not limited to, index prices and prices reported to ONRR for like-quality oil.

30 C.F.R. § 1206.104(c)(2); *see also* 30 C.F.R. § 1206.143(c)(2) (as to sales of gas, residue gas, and gas plant products). The Rule includes similar provisions concerning oil and gas transportation or processing agreements that are "unreasonably high." 30 C.F.R. §§ 1206.110(f)(2) (oil transportation); 1206.152(g)(2) (gas transportation); 1206.159(e)(2) (gas processing). Petitioners argue this presents no standard at all, and "[w]hile ONRR need not blindly accept every arm's-length contract, the unchecked discretion afforded by these Rule provisions broadly undercuts arm's-length agreements and the certainty that is critical to lessees' royalty valuation." (Doc. 89 p. 69.) Petitioners also challenge the default valuation provisions themselves (Doc. 89 pp. 99-107), which the Court will address below. The current discussion concerns the sections allowing ONRR to implement the

default provisions based on "unreasonably low/unreasonably high" contracts.

Petitioners largely argue about the "10 percent threshold." (Doc. 89 pp. 68-69.) Their concerns are unpersuasive. "The 10-percent variance that we *may* use in our analysis of transportation transactions is nothing more than a tolerance to help determine a proper transportation allowance." 81 Fed. Reg. at 43341-42 (AR 73967-68) (emphasis in original). Petitioners' argument about the consequences of being "10.1 percent below what ONRR deems the 'the lowest reasonable value'" (Doc. 89 p. 68) is speculative and based more in hysteria than fact. The 10-percent is a guide for ONRR, and Petitioners have not shown it to be an unreasonable guide.

ONRR provided appropriate reasons for implementing the written, signed contract requirement and the "unreasonably low/unreasonably high" default trigger. ONRR considered ways to better implement its statutory collection and auditing duties while ensuring accurate royalties are paid, and it rationally decided on these. Neither is ONRR's "unreasonably low" determination untethered, as it is tied to the lowest reasonable measures of market price. Petitioners have not shown that ONRR acted arbitrarily or capriciously, abused its discretion, or exceeded its lawful authority by promulgating the signed writing requirement for contracts and the default valuation trigger for "unreasonably low" valuations or "unreasonably high" allowances.

### 1.6   The 2016 Valuation Rule's "default provisions" are not arbitrary or unlawful as to oil and gas.

The 2016 Valuation Rule includes several "default provisions," which allow ONRR to value production or determine allowances when triggered. As noted above, one example

of this is where ONRR determines a lessee has valued its production for royalty purposes at an "unreasonably low" price. ONRR would then value the commodity, considering any information it deems relevant to such valuation. *See, e.g.*, 30 C.F.R. §§ 1206.105 (federal oil default provision), 1206.144 (federal gas default provision). Petitioners contend this affords ONRR "unbridled discretion to determine value and no safeguards against arbitrariness." (Doc. 89 p. 101.)

This Court already noted that the default provisions "give ONRR a great deal of discretion." *Cloud Peak*, 415 F. Supp. 3d at 1048. But it also noted this discretion comes from the "rather sweeping authority" Congress granted the DOI Secretary "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of [the leasing statutes]." *Id.* (quoting *Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1039 (D.C. Cir. 2002)). The Court finds it significant that the default provisions are not a standard valuation method; they are a fallback for when the standard methods for valuation or auditing fail.

> The default provision addresses valuation situations where circumstances result in the Secretary of the Interior's (Secretary) inability to reasonably determine the correct value of production. Such circumstances include, but are not limited to, the lessee's failure to provide documents, the lessee's misconduct, the lessee's breach of the duty to market, or any other situation that significantly compromises the Secretary's ability to reasonably determine the correct value. The mineral statutes and lease terms give the Secretary the authority and considerable discretion to establish the reasonable value of production by using a variety of discretionary factors and any other information that the Secretary determines is relevant. The default provision simply codifies the Secretary's authority to determine the value of production for royalty purposes and specifically enumerates when, where, and how the Secretary will use that discretion.

\* \* \*

> Some commenters contend that ONRR did not perform an adequate
> economic analysis in assigning a royalty impact to invoking the default
> provision.  We disagree and emphasize, again, that we anticipate using the
> default provision only in very specific cases where we cannot determine
> proper royalty values through standard procedures.

81 Fed. Reg. at 43341 (AR 73967).

Moreover, the default provisions do not give ONRR unbounded discretion to make

up valuations out of thin air.  "[T]he default provision will always establish a reasonable

value of production **using market-based transaction data**, which has always been the

basis for our royalty valuation rules."  *Id.* (emphasis added).   And a lessee's right to

challenge a valuation determined by ONRR remains available.

> Some industry commenters expressed concerns over their ability to challenge
> our use of the default provision.   Industry's concerns are unwarranted
> because a company may appeal an order, including an order wherein we used
> the default provision to determine royalty value.  Appeal rights under 30 CFR
> part 1290 will not change under this final rule.

*Id.*

In sum, under 30 U.S.C. § 1711 Congress delegated to ONRR a substantial amount

of responsibility to collect and audit royalty payments, along with a substantial amount of

discretion to accomplish the task.  *Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030,

1033 (D.C. Cir. 2008) ("In the Federal Oil and Gas Royalty Management Act, the Secretary

of the Interior was instructed by Congress to create a comprehensive inspection, collection,

accounting, and auditing system to ensure that the government receives the royalties

owed.").  The default provisions constitute a reasonable fallback method within ONRR's

discretion that allows it to meet its statutory obligations when the primary valuation

methodologies fail.   ONRR considered the many comments concerning the default provisions and provided rational reasons for adopting the default provisions. Petitioners have not shown that ONRR acted arbitrarily or capriciously, abused its discretion, or exceeded its lawful authority by enacting the default provisions in the 2016 Valuation Rule.

2.   **As to federal and Indian coal, Petitioners have shown the coal-valuation provisions in the 2016 Valuation Rule are arbitrary and capricious, beyond statutory authority, and generally unworkable.**

As with the preliminary injunction, the result is different when it comes to the federal and Indian coal provisions.   Previously, the Court found the provision "requiring lessees to value coal based on the gross proceeds of electricity sales (when there is no prior arm's-length sale) is likely to be found contrary to law or arbitrary and capricious on the merits." *Cloud Peak*, 415 F. Supp. 3d at 1051.   After determining that enjoining "only the subsections that contemplate using electricity sales to value coal" appeared likely "to cause more problems than it solves," the Court preliminarily enjoined the 2016 Valuation Rule's "application as to all facets of coal valuation." *Id.* at 1052-53.

Federal Respondents now concede that several coal-specific provisions in the 2016 Valuation Rule are problematic and unworkable. (Doc. 87; Doc. 97 pp. 46-56.)   They say the Court went too far, though, and only certain electricity-based-valuation provisions should be excised rather than the entire coal-valuation methodology. (Doc. 87 p. 3; Doc. 97 pp. 46-56.)   Of course, Petitioners contend all coal-valuation provisions of the 2016 Valuation Rule (and the entire rule itself) should be struck down. (Doc. 106 pp. 28-38; Doc. 95.)   Respondent-Intervenors contend the Court erred by preliminarily enjoining any part of the coal-valuation methodology and ask that the entire 2016 Valuation Rule be

upheld. (Doc. 102 pp. 48-71.)

Respondent-Intervenors' arguments are unpersuasive. The Court's previous concerns with using electricity sales to value the price of coal continue.

Several problems are inherent in valuing coal based on the sale of electricity, but the Court will only discuss two of the more glaring problems to serve as examples. First, "an electricity utility's power supply portfolio typically includes a range of options, from nuclear to coal to natural gas to hydro, wind, and solar." Jim Rossi, *The Shaky Political Economy Foundation of a National Renewable Electricity Requirement*, 2011 U. Ill. L. Rev. 361, 369 (2011). The electricity sold to consumers is generated from multiple sources, not just coal. Thus, the sales price of the electricity is comprised of much more than just the cost of coal, and that's ignoring the rabbit hole that is electricity sales regulation by both the federal and state governments. Trying to value coal based on the sale of electricity is akin to valuing wheat based on the sale of a cake; there may be a relationship between the two, but it is weak and several other factors potentially play a much larger role in determining the sales price of the end product. In response to comments, ONRR noted, "Opponents argued that valuing coal using electric sales was a violation of the MLA, ignored and oversimplified the complexities of electric markets and contracts, and was administratively burdensome." 81 Fed. Reg. at 43355. While ONRR refuted it was in violation of the Mineral Leasing Act, citing 30 U.S.C. § 207, ONRR offered no response to the contention that it ignored and oversimplified the complexities of electric markets. **Moreover, at the September 4, 2019 hearing, none of the parties could articulate how this provision could be applied to extract the value of the coal from the sale of electricity, a highly-regulated commodity.**

Second, coal delivered to a power plant may sit in storage and not be burned to generate electricity until well after the lessee is required to report the value of that coal to ONRR for royalty-calculation purposes. *See Herman v. Associated Elec. Co-op., Inc.*, 172 F.3d 1078, 1088 (8th Cir. 1999) ("The refuse and coal was screened, sized, crushed, and stored until it was fed into boilers to produce electricity and steam."). This renders it impossible to value the coal based on the sales price of electricity because there's no relationship between the two at the time the report to ONRR is due. This further creates the issue of whether ONRR is in fact requiring "payment of a royalty ... of not less than 12 ½ per centum of *the value of coal,*" 30 U.S.C. § 207(a) (emphasis added), or, contrary to ONRR's statutory authority, requiring payment of royalty based upon the value of electricity.

*Cloud Peak*, 415 F. Supp. 3d at 1050–51 (bold added).  At the core of the Court's concerns is the functional difficulty (if not sheer impossibility) of valuing coal based on the altogether different, and highly regulated, commodity of electricity.  Now having the benefit of full briefing and the administrative record before it, the Court remains convinced that

> [b]asing the value of coal on the sales prices of electricity and failing to discuss the serious complications and complexities suggests ONRR either exceeded its statutory authority, failed to consider an important aspect of the problem, contradicts the evidence before the agency, or is so implausible that it cannot be explained by a difference in view or the product of agency expertise.

*Id.* at 1051.  It is also significant that the parties responsible for paying royalties (Petitioners) and collecting royalties (ONRR) all agree with this assessment, and the only parties in disagreement (Intervenor-Respondents) do neither.

Consequently, Federal Respondents contend, and the Court agrees, the following electricity-based-valuation provisions must be vacated from the 2016 Valuation Rule:

(1)     The definition of "coal cooperative" from 30 C.F.R. § 1206.20;

(2)     The phrase "one of the following applies" from 30 C.F.R. § 1206.252(b);

(3)     30 C.F.R. § 1206.252(b)(1) and (b)(2), but retaining subsections (b)(2)(i) through (b)(2)(iii);

(4)     30 C.F.R. § 1206.252(c);

(5)     The phrase "including, but not limited to, the price of electricity" from 30 C.F.R. § 1206.254(b);

(6)     The phrase "one of the following applies" from 30 C.F.R. § 1206.452(b);

(7)   30 C.F.R. § 1206.452(b)(1) and (b)(2), but retaining subsections (b)(2)(i) through (b)(2)(iii);

(8)   30 C.F.R. § 1206.452(c); and

(9)   The phrase "including, but not limited to, the price of electricity" from 30 C.F.R. § 1206.454(b).

(*See* Doc. 88-1); *see also* 5 U.S.C. § 706(2)(A), (C) (a reviewing court "shall ... hold unlawful and set aside agency action ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] in excess of statutory jurisdiction, authority, or limitations"); *Wyoming v. United States Dep't of the Interior*, 493 F. Supp. 3d 1046, 1085 (D. Wyo. 2020) ("Except in limited circumstances, vacatur is the typical and appropriate remedy under the APA for unlawful agency action.").

The issue now becomes whether any of the remaining coal-valuation provisions of the 2016 Valuation Rule must also be vacated. *See High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1228-29 (10th Cir. 2020) ("a court 'may partially set aside a regulation if the invalid portion is severable,' that is, 'if the severed parts operate entirely independently of one another, and the circumstances indicate the agency would have adopted the regulation even without the faulty provision.'") (quoting *Ariz. Pub. Serv. Co. v. U.S. E.P.A.*, 562 F.3d 1116, 1122 (10th Cir. 2009)). The Court finds the decision is largely controlled by the remaining functionality of the Rule's coal-valuation methodology. After considering the parties' full merits briefing and the entire record, the Court continues to find that severance of only the electricity-based-valuation provisions "would appear to cause more problems than it solves," *id.* at 1052, and would leave the coal-valuation methodology arbitrary and unworkable in practice.

Under the 2016 Valuation Rule, the primary method for valuing coal is to base it on the first arm's-length sale. Where the lessee first transfers the coal in a non-arm's-length transaction, though, the preferred methodology becomes a netback calculation based on the gross proceeds accruing to the affiliate "under the first arm's-length contract" less applicable transportation and washing allowances. 30 C.F.R. §§ 1206.252(a) (federal coal); 1206.452(a) (Indian coal). This methodology replaced the former "benchmark" valuation system in circumstances where the lessee first transferred the coal in a non-arm's-length transaction. Under the 2016 Rule, the lessee would trace the coal through the non-arm's-length transfers to the first arm's-length sale and then determine the coal's value on that sale (less applicable deductions).

The Court does not find this netback provision particularly troubling. "[A]n arm's-length sale has been historically accepted as an accurate measurement of an item's value." *Cloud Peak*, 415 F. Supp. 3d at 1052; *see also* 76 Fed. Reg. 30878, 30879 (May 27, 2011) ("The Department of the Interior has long held the view that the prices agreed to in arm's-length transactions are the best indication of market value."). The following comments from ONRR in the July 2016 Final Rule are reasonable and support this coal-valuation provision:

> The best indication of value is the gross proceeds received under an arm's-length contract between independent persons who are not affiliates and who have opposing economic interests regarding that contract. The best indicator of value under a non-arm's-length sale is the gross proceeds accruing to the lessee or its affiliate under the first arm's-length contract, less applicable allowances.

81 Fed. Reg. at 473339 (AR 73965). Moreover, this coal-valuation method appears

consistent with how lessees are required to value oil and gas.  *See* 30 C.F.R. §§ 1206.52(a); 1206.141(b); 1206.142(c); 81 Fed. Reg. at 43354 (AR 73980) ("Consistent with how we require lessees to value other commodities, we are requiring lessees to value non-arm's-length dispositions of Federal coal at the first arm's-length sale.").

The problem occurs where there is never a "first arm's-length sale" of the coal.  If the Court were to vacate only the electricity-based-valuation provisions, the remaining coal-valuation provisions would effectively provide little to no guidance for lessees to value coal never transferred at arm's-length.  Where the non-arm's-length coal is burned at a power plant to generate electricity, the lessee "must propose to ONRR a method to determine the value using the procedures in § 1206.258(a)."    30 C.F.R. §§ 1206.252(b)(2)(i) (federal coal), 1206.452(b)(2)(i) (Indian coal).   The lessee then must use that proposed method to value its coal for royalty purposes, and ONRR will later determine whether the proposed valuation methodology is appropriate.  30 C.F.R. §§ 1206.252(b)(2)(ii) through (b)(2)(iii) (federal coal), 1206.452(b)(2)(ii) through (b)(2)(iii) (Indian coal); *see also* 81 Fed. Reg. at 43366 (AR 73992) ("If we were unable to establish royalty values of Federal coal using the sales value of electricity generated from coal produced, royalty value will be based on a method that the lessee proposes under § 1206.252(b)(2)(i), which we approve, or on a method that we determine under § 1206.254 [default provision for federal coal].").  This provides the lessee with no clear, consistent standard to anticipate its royalty obligations and make business determinations.

Despite ONRR's assertion that it "seek[s] a clear, consistent, and repeatable standard for valuing coal at its true market value," 81 Fed. Reg. at 43339 (AR 73965), this

"propose-to-us-a-methodology" offers a lessee no standard to follow for non-arm's-length coal that was burned to generate electricity. Petitioners correctly contend, "The Rule would afford no methodology for valuing such coal, instead forcing coal lessees to make case-by-case proposals to ONRR and subjecting them to the default provisions." (Doc. 106 p. 45.) This lack of guidance also fails to fulfill the statutory requirement that a coal lease "shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12½ per centum of **the value of coal as defined by regulation**[.]" 30 U.S.C. § 207(a) (emphasis added). After vacating the electricity-based-valuation provisions in the 2016 Valuation Rule, ONRR effectively says, "For non-arm's-length coal used to generate electricity, the lessee must tell us how to value the coal, and we'll determine later whether the lessee was correct." This cannot be said to provide a "clear, consistent, and repeatable standard for valuing coal at its true market value." It is particularly problematic because, as Federal Respondents readily point out, "Lessees are responsible, in the first instance, for accurately calculating and paying royalties." (Doc. 97 p. 12 (citing *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 88 (2006).) Absent sufficient guidance, lessees will struggle to meet this obligation. And this is not to mention the apparent gap in the regulations concerning coal that is (1) never transferred at arm's-length and (2) not used to generate electricity. *See* 30 C.F.R. § 1206.252; *see also* Doc. 89 p. 92 ("When a coal lessee or its affiliate does not sell coal at arm's-length and the netback from electricity does not apply, the 2016 Rule does not specify any valuation method.").

The Court concludes the lack of guidance, arbitrariness, and practical unworkability of the 2016 Valuation Rule's coal-valuation methodology cannot be cured through a

selective line-item veto. As at the preliminary-injunction stage, the Court determines the 2016 Valuation Rule cannot be given effect as to its coal-valuation provisions. The provisions specific to the valuation of federal and Indian coal must be vacated.

## CONCLUSION AND ORDER

ONRR has been delegated substantial authority by Congress in determining the means and methods to value and collect royalties. As has long been recognized by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984):

> an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." *TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

*Id.* at 865-66. While not the ideal way to function given the sometimes dramatic policy shifts every four to eight years, the reality under *Chevron* is, as the Government-Respondent asserts, "[i]nherent within the modern administrative state is the Executive

branch prerogative to define and make changes in policy." (Doc. 97 p. 9.)  So it must be.

Nonetheless, Petitioners have established the coal-valuation provisions of the 2016 Valuation Rule must be vacated under the APA as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.  However, the oil-valuation and gas-valuation provisions have not been shown to be in violation of the APA or other law and should not be set aside.  Further, the oil-valuation and gas-valuation provisions are readily severable from the coal-valuation provisions, as has been the practice since this Court entered the partial preliminary injunction in October 2019.

**IT IS THEREFORE ORDERED** that the federal and Indian coal-valuation provisions of the 2016 Valuation Rule are hereby **VACATED**.  As the coal-specific 2016 Valuation Rule provisions have never been put into practice (due to the earlier preliminary injunction), the pre-2016 valuation methodologies for federal and Indian coal shall continue to govern.

**IT IS FURTHER ORDERED** that the federal oil-valuation provisions and Federal gas-valuation provisions of the 2016 Valuation Rule are hereby **UPHELD**.

**IT IS FURTHER ORDERED** that Federal Respondents' Motion for Final Judgment (Doc. 87) is hereby **DENIED AS MOOT** based on the Court's full review of the matter here.

**DATED:** September ___8___, 2021.

Scott W. Skavdahl
United States District Judge

# ATTACHMENT 2

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

CLOUD PEAK ENERGY INC.; NATIONAL MINING
ASSOCIATION; and WYOMING MINING ASSOCIATION,

      Petitioners,

      v.

UNITED STATES DEPARTMENT OF THE INTERIOR; *et al.*,

      Respondents.

**No. 19-CV-120-SWS**
**(Lead Case)**

---

AMERICAN PETROLEUM INSTITUTE;

      Petitioner,

      v.

UNITED STATES DEPARTMENT OF THE INTERIOR; *et al.*,

      Respondents.

No. 19-CV-121-SWS
(Joined Case)

---

TRI-STATE GENERATION AND TRANSMISSION ASS'N,
INC.; BASIN ELECTRIC POWER COOPERATIVE; and
WESTERN FUELS-WYOMING, INC.,

      Petitioners,

      v.

DAVID BERNHARDT, in his official capacity as Secretary
of the U.S. Department of Interior; *et al.*

      Respondents.

No. 19-CV-126-SWS
(Joined Case)

## JUDGMENT

These joined cases came before the Court under the Administrative Procedure Act (APA), 5 U.S.C. § 706, for judicial review of a rule promulgated in 2016 by the Office of Natural Resources Revenue (ONRR), which effectively changed how royalties owed to the federal government were calculated on oil, gas, and coal produced from federal lands and offshore leases as well as coal produced from Indian lands (2016 Valuation Rule).  The Court entered an Order Upholding in Part and Reversing in Part 2016 Valuation Rule on September 8, 2021 (19-CV-120 Doc. 107), which is fully incorporated herein by this reference.  In accordance with the findings of fact and conclusions of law set forth in that Order,

**IT IS HEREBY ORDERED AND ADJUDGED** that the federal and Indian coal-valuation provisions of the 2016 Valuation Rule are hereby **SET ASIDE AND VACATED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that the federal oil-valuation provisions and federal gas-valuation provisions of the 2016 Valuation Rule are hereby **UPHELD AND AFFIRMED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that Federal Respondents' Motion for Final Judgment (Doc. 87) is hereby **DENIED AS MOOT.**

**FINAL JUDGMENT** is hereby entered accordingly.

**DATED:** September _____8^{TH}_____, 2021.

Scott W. Skavdahl
United States District Judge

# ATTACHMENT 3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 OCT -8 PM 1: 16

MARGARET BOTKINS, CLERK
CASPER

CLOUD PEAK ENERGY INC.; NATIONAL MINING
ASSOCIATION; and WYOMING MINING ASSOCIATION,

Petitioners,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; *et al.*,

Respondents.

**No. 19-CV-120-SWS**
**(Lead Case)**

AMERICAN PETROLEUM INSTITUTE;

Petitioner,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; *et al.*,

Respondents.

No. 19-CV-121-SWS
(Joined Case)

TRI-STATE GENERATION AND TRANSMISSION ASS'N,
INC.; BASIN ELECTRIC POWER COOPERATIVE; and
WESTERN FUELS-WYOMING, INC.,

Petitioners,

v.

DAVID BERNHARDT, in his official capacity as Secretary
of the U.S. Department of Interior; *et al.*

Respondents.

No. 19-CV-126-SWS
(Joined Case)

**ORDER GRANTING PARTIAL PRELIMINARY INJUNCTION**

These joined cases come before the Court on Petitioners' Joint Motion for Preliminary Injunction (Doc. 22[1]) and supporting memorandum (Doc. 23).  Independent Petroleum Association of America filed an amicus curiae brief in support of the request for preliminary injunction (Doc. 47).  Respondents filed an opposition to the motion (Doc. 58). The States of California and New Mexico, Intervenor-Respondents here, filed a joint opposition to preliminary injunction (Doc. 56).  Intervenor-Respondents Natural Resources Defense Council, Northern Plains Resource Council, Powder River Basin Resource Council, The Wilderness Society, and Western Organization of Resource Councils (collectively, "Conservation Groups") also filed a joint opposition to a preliminary injunction (Doc. 57).   Finally, Petitioner Tri-State Generation and Transmission Association, Inc. provided a notice of supplemental evidence (Doc. 59).  The Court held an evidentiary hearing on the matter on September 4, 2019.  (Doc. 62.)  Having considered the evidence and written testimony presented, the arguments of counsel, and the record herein, the Court finds and concludes Petitioners' request for a preliminary injunction should be granted in part and denied in part.

## BACKGROUND

Oil, gas, and coal producers often enter into leases with the federal government or Indian tribes to produce natural resources from federal lands, offshore areas, and Indian lands.  The law generally requires lessees to value the fossil fuels they produce and pay royalties to the federal government on that production by the end of the calendar month

---

[1]  All citations to the record are to the lead case, Case No. 19-CV-120, unless otherwise noted.

following the production month.  Respondent Office of Natural Resources Revenue ("ONRR") is a unit of the U.S. Department of Interior, which is statutorily tasked with collecting, verifying, and then disbursing the revenues associated with the production of natural resources on federal and Indian lands and the Outer Continental Shelf.

In May 2011, ONRR published two advance notices of proposed rulemaking.  The first sought public comments and suggestions concerning potential changes to how federal oil and gas were valued for royalty purposes.  *Federal Oil and Gas Valuation*, 76 Fed. Reg. 30878 (May 27, 2011).  The second requested public comments and suggestions regarding potential changes to how federal and Indian coal was valued.  *Federal and Indian Coal Valuation*, 76 Fed. Reg. 30881 (May 27, 2011).

Following the comment periods as well as six public workshops, ONRR published a proposed rule in January 2015 ("the Proposed Rule"), which sought to change how federal oil, gas, and coal as well as Indian coal would be valued when calculating royalties. *Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform*, 80 Fed. Reg. 608 (Jan. 6, 2015).  In July 2016, following an extended public comment period, ONRR then published the final rule ("the Valuation Rule"), which enacted most of the amendments first set forth by ONRR in its proposed rule.  *Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform Rule*, 81 Fed. Reg. 43338 (July 1, 2016) (to be codified at 30 C.F.R. Parts 1202, 1206[2]).  The Valuation Rule effectively changes how lessees calculate the value of the natural resources in order to pay royalties on oil, gas, and

---

[2]  The Court's citations to the Valuation Rule are to the Federal Register because, as of the date of this Order, both www.ecfr.gov and Westlaw still reflect the pre-2016 text of 30 C.F.R. Parts 1202 and 1206.

coal produced from federal lands and offshore leases as well as coal produced from Indian lands.

On December 29, 2016, Petitioners originally filed challenges to the Valuation Rule in this Court.[3] However, those Petitions were voluntarily dismissed in November 2017 due to the "repeal" of the July 1, 2016 Valuation Rule. (16-CV-319, Doc. 23).

In early 2017, ONRR postponed the Valuation Rule's effective date and then undertook the rulemaking process to pass another rule ("the Repeal Rule") that repealed the Valuation Rule, leaving the former valuation methods unchanged. *Repeal of Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform*, 82 Fed. Reg. 36934 (Aug. 7, 2017). However, in October 2017, the States of California and New Mexico, joined by the Conservation Groups as intervenor-plaintiffs, filed suit in the Northern District of California to challenge the Repeal Rule under the APA. *State of Cal. v. USDOI*, No. C 17-5948 SBA (N.D. Cal. Oct. 17, 2017). On March 29, 2019, the Northern District of California granted summary judgment in the plaintiffs' favor, vacating the Repeal Rule after finding ONRR violated the APA when adopting it. *Id.* at Doc. 72. This effectively reinstated the now-not-repealed Valuation Rule. On June 13, 2019, ONRR issued a "Dear Reporter" letter that announced the Valuation Rule applies to "all federal oil and gas lessees and all federal and Indian coal lessees" from January 1, 2017 forward, and requires full compliance to occur by January 1, 2020. (Doc. 23-3 at p. 1.) "This means that lessees must come into compliance [with the new royalty calculation methods]

---

[3] *Cloud Peak Energy Inc., et al. v. USDOI*, Case No. 16-315; *API v. USDOI*, Case No. 16-316; and *Tri-State Generation and Transmission Ass'n, et al. v. USDOI*, Case No. 16-319.

retrospectively for the last two and a half years and prospectively by January 1, 2020."
(Doc. 23 at p. 11.[4])

The several petitioners before this Court find the Valuation Rule problematic and burdensome. They seek to set it aside under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, arguing it is arbitrary and capricious and exceeds ONRR's authority. Immediately before the Court is Petitioners' request for a preliminary injunction, which would prevent them from having to comply with the Valuation Rule during the pendency of this litigation, thus relieving Petitioners from the "substantial and unnecessary burden" of calculating the royalties owed to the federal government for the development of federal resources under the new valuation methods.

## PRELIMINARY INJUNCTION STANDARD

Preliminary injunctions in this judicial review of administrative action are permitted under the APA, 5 U.S.C. § 705, as well as Federal Rule of Civil Procedure 65(a).

> A preliminary injunction has the limited purpose of preserving the relative positions of the parties until a trial on the merits can be held. It is an extraordinary remedy never awarded as of right. A party may be granted a preliminary injunction only when monetary or other traditional legal remedies are inadequate, and the right to relief is clear and unequivocal.

> Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must show: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.

---

[4] The Court cites to the page numbers at the top of each page assigned to the document by the CM/ECF system, as opposed to the page numbers at the bottom of each page assigned by counsel.

*DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1269–70 (10th Cir. 2018) (internal

citations and quotation marks omitted).

## **DISCUSSION**

"'[B]ecause a showing of probable irreparable harm is the single most important

prerequisite for the issuance of a preliminary injunction, the moving party must first

demonstrate that such injury is likely before the other requirements' will be considered."

*Id.* at 1270 (quoting *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th

Cir. 2017)).

**1.     Petitioners have shown likely irreparable harm.**

"Our frequently reiterated standard requires plaintiffs seeking preliminary relief to

demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). "It is also well settled

that simple economic loss usually does not, in and of itself, constitute irreparable harm;

such losses are compensable by money damages." *Schrier v. Univ. of Colo.*, 427 F.3d

1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189

(10th Cir. 2003)).

Petitioners first contend they face inevitable, irreparable harm because they "must

expend significant sums to attempt full compliance with the [Valuation] Rule by ONRR's

prescribed January 1, 2020 date," including the purchase of new or reprogrammed software

and the need to hire and/or train personnel to recalculate royalties and re-submit reports

from prior years.  (Doc. 23 at p. 17.)  The parties disagree drastically concerning the extent

of the costs of compliance.  Gregory Gould, the Director of ONRR, testified via declaration

that "ONRR estimates the annual cost of rereporting across reporters will be $401,000." (Doc. 58-1 at p. 9.) In stark contrast, Dan Naatz, a Senior Vice President of the Independent Petroleum Association of America ("IPAA," an amicus in this litigation) testified via declaration that the IPAA estimates each of its member-companies faces compliance costs of $100,000 to $330,000 for "lost employee time or direct expense for outside consultants to perform the retrospective reversing and rebooking," with all IPAA members incurring a collective compliance cost of at least $100 million. (Doc. 47-2 at p. 6.)

While each side in this case has tried to paint the issue as black or white, courts are split on the question of whether compliance costs alone can constitute irreparable harm. Some federal circuit courts have said that economic outlays cannot amount to irreparable harm:

- Third Circuit: "Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction."
  *-A. O. Smith Corp. v. F. T. C.*, 530 F.2d 515, 527 (3d Cir. 1976).

- Seventh Circuit: "In addition, injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm."
  *-Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (citing *A. O. Smith Corp.*, 530 F.3d at 527).

- Second Circuit: "However, ordinary compliance costs are typically insufficient to constitute irreparable harm."
  *-Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (finding the loss of interest on escrowed funds did not amount to irreparable harm) (citing *Am. Hosp. Ass'n*, 625 F.2d at 1321, and *A. O. Smith Corp.*, 530 F.3d at 527-28).

Other circuits have taken a more relaxed approach when the movants are barred from the possibility of recovering their monetary costs down the road:

- Eighth Circuit: "The threat of unrecoverable economic loss, however, does qualify as irreparable harm."
  -*Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996).

- Eleventh Circuit: "In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."
  -*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (collecting cases).

- Fifth Circuit: "The tremendous costs of the emissions controls impose a substantial financial injury on the petitioner power companies which, in this circuit, 'may also be sufficient to show irreparable injury.' *Enter. Int'l Inc. v. Corp. Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472–73 (5th Cir. 1985). Indeed 'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.' *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (Scalia, J., concurring in part and in the judgment). When determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts....' *Enter. Int'l*, 762 F.2d at 472. **No mechanism here exists for the power companies to recover the compliance costs they will incur if the Final Rule is invalidated on the merits.**"
  -*Texas v. United States Envtl. Prot. Agency*, 829 F.3d 405, 433–34 (5th Cir. 2016) (emphasis added).

- Ninth Circuit: "Economic harm is not normally considered irreparable. However, such harm is irreparable here because the states will not be able to recover monetary damages connected to the IFRs [interim final rules]."
  -*California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019).

Even where preliminary injunctions or stays pending appeal have been denied for lack of irreparable harm, including in cases quoted above, courts often leave open the possibility that monetary injuries can constitute irreparable harm in cases where they are forever unrecoverable.

- D.C. Circuit: "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. **The possibility that adequate compensatory**

or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."
-*Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (emphasis added).

- Seventh Circuit: "Only harm that the district court cannot remedy following a final determination on the merits may constitute irreparable harm."
  -*Am. Hosp. Ass'n*, 625 F.2d at 1331 (citing *A. O. Smith Corp.*, 530 F.2d at 527).

The preceding rudimentary and incomplete review of caselaw suggests more circuit courts prefer finding monetary costs to be irreparable harm in cases where the costs cannot later be recovered. And while these cases provide only persuasive guidance, the Tenth Circuit and this Court have already previously held that unrecoverable economic costs <u>can</u> constitute irreparable harm for preliminary injunction purposes.

- Tenth Circuit: "Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury. *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.,* 31 F.3d 1536, 1543 (10th Cir.1994); *see also Ohio Oil Co. v. Conway,* 279 U.S. 813, 814, 49 S.Ct. 256, 73 L.Ed. 972 (1929) (holding that paying an allegedly unconstitutional tax when state law did not provide a remedy for its return constituted irreparable injury in the event that the statute were ultimately adjudged invalid); *Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250, 1258 (10th Cir.2003) ('An irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.' (quotation and emphasis omitted)). If forced to comply with the Oklahoma Act, the Chambers' members will face a significant risk of suffering financial harm as described in Part II. Yet, because Oklahoma and its officers are immune from suit for retrospective relief, *Edelman,* 415 U.S. at 667–68, 94 S.Ct. 1347, these financial injuries cannot be remedied."
  -*Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010); *see also Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) ("Under Wyoming law, Tri-State may not be able to collect directly from Pacific…. Difficulty in collecting a damage judgment may support a claim of irreparable injury…. If Tri-State cannot collect a money judgment, then failure to enter the preliminary injunction would irreparably harm it.").

- District of Wyoming: "Economic damages in the form of compliance costs that cannot later be recovered for reasons such as sovereign immunity constitute irreparable injury. *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 756, 770–71 (10th Cir. 2010) (finding trade associations' members were likely to suffer irreparable harm from compliance costs related to Oklahoma law that might total more than $1,000 per business per year because such costs were unrecoverable due to sovereign immunity)."
  *-Wyoming v. United States Dep't of the Interior*, 136 F. Supp. 3d 1317, 1347–48 (D. Wyo. 2015), *vacated and remanded on other grounds sub nom. Wyoming v. Sierra Club*, No. 15-8126, 2016 WL 3853806 (10th Cir. July 13, 2016).

Accordingly, this Court has little difficulty concluding that "the general rule that '[e]conomic harm is not normally considered irreparable' does not apply where there is no adequate remedy to recover those damages, such as in APA cases." *East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018) (quoting *California v. Azar*, 911 F.3d at 581).

As noted earlier, the parties strongly disagree as to how much the compliance costs will amount to. Nonetheless, the parties agree lessees will incur at least <u>some</u> economic costs in complying with the Valuation Rule, and the actual costs likely rest somewhere between the parties' estimates. But even if those costs are closer to ONRR's estimates ($401,000 across the industry) than IPAA's estimates ($100,000+ per company), they're certainly not insignificant. And those compliance costs will not be recoverable later even if Petitioners win on the merits due to the federal government's sovereign immunity from monetary damages. *See* 5 U.S.C. § 702 (allowing a person aggrieved by agency action to file an action "seeking relief other than money damages"); *Lane v. Pena*, 518 U.S. 187, 196 (1996) ("It is plain that Congress is free to waive the Federal Government's sovereign immunity against liability without waiving its immunity from monetary damages awards.

The Administrative Procedure Act (APA) illustrates this nicely."). Consequently, the lessees' monetary costs necessary to comply with the new Valuation Rule, which are not later recoverable even if Petitioners win this litigation on its merits, constitute irreparable injury.

Petitioners also argue irreparable harm exits because lessees face a threat of civil penalties if they mis-report under the Valuation Rule and contend they are likely to mis-report because they don't adequately understand many aspects of the new rule and ONRR has failed to provide sufficient guidance to help. While lessees' fears are not unfounded, the threat of civil penalties for mis-reporting is too speculative to amount to irreparable harm. "[T]o satisfy the irreparable harm factor, the [movant] 'must establish both that harm will occur, and that, when it does, such harm will be irreparable.'" *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1251 (10th Cir. 2017) (quoting *Vega v. Wiley*, 259 F. App'x. 104, 106 (10th Cir. 2007) (unpublished)). Lessees' fears of civil penalties for mis-reporting under the new rule may rest in reality, but such fears are too theoretical and abstract to constitute irreparable harm for injunctive relief. An injunction "will not be granted against something merely feared as liable to occur at some indefinite time." *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931). The Court finds lessees' fears of civil penalties count for very little in the irreparable harm analysis.

At the September 4, 2019 hearing, Respondents also noted Petitioners' delay in seeking injunctive relief counters their claims of irreparable harm. "To be sure, our case law dictates that 'delay in seeking preliminary relief cuts against finding irreparable

injury.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) (quoting *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social and Rehab. Servs.,* 31 F.3d 1536, 1543–44 (10th Cir. 1994)).   And there is some delay at issue here.   The Northern District of California issued its order vacating the Repeal Rule on March 29, 2019.   Petitioners, who were parties in that case, chose not to seek an appeal in the Ninth Circuit to challenge that order.  Instead, more than two months later, on June 12, 2019, they filed petitions for review in this Court to challenge the now-reinstated Valuation Rule.   Petitioners then waited more than another month to pursue their joint motion for preliminary injunction, which they filed on July 19, 2019.   As in the *RoDa Drilling* and *Kan. Health Care Ass'n* cases, though, the three months of delay here does not substantively alter the irreparable harm analysis.   When faced with the Northern District of California's decision, the several Petitioners needed time to consult each other and determine their next steps.   Moreover, and more significantly, Petitioners filed their joint motion for preliminary injunction barely a month after ONRR issued its "Dear Reporter" letter on June 13, 2019, which announced that lessees had only until January 1, 2020, to fully comply with the Valuation Rule. (*See* Doc. 23-3.)  The delay was not unreasonable and not a consequence of Petitioners sitting on their rights.   Therefore, it weighs little against a finding of irreparable harm.

Altogether, lessees' unrecoverable compliance costs suffice to demonstrate irreparable injury, and the Court turns to the remaining requirements for a preliminary injunction.

2.      <u>**Petitioners have shown a likelihood of success on the merits only as to the new valuation methodology for federal and Indian coal.**</u>

"The very purpose of an injunction under Rule 65(a) is to give temporary relief based on a preliminary estimate of the strength of plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc. Civ.* § 2948.3 (3d ed.) (Aug. 2019 update). As the Court still lacks the administrative record in this judicial review action, its current estimate of the case is preliminary and should not be taken as conclusive.

Insofar as relevant here, the APA allows a court to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). When reviewing agency action, "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. 706. Agency action is arbitrary and capricious where

> the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## 2.1    **Extra-Record Documents**

The first issue to consider is the scope of review. Parties on both sides of this case filed attachments from outside the administrative record, including several declarations, and referenced arguments and filings from the Northern District of California. However, when considering the likelihood of success on the merits under the APA, "judicial review

is generally limited to the administrative record." *N. Arapaho Tribe v. Ashe*, 92 F. Supp. 3d 1160, 1170 (D. Wyo. 2015); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").

> Reviews of agency action in the district courts must be processed *as appeals*. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure.

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) (emphasis in original). To that end, Rule 16 of the Federal Rules of Appellate Procedure describes the contents of the administrative record:

(a)   **Composition of the Record.**  The record on review … of an agency order consists of:
(1)   the order involved;
(2)   any finding or report on which it is based; and
(3)   the pleadings, evidence, and other parts of the proceedings before the agency.

Fed. R. App. P. 16(a). The Tenth Circuit has described the few occasions when it may be appropriate to consider something beyond the administrative record:

> A reviewing court may go outside of the administrative record only for limited purposes. For example: Where the administrative record fails to disclose the factors considered by the agency, a reviewing court may require additional findings or testimony from agency officials to determine if the action was justified, *Overton,* 401 U.S. at 420, 91 S.Ct. at 825; or where necessary for background information or for determining whether the agency considered all relevant factors including evidence contrary to the agency's position, *Thompson v. United States Dept. of Labor,* 885 F.2d 551, 555 (9th Cir.1989); or where necessary to explain technical terms or complex subject matter involved in the action, *Animal Defense Council v. Hodel,* 867 F.2d 1244, 1244 (9th Cir.1989), and *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988).

*Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision*, 934 F.2d 1127, 1137–38 (10th Cir. 1991). None of the parties contend any of these limited reasons for looking beyond the administrative record exist in this case, and, at least at this early stage of litigation, the Court does not find the circumstances currently suggest a need to consider extra-record documents. Therefore, in considering the likelihood of Petitioners' success on the merits, the Court will not consider any documents or court filings that were not before ONRR in July 2016 when it published the Valuation Rule in final form.[5]

### 2.2 As to federal oil and gas, Petitioners have not shown the Valuation Rule is likely to be found to exceed the Department of Interior's statutory authority.

Petitioners challenge the Valuation Rule as exceeding ONRR's Congressionally-delegated authority (Doc. 23 at p. 19), though they provide little detailed argument on this issue. "Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)).

Congress empowered the Secretary of the Interior to lease federal lands containing deposits of coal, oil, and gas (among other resources), 30 U.S.C. § 352, as well as areas of the Outer Continental Shelf containing gas and oil deposits, 43 U.S.C. § 1334. Congress

---

[5] In contrast, the Court did consider all the parties' submissions, including the extra-record documents, when examining the irreparable harm factor because the alleged irreparable harm necessarily arises after the agency action and is likely better understood or measured post-hoc.

also required the Secretary to collect royalties and other "receipts" owed to the United States on those leases. 30 U.S.C. § 360; 30 U.S.C. § 1711; 30 U.S.C. § 1751. Indeed, Congress sought "to clarify, reaffirm, expand and define the authorities and responsibilities of the Secretary of the Interior to implement and maintain a royalty management system for oil and gas leases on Federal lands, Indian lands, and the Outer Continental Shelf." 30 U.S.C. § 1701(b)(2). The Secretary is statutorily authorized to "prescribe such rules and regulations as are necessary" to carry out those duties. 30 U.S.C. § 359; 43 U.S.C. § 1334; 30 U.S.C. § 1751. The Court finds no ambiguity in Congress' mandate and simply applies it accordingly here. *See Ukeiley v. United States Envtl. Prot. Agency*, 896 F.3d 1158, 1163–64 (10th Cir. 2018) ("Under *Chevron*, we first consider if Congress has directly spoken to the precise question at issue and, if so, we apply the statute's plain meaning and the inquiry ends.") (internal quotation marks omitted).

Congress placed a great deal of responsibility in the Secretary of the Interior to administer federal and Indian leases and collect accurate royalties owed on those leases. Proportionate to that responsibility, Congress provided the Secretary a wide latitude of discretion in enacting rules and regulations enabling the Department of Interior to complete the tasks it has been assigned. *Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1039-40 (D.C. Cir. 2002) (under mineral leasing statutes Congress granted Department of Interior rather sweeping authority to proscribe necessary and proper rules and regulations and to do any and all things necessary to carry out the purposes of the leasing statutes, including determining the methods by which royalties are calculated); *see also Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1033 (D.C. Cir. 2008) ("In the Federal Oil

and Gas Royalty Management Act, the Secretary of the Interior was instructed by Congress

to create a comprehensive inspection, collection, accounting, and auditing system to ensure

that the government receives the royalties owed."). "Congress enacted the Federal Oil and

Gas Royalty Management Act ('FOGRMA') in 1983 to strengthen the ability of the

Secretary of the Interior ('Secretary') to collect oil and gas royalties by developing a

comprehensive system of royalty management in order properly to collect and account for

all royalties." *Shell Oil Co. v. Babbitt*, 125 F.3d 172, 174 (3d Cir. 1997) (citing 30 U.S.C.

§§ 1701 *et seq.*). Excluding the new valuation methodology for federal and Indian coal

(discussed separately below), Petitioners have not presented any convincing argument or

evidence showing the Valuation Rule exceeded the Secretary's statutory authority. Thus,

Petitioners have not shown a likelihood of success on this argument as it applies to federal

oil and gas valuations.

### 2.3   As to federal oil and gas, Petitioners have not shown the Valuation Rule is likely to be found arbitrary and capricious.

The U.S. Supreme Court has explained the arbitrary and capricious standard as

follows:

> Under what we have called this "narrow" standard of review, we insist that
> an agency "examine the relevant data and articulate a satisfactory
> explanation for its action." *Motor Vehicle Mfrs. Assn. of United States, Inc.
> v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77
> L.Ed.2d 443 (1983). We have made clear, however, that "a court is not to
> substitute its judgment for that of the agency," *ibid.,* and should "uphold a
> decision of less than ideal clarity if the agency's path may reasonably be
> discerned," *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,*
> 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009). "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs.*, 842 F.2d 1158, 1164 (10th Cir. 1988)).

In brief, under the new Valuation Rule, federal oil is first valued according to the lessee's or affiliate's arm's-length sales of the commodity. 81 Fed. Reg. at 43373 (new 30 C.F.R. § 1206.101). If there is no associated arm's-length sale, then the lessee can use certain averages or region-specific marketplace spot prices to value their oil. 81 Fed. Reg. at 43373-74 (new 30 C.F.R. § 106.102). Finally, if ONRR determines the oil value is unreasonable (regardless of whether it is sold under an arm's-length agreement), e.g., the spot price is unreasonably low, ONRR holds the discretion to value the oil based on its consideration of several factors. 81 Fed. Reg. at 43375 (new 30 C.F.R. § 1206.105).

Federal gas valuations follow a similar path. It is valued according to the first arm's-length contract for sale. 81 Fed. Reg. at 43380-82 (new 30 C.F.R. §§ 1206.141 (unprocessed gas), 1206.142 (processed gas)). Where there is no applicable arm's-length sale, unprocessed gas and residue gas (when processed) are valued according to the published bidweek price reported at associated index pricing point(s), while natural gas liquids (NGLs) are valued based on published commercial price bulletins. 81 Fed. Reg. at 43381-82 (new 30 C.F.R. §§ 1206.141(c) (unprocessed gas), 1206.142(d) (residue gas and NGLs after processing). If these methods are unavailable, ONRR again has discretion to

value the gas based on its consideration of several factors.  81 Fed. Reg. at 43383 (new 30 C.F.R. § 1206.144.

At this early stage of the litigation, the available record evidence demonstrates ONRR examined the relevant data and articulated a satisfactory explanation for changing the method used to value oil and gas produced from federal leases when calculating royalties.  To begin with, in the "Background" section of the Proposed Rule, ONRR explained the impetus behind the proposed changes was a 2007 report from the Subcommittee on Royalty Management titled *Mineral Revenue Collection from Federal and Indian Lands and the Outer Continental Shelf.*  80 Fed. Reg. at 608.  The next section then offered a brief overview of the proposed changes.  *Id.* at 609-10.  The subsequent 32 pages provided a detailed section-by-section explanation of the proposed changes, ONRR's reasons behind each change, and ONRR's calculations of revenue and costs under the proposed rule.  *Id.* at 610-42.  The final 33 pages of this publication sets forth the proposed new text of each provision in 30 C.F.R. Parts 1202 and 1206.  *Id.* at 642-75.

During an extended public comment period on the Proposed Rule, ONRR "received more than 1,000 pages of written comments from over 300 commenters and over 190,000 petition signatories."  81 Fed. Reg. at 43338.  The published Valuation Rule spent 21 pages summarizing the comments received and responding to them, explaining why some comments and suggestions were adopted while others rejected.  *Id.* at 43338-59; *see, e.g., id.* at 43342 (noting ONRR modified the definition of "area" based on comments received), *id.* at 43346 (noting ONRR reworded a paragraph in 30 C.F.R. § 1206.141(b) based on confusion expressed by commenters), *id.* at 43348 (noting ONRR added a new paragraph

(d) to 30 C.F.R. § 1206.141 based on comments received), *id.* at 43351 (noting ONRR added a new paragraph (e) to 30 C.F.R. § 1206.142 based on comments received). The published final rule then spent nine pages under the subheading "Procedural Matters" explaining how it calculated the anticipated costs, savings, and benefits for the various parties involved resulting from the rule changes.

In general, starting with the advanced notices of proposed rulemaking published in 2011 through the Proposed Rule in 2015 and final Valuation Rule in 2016, the available evidence suggests ONRR examined the relevant data, solicited and considered public comments, and offered satisfactory explanations supporting its decisions to change how federal oil and gas is valued when calculating royalties. Petitioners offered some focused criticism of ONRR's actions, which the Court will address briefly.

Petitioners argue, "The ill-conceived Rule is the fruit of an administrative process that ignored key legal and economic concerns. Despite Petitioners' and other affected parties' voluminous comments on the Rule as proposed, the final Rule was basically *unchanged*." (Doc. 23 at p. 19 (emphasis in original).) There is no requirement that an agency adopt comments or suggestions during proposed rulemaking. Instead, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). As already recounted and documented, ONRR did so here with regard to oil and gas.

Petitioners also take issue with the Valuation Rule's "default" provision. (Doc. 23 at pp. 20-23.) In brief, the default provision allows ONRR to decide the value of a lessee's oil, gas, or coal for royalty purposes if ONRR determines the lessee's valuation did not

conform to the final Valuation Rule's requirements.  81 Fed. Reg. at 43374-75 (new 30 C.F.R. §§ 1206.104, 1206.105 (oil)); 81 Fed. Reg. at 43382-83 (new 30 C.F.R. §§ 1206.143, 1206.144 (gas)); 81 Fed. Reg. at 43390-91 (new 30 C.F.R. §§ 1206.253, 1206.254 (federal coal)); 81 Fed. Reg. at 43396-97 (new 30 C.F.R. §§ 1206.453, 1206.454 (Indian coal)).  These provisions certainly give ONRR a great deal of discretion, a point with which ONRR agrees.  *See* 80 Fed. Reg. at 614 ("under proposed § 1206.105, ONRR has the authority and responsibility to establish the reasonable value of production for royalty purposes and possesses considerable discretion in determining that value").

> But in the mineral leasing statutes Congress has granted rather sweeping authority "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of [the leasing statutes]."  30 U.S.C. § 189 (federal lands); see also 25 U.S.C. §§ 396, 396d (tribal lands); 43 U.S.C. § 1334(a) (outer Continental shelf).  These "purposes," of course, include the administration of federal leases, which involves collecting royalties and determining the methods by which they are calculated.    See *California Co. v. Udall,* 296 F.2d 384, 387–88 (D.C.Cir.1961); see also *Independent Petroleum Association v. Babbitt,* 92 F.3d 1248, 1262 n. 6 (D.C.Cir.1996) (Rogers, J., dissenting) (recognizing that Congress authorized Interior "to prescribe regulations governing mineral leases").

*Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1039–40 (D.C. Cir. 2002). Petitioners here have made their displeasure with the default provision known, but they have not shown a likelihood of success on the merits because of it.  This is particularly true given that prior to the enactment of the Valuation Rule, the regulations already contained several default provisions under which ONRR could determine a resource's value or challenge the value calculated by the lessee.  *See, e.g.*, 30 C.F.R. §§ 1206.103(d) (allowing ONRR to "establish reasonable royalty value based on other relevant matters" where

ONRR determines the NYMEX or ANS spot prices were unreasonable in a particular case as to oil not sold under arm's-length contract); 1206.152(f) (allowing ONRR to establish value of unprocessed gas where "ONRR determines that a lessee has not properly determined value"); 1206.153(f) (same as to processed gas); 1206.257(e) (same as to federal coal); 1206.456(e) (same as to Indian coal).

Petitioners also contend the Valuation Rule erroneously requires arm's-length contracts to be in writing and signed by all parties, or the default provision may be triggered to allow ONRR to calculate the value of the fossil fuel. (Doc. 23 at p. 23.) Petitioners feel this is an outdated requirement inconsistent with current procedures and ignores that oral contracts are legally binding. ONRR considered and addressed this issue in its responses to the comments. *E.g.,* 81 Fed. Reg. at 43342. In short, ONRR agreed that oral contracts are legally binding, but noted that oral contracts, and even their written follow-ups (via email exchanges, letters, etc.), significantly impede or even render impossible ONRR's duty to audit lessees' royalty payments. ONRR also responded that requiring written contracts was "a logical evolution of our previous regulations," which "required arm's-length sales contract revisions and amendments to be in writing and signed by all parties." 81 Fed. Reg. at 43342. While this requirement may be unwieldy and problematic for lessees, ONRR has asserted good reasons underlying it. "The Court is not free to second guess or review the *wisdom* of the agency's decision." *Colorado Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1243 (D. Colo. 2012) (emphasis in original) (citing *New Mexico ex rel. Richardson v. Bureau of Land Mgt.*, 565 F.3d 683, 704 (10th Cir. 2009)).

Petitioners next attack the loss of certain transportation allowances on oil and gas. (Doc. 23 at pp. 24-27.)  The focus of this attack is ONRR's decision to revoke the May 1999 "Guidance for Determining Transportation Allowances for Production from Leases in Water Depths Greater Than 200 Meters" (Deep Water Policy).[6]  This policy provided that most subsea movement of oil or gas from subsea manifolds to the first offshore platform facility qualified as a transportation allowance on which lessees did not owe royalty.  Canceling the Deep Water Policy means the movement of oil and gas to a platform facility constitutes "gathering" rather than "transportation" and is therefore no longer allowed as a deduction.  In the final Valuation Rule publication, ONRR explained its decision on this matter thusly:

> The former Minerals Management Service [ONRR's predecessor] intended for the Deep Water Policy to incentivize deep water leasing by allowing lessees to deduct broader transportation costs than the regulations allowed. ONRR concluded that the Deep Water Policy has served its purpose and is no longer necessary.  The regulations still allow offshore lessees to deduct considerable transportation costs to move oil and gas from the offshore platform to onshore markets.  Rescinding this policy clarifies the meaning of gathering, which, in turn, provides a more consistent and reliable application of the regulations.

81 Fed. Reg. at 43,340.  Further, in the Section-By-Section Analysis of the Proposed Rule, ONRR explained the Deep Water Policy did not comply with its definition of "gathering" and "lessees have taken transportation allowances under the Deep Water Policy, in some instances, for movement ONRR considers non-deductible 'gathering' under its regulations."  80 Fed. Reg. at 624.  Accordingly, ONRR rescinded the Deep Water Policy

---

[6]  Available at https://www.onrr.gov/Laws_R_D/pubcomm/PDFDocs/990520.pdf.

because it had effected its purpose of encouraging deep water leasing and to more uniformly apply the "gathering" definition to all resources. ONRR examined the relevant data and articulated a satisfactory explanation for its action. An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television Stations*, 556 U.S. at 515 (emphases in original). That standard appears to be satisfied here. And to the extent Petitioners also challenge the Valuation Rule's caps on transportation and processing allowances (*see* Doc. 23 at 24-26), the same analysis and result hold true.

Petitioners conclude by attacking the valuation methods assigned to federal and Indian coal leases. (Doc. 23 at pp. 27-33.) The Court will consider the issues related to coal valuation separately. Suffice it to say that, as it stands now, the Court is not convinced Petitioners are likely to succeed on their claim that the new oil and gas valuation provisions are arbitrary or capricious.

### 2.4 As to federal and Indian coal, Petitioners have shown the Valuation Rule is likely to be found arbitrary and capricious or beyond statutory authority

The new valuation procedures applying to coal require a slightly different analysis, and the Court shares in some of Petitioners' very serious concerns.

In general, the Valuation Rule demands lessees to value the natural resources based on the first arm's-length sale. "The Department of the Interior has long held the view that the prices agreed to in arm's-length transactions are the best indication of market value."

76 Fed. Reg. 30878, 30879.  Sometimes though, particularly where coal cooperatives are involved and vertical integration is extensive, coal is burned at a power plant to generate electricity before there is any true arm's-length sale.  In such a situation, "the value of the coal subject to this section, for royalty purposes, is the gross proceeds accruing to you for the power plant's arm's-length sales of the electricity less" applicable deductions.  81 Fed. Reg. at 43390 (new 30 C.F.R. § 1206.252(b) (federal coal)); 81 Fed. Reg. at 43396 (new 30 C.F.R. 1206.452(b) (Indian coal)).  Thus, when an earlier arm's-length sale is not available, the Valuation Rule requires federal and Indian coal lessees to value their coal based on the sale of electricity generated from burning that coal.

Several problems are inherent in valuing coal based on the sale of electricity, but the Court will only discuss two of the more glaring problems to serve as examples.  First, "an electricity utility's power supply portfolio typically includes a range of options, from nuclear to coal to natural gas to hydro, wind, and solar."  Jim Rossi, *The Shaky Political Economy Foundation of a National Renewable Electricity Requirement*, 2011 U. Ill. L. Rev. 361, 369 (2011).  The electricity sold to consumers is generated from multiple sources, not just coal.  Thus, the sales price of the electricity is comprised of much more than just the cost of coal, and that's ignoring the rabbit hole that is electricity sales regulation by both the federal and state governments.  Trying to value coal based on the sale of electricity is akin to valuing wheat based on the sale of a cake; there may be a relationship between the two, but it is weak and several other factors potentially play a much larger role in determining the sales price of the end product.  In response to comments, ONRR noted, "Opponents argued that valuing coal using electric sales was a

violation of the MLA, ignored and oversimplified the complexities of electric markets and contracts, and was administratively burdensome." 81 Fed. Reg. at 43355. While ONRR refuted it was in violation of the Mineral Leasing Act, citing 30 U.S.C. § 207, ONRR offered no response to the contention that it ignored and oversimplified the complexities of electric markets. Moreover, at the September 4, 2019 hearing, none of the parties could articulate how this provision could be applied to extract the value of the coal from the sale of electricity, a highly-regulated commodity.

Second, coal delivered to a power plant may sit in storage and not be burned to generate electricity until well after the lessee is required to report the value of that coal to ONRR for royalty-calculation purposes. *See Herman v. Associated Elec. Co-op., Inc.*, 172 F.3d 1078, 1088 (8th Cir. 1999) ("The refuse and coal was screened, sized, crushed, and stored until it was fed into boilers to produce electricity and steam."). This renders it impossible to value the coal based on the sales price of electricity because there's no relationship between the two at the time the report to ONRR is due. This further creates the issue of whether ONRR is in fact requiring "payment of a royalty ... of not less than 12 ½ per centum of *the value of coal*," 30 U.S.C. § 207(a) (emphasis added), or, contrary to ONRR's statutory authority, requiring payment of royalty based upon the value of electricity.

Thus, at this preliminary stage of the proceedings, the Court agrees with Petitioners that the provision in the Valuation Rule requiring lessees to value coal based on the gross proceeds of electricity sales (when there is no prior arm's-length sale) is likely to be found contrary to law or arbitrary and capricious on the merits, at least based on this initial

assessment. Basing the value of coal on the sales prices of electricity and failing to discuss the serious complications and complexities suggests ONRR either exceeded its statutory authority, failed to consider an important aspect of the problem, contradicts the evidence before the agency, or is so implausible that it cannot be explained by a difference in view or the product of agency expertise. Accordingly, the Court will consider the final two preliminary injunction factors in relation to the new coal-valuation methodology.

3. **Threat of Irreparable Harm versus Harm of Preliminary Injunction to the Opposing Party (Balance of Equities)**

The balance of equities weighs in favor of preliminarily enjoining the Valuation Rule's new methodology for valuing federal and Indian coal. Staying the Valuation Rule as it applies to coal royalties would not impose a significant burden on either the lessees or ONRR. And if the Court is wrong and ONRR prevails on the merits, then the lessees are capable of re-reporting past reports and complying with the new rule, including paying any interest owed for underpayment of royalties during the pendency of the litigation. 30 U.S.C. § 1721(a), (h).

In contrast, if the coal lessees prevail on the merits without a preliminary injunction, then the burden placed on coal lessees to conform to the Valuation Rule during this litigation and then to revert to the old system is immense, consisting of both the unrecoverable compliance costs discussed earlier as well as lost interest on any royalty overpayments. *See* Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94, § 32301 (2015) (amending 30 U.S.C. § 1721 to eliminate ONRR's obligation to pay interest on royalty overpayments).

In light of Petitioners' likelihood of success on the merits concerning the new coal valuation methodology, there's a much greater risk of irreparable harm to coal lessees if a preliminary injunction is denied than to ONRR if a preliminary injunction is granted. The balance of harms weighs in Petitioners' favor.

## 4. Adverse Effect on the Public Interest

The public has an interest in the accurate and timely collection of royalties owed for the development of fossil fuels on federal and Indian lands. That interest would not be adversely affected if a preliminary injunction was issued in this case. Much of the same reasoning from the balance-of-equities factor applies here. If the new rule's coal-valuation methodology is upheld on its merits, ONRR and the public will be made whole because coal lessees will be required to submit any underpayment along with interest. And in the interim, royalties under the pre-2016 methodology will continue to be owed and collected. Therefore, this factor also supports Petitioners' request for preliminary injunction, at least as to the Valuation Rule's effects on coal royalties.[7]

## 5. Scope of Preliminary Injunction

The question now concerns the scope of the preliminary injunction. Petitioners have not shown that all provisions of the Valuation Rule pertaining to coal are likely to be found arbitrary and capricious. For example, the final rule contemplates basing the value of coal on the first arm's-length contract where available. *See* 81 Fed. Reg. at 43390 (new 30

---

[7] For largely similar reasons, the final two factors also weigh in favor of a preliminary injunction as to the new methodologies for valuing oil and gas for royalty calculations. However, a preliminary injunction cannot lie where Petitioners have not shown a likelihood of success on the merits. *See Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) ("each of these elements is a prerequisite for obtaining a preliminary injunction").

C.F.R. § 1206.252(a) (federal coal)); 81 Fed. Reg. at 43396 (new 30 C.F.R. § 1206.452(a) (Indian coal)). This valuation methodology is unlikely to be found arbitrary and capricious on the merits because an arm's-length sale has been historically accepted as an accurate measurement of an item's value. The primary problem with the new valuation methodology for coal is requiring it to be valued based on the sales price of a different commodity (electricity) where an arm's-length sale of the coal does not otherwise exist.

The Court is therefore tempted to preliminarily enjoin only the subsections that contemplate using electricity sales to value coal. However, this would appear to cause more problems than it solves because the entire new methodology has been re-written based on new definitions, including what constitutes an arm's-length transaction. 81 Fed. Reg. at 43369 (new 30 C.F.R. § 1202.20). Applying new definitions to the old valuation methodology invites confusion, complications, errors, and further litigation. Consequently, the Court finds the only concrete way to ensure the status quo during the pendency of the litigation is to enjoin the Valuation Rule's application as to all facets of coal valuation. The pre-2016 valuation methodologies for coal shall continue to control during this litigation.

## CONCLUSION AND ORDER

Petitioners have established the four elements for a preliminary injunction preventing the final Valuation Rule from applying to coal valuations during the pendency of this action. Therefore, a preliminary injunction will issue, but only as to federal and Indian coal royalties. Petitioners have not shown a likelihood of success on the merits as to their challenge to the Valuation Rule's new methodologies for valuing oil and gas. The

findings and conclusions set forth herein "do not constitute a determination on the merits, but are preliminary findings in the context of the limited evidence presented at the hearing for a preliminary injunction." *CBM Geosolutions, Inc. v. Gas Sensing Tech. Corp.*, 2009 WY 113, ¶ 13, 215 P.3d 1054, 1060 (Wyo. 2009).

**IT IS THEREFORE ORDERED** that Petitioners' Joint Motion for Preliminary Injunction (Doc. 22) is hereby **GRANTED IN PART AND DENIED IN PART**.  The 2016 *Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform Rule*, 81 Fed. Reg. 43338, is enjoined from applying or taking effect as to federal and Indian coal valuations during the pendency of this action.[8]  Instead, the pre-2016 valuation methodologies applicable to coal shall continue to govern during this litigation.  However, the 2016 Valuation Rule is <u>not</u> enjoined as to the new valuation methodologies for federal oil and gas.

**IT IS FURTHER ORDERED** that Petitioners need not post a bond or security.[9]

**DATED:** October ___8Th___, 2019.

Scott W. Skavdahl
United States District Judge

---

[8] This preliminary injunction shall apply nationwide. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1409–10 (D.C. Cir. 1998) ("when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed"); *Earth Island Inst. v. Ruthenbeck,* 490 F.3d 687, 699 (9th Cir. 2007), *rev'd on other grounds,* 555 U.S. 488 (2009) (nationwide scope of injunction compelled by APA where agency action found to be unlawful).

[9] District courts have wide discretion in determining whether to require security under F.R.C.P. 65(c). *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1215 (10th Cir. 2009).  Having determined there is no likelihood of harm to Respondents, the Court finds an injunction bond is unnecessary in this case. *See Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir. 1987).