No. 21-8076

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

AMERICAN PETROLEUM INSTITUTE,

*Petitioner-Appellant,*

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,

*Respondents-Appellees,*

and

STATE OF CALIFORNIA and STATE OF NEW MEXICO,

*Intervenors-Appellees,*

NATURAL RESOURCES DEFENSE COUNCIL, *et al.*,

*Intervenors-Appellees.*

On Appeal from the United States District Court for the
District of Wyoming, Case No. 19-cv-121-SWS
Hon. Scott W. Skavdahl

**INTERVENORS-APPELLEES' JOINT RESPONSE BRIEF**

Thomas Zimpleman
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
Telephone: 202-513-6244
Email: TZimpleman@nrdc.org

*Attorney for Conservation Groups*

[*Additional counsel listed on
signature page*]

**Oral argument not requested.**

ROB BONTA
Attorney General of California
ED OCHOA
Senior Assistant Attorney General
DAVID ZONANA
Supervising Deputy Attorney General
GEORGE TORGUN
ADRIANNA LOBATO
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
Telephone: (510) 879-1002
Email: George.Torgun@doj.ca.gov

*Attorneys for the State of California*

## CORPORATE DISCLOSURE STATEMENT

Intervenor-Respondents Natural Resources Defense Council, Inc., The Wilderness Society, Powder River Basin Resource Council, Northern Plains Resource Council, and Western Organization of Resource Councils are non-profit corporations with no parent corporation and no outstanding stock shares or other securities in the hands of the public.  They do not have any parent, subsidiary, or affiliate that has issued stock shares or other securities to the public.  No publicly held corporation owns any stock in them.

Dated:  March 30, 2022

/s/ Thomas Zimpleman
Thomas Zimpleman
Natural Resources Defense Council
*Attorney for Conservation Groups*

# TABLE OF CONTENTS

**Page**

Statement of the Issues Presented ................................................................. 1

Statement of the Case ................................................................................... 1

    I.    ONRR's Authority to Calculate and Collect Royalties
          from Oil and Gas Development on Public Lands. .................... 1

    II.   Factual Background. ........................................................... 4

    III.  Procedural History ................................................................. 9

Summary of Argument ................................................................................. 12

Standard of Review ...................................................................................... 13

Argument ...................................................................................................... 14

    I.    The District Court Applied the Correct Legal Standards
          in Upholding the Valuation Rule's Oil and Gas
          Provisions. ................................................................. 14

    II.   The Valuation Rule's Oil and Gas Provisions are Lawful ...... 18

          A.   The Decision to End the Deep Water Policy is
                Within ONRR's Statutory Authority and was
                 Supported by the Record. ............................................. 19

          B.   ONRR Has Authority to Set the Valuation Rule's
                Hard Caps on Transportation and Processing
                Allowances and They Are Supported by the
                Record. ....................................................................... 25

          C.   The Valuation Rule's Index Option for Valuing
                Gas is Not Arbitrary and Capricious. ........................... 30

          D.   ONRR Provided a Reasoned Explanation for the
                Valuation Rule's Oil and Gas Default Provisions. ....... 34

          E.   The Valuation Rule's Triggers for the Default
                Provisions are Not Arbitrary or Capricious. ................. 43

Conclusion ................................................................................................... 46

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Trucking Ass'ns v. Atchison, Topeka, & Santa Fe Ry. Co.*
387 U.S. 397 (1967)................................................................ 17

*Amoco Prod. Co. v. Watson*
410 F.3d 722 (D.C. Cir. 2005)........................................... 19, 26

*Becerra v. U.S. Dep't of the Interior*
276 F. Supp. 3d 953 (N.D. Cal. 2017)..................................... 10

*Bowen v. Georgetown Univ. Hosp.*
488 U.S. 204 (1998)................................................................ 30

*Cal. Co. v. Udall*
296 F.2d 384 (D.C. Cir. 1961)........................................... 24, 32

*Citizens' Comm. to Save Our Canyons v. Krueger*
513 F.3d 1169 (10th Cir. 2008) .............................................. 15

*Colo. Env't Coal. v. Dombeck*
185 F.3d 1162 (10th Cir. 1999) .............................................. 16

*De Niz Robles v. Lynch*
803 F.3d 1165 (10th Cir. 2015) .............................................. 16

*Encino Motorcars, LLC v. Navarro*
136 S. Ct. 2117 (2016).......................................................15, 26

*Env't Def. Fund, Inc. v. Costle*
657 F.2d 275 (D.C. Cir. 1981)................................................ 33

*FCC v. Fox Television Stations, Inc.*
556 U.S. 502 (2009)....................................... 14, 15, 17, 40

*Gallegos v. Lyng*
891 F.2d 788 (10th Cir. 1989) ................................................ 34

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re FCC 11-161*
   753 F.3d 1015 (10th Cir. 2014) ........................................................ 24, 30

*Indep. Petroleum Ass'n of Am. v. DeWitt*
   279 F.3d 1036 (D.C. Cir. 2002) ........................................................ *passim*

*Kerr-McGee Corp.*
   147 IBLA 277 (1999) ............................................................................ 21

*Kobach v. U.S. Election Assistance Comm'n*
   772 F.3d 1183 (10th Cir. 2014) ............................................................ 13

*Lab. Council for Latin Am. Advancement v. EPA*
   12 F.4th 234 (2d Cir. 2021) .................................................................. 22

*Mo. Pub. Serv. Comm'n v. FERC*
   337 F.3d 1066 (D.C. Cir. 2003) ............................................................ 29

*Mobile Relay Assocs. v. FCC*
   457 F.3d 1 (D.C. Cir. 2006) .................................................................. 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
*Auto. Ins. Co.*
   463 U.S. 29 (1983) .......................................................................... 14, 20

*Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*
   384 F.3d 721 (9th Cir. 2004) ................................................................ 32

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*
   565 F.3d 683 (10th Cir. 2009) .............................................................. 10

*Norman*
   126 IBLA 375 (1993) ............................................................................ 27

*Olenhouse v. Commodity Credit Corp.*
   42 F.3d 1560 (10th Cir. 1994) ................................................... 10, 14, 27

# TABLE OF AUTHORITIES
## (continued)

Page

*Permian Basin Area Rate Cases*
   390 U.S. 747 (1968)................................................................. 20

*Pinney v. Nat'l Transp. Safety Bd.*
   993 F.2d 201 (10th Cir. 1993) ................................................. 36

*Qwest Corp. v. FCC*
   689 F.3d 1214 (10th Cir. 2012) .............................................. 23

*Shell Oil Co.*
   52 IBLA 15 (1981) .................................................................. 25

*Smiley v. Citibank (S. Dakota), N.A.*
   517 U.S. 735 (1996)................................................................. 26

*State of California v. U.S. Dep't of the Interior*
   381 F. Supp. 3d 1153 (N.D. Cal. 2019)....................................... 10, 11, 18

*Union Oil Co. of Cal. v. Leavell*
   220 F.3d 562 (7th Cir. 2000) .................................................. 42

*United States v. AT&T Inc.*
   310 F. Supp. 3d 161 (D.D.C. 2018).......................................... 42

*Vastar Res.*
   148 IBLA 107 (1999) ............................................................. 35

## FEDERAL STATUTES

5 U.S.C. § 553(a)(2)........................................................................ 40

5 U.S.C. § 553(b)(3)(A) ................................................................. 40

5 U.S.C. § 705................................................................................9

28 U.S.C. § 1391(e)(1)....................................................................9

# TABLE OF AUTHORITIES
### (continued)

**Page**

30 U.S.C. § 181 ................................................................................2

30 U.S.C. § 189 ................................................................ 3, 17, 26

30 U.S.C. § 191(a) ...........................................................................2

30 U.S.C. § 207(a) ........................................................... 1, 24, 32

30 U.S.C. § 226(b)(1)(A) ............................................... 2, 17, 24, 32

30 U.S.C. § 1701 .............................................................................3

30 U.S.C. § 1701(a)(3) ....................................................................3

30 U.S.C. § 1701(b)(2) ..................................................... 1, 17

30 U.S.C. § 1711(a) ......................................................... 3, 35, 41

30 U.S.C. § 1751(a) ......................................................... 3, 17

43 U.S.C. § 1331 .............................................................................2

43 U.S.C. § 1334(a) ......................................................... 3, 17, 26

43 U.S.C. § 1337(a)(1) ....................................................................2

43 U.S.C. § 1337(a)(1)(A), (C), (F) ................................. 24


**STATE STATUTES**

Cal. Educ. Code § 12320 ................................................................2

N.M. Stat. Ann. § 22-8-34(A) .........................................................2

Utah Code § 35A-8-301 ..................................................................2

# TABLE OF AUTHORITIES
## (continued)

Page

**FEDERAL REGULATIONS**

30 C.F.R. § 206.102(b)(1)........................................................................4

30 C.F.R. § 206.102(c) ...........................................................................4

30 C.F.R. § 206.152(b)(1).......................................................................4

30 C.F.R. § 206.152(c)(1).......................................................................4

30 C.F.R. § 1201.100.............................................................................1

30 C.F.R. § 1206.20 ....................................................................... 37, 44

30 C.F.R. § 1206.101 ............................................................................ 20

30 C.F.R. § 1206.104(a)(1)................................................................... 35

30 C.F.R. § 1206.104(c) ............................................................ 36, 37, 41, 45

30 C.F.R. § 1206.104(c)(2)............................................................. 37, 45

30 C.F.R. § 1206.104(g) ....................................................................... 43

30 C.F.R. § 1206.105.................................................................. 35, 37, 41, 45

30 C.F.R. § 1206.109(a) ....................................................................... 27

30 C.F.R. § 1206.109(c)(1).................................................................. 27

30 C.F.R. § 1206.109(c)(2).................................................................. 27

30 C.F.R. § 1206.110(f)(2) ................................................................... 45

30 C.F.R. § 1206.143 ........................................................................... 35

30 C.F.R. § 1206.143(c)(2)................................................................... 45

30 C.F.R. § 1206.144 ........................................................................... 35

vi

## TABLE OF AUTHORITIES
### (continued)

**Page**

30 C.F.R. § 1206.151 ................................................................. 20

30 C.F.R. § 1206.152(f) ............................................................ 38

30 C.F.R. § 1206.152(g)(2) ....................................................... 45

30 C.F.R. § 1206.158(a) ............................................................ 27

30 C.F.R. § 1206.158(c)(2) ....................................................... 27

30 C.F.R. § 1206.158(c)(3) ....................................................... 27

30 C.F.R. § 1206.158(d)(2) ....................................................... 27

30 C.F.R. § 1206.253 ................................................................. 35

30 C.F.R. § 1206.254 ................................................................. 35

30 C.F.R. § 1206.453 ................................................................. 35

30 C.F.R. § 1206.454 ................................................................. 35

30 C.F.R. § 1210.53(a) ................................................................8

30 C.F.R. § 1210.201(b)(1) .........................................................8

30 C.F.R. § 1290.108 ........................................................... 42, 45

43 C.F.R. § 4.31 ....................................................................... 42

### STATE REGULATIONS

Utah Admin. Code § R990-8-1 .....................................................2

Utah Admin. Code § R900-8-2 .....................................................2

# TABLE OF AUTHORITIES
## (continued)

Page

**FEDERAL REGISTER NOTICES**

53 Fed. Reg. 1,184 (Jan. 15, 1988) ...................................................4

53 Fed. Reg. 1,220 (Jan. 15, 1988) ...................................................4

53 Fed. Reg. 1,220-21 (Jan. 15, 1988) ..............................................4

53 Fed. Reg. 1,230 (Jan. 15, 1988) ...................................................4

53 Fed. Reg. 1,240 (Jan. 15, 1988) ................................................. 22

53 Fed. Reg. 1,274 (Jan. 15, 1988) ...................................................4

53 Fed. Reg. 1,274-75 (Jan. 15, 1988) ..............................................4

65 Fed. Reg. 14,022 (Mar. 15, 2000) .................................................4

65 Fed. Reg. 14,022-24 (Mar. 15, 2000) ............................................4

65 Fed. Reg. 14,047-48 (Mar. 15, 2000) ................................... 20, 23

65 Fed. Reg. 14,059 (Mar. 15, 2000) .................................................4

82 Fed. Reg. 11,823 (Feb. 27, 2017) ..................................................9

82 Fed. Reg. 16,323 (Apr. 4, 2017) ................................................. 10

82 Fed. Reg. 36,934 (Aug. 7, 2017) .............................................. 9, 10

82 Fed. Reg. 36,935 (Aug. 7, 2017) ...................................................9

85 Fed. Reg. 62,054 (Oct. 1, 2020) ................................................. 12

86 Fed. Reg. 4,612 (Jan. 15, 2021) ................................................. 12

86 Fed. Reg. 54,045 (Sept. 30, 2021) .............................................. 12

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Aplt. App. | Appellant's Appendix |
| FOGRMA | Federal Oil and Gas Royalty Management Act |
| Intervenors' Supp. App. | Intervenors-Appellees' Supplemental Appendix |
| MLA | Mineral Leasing Act |
| OCSLA | Outer Continental Shelf Lands Act |
| ONRR | Office of Natural Resources Revenue |

## STATEMENT OF RELATED CASES

Pursuant to 10th Cir. R. 28.2(C)(3), Intervenors-Appellees state that

Federal Respondents-Appellees filed a prior cross-appeal, Case No. 21-

8077, which was voluntarily dismissed by this Court's Order dated January

7, 2022.  There are no other prior or related appeals.

## STATEMENT OF THE ISSUES PRESENTED

1.    Did the district court apply the appropriate standards of review under the Administrative Procedure Act ("APA") in deciding challenges to the 2016 Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform rule (the "Valuation Rule" or "Rule")?

2.    Did the district court correctly find that the Office of Natural Resources Revenue ("ONRR") did not act arbitrarily and capriciously, abuse its discretion, or act unlawfully in promulgating the oil and gas provisions of the Valuation Rule?

## STATEMENT OF THE CASE

### I.    ONRR'S AUTHORITY TO CALCULATE AND COLLECT ROYALTIES FROM OIL AND GAS DEVELOPMENT ON PUBLIC LANDS.

The federal government owns the rights to significant fossil fuel resources located on public lands and mineral estates.  It leases vast tracts of these lands to private companies for fossil fuel exploration, development, and production.  Under authority granted by Congress, the Department of the Interior is responsible for managing the calculation and collection of royalties on oil, gas, and coal produced on these leases.  *See* 30 U.S.C. §§ 207(a), 226(b)(1)(A), 1701(b)(2).  This authority has been delegated to ONRR, a subdivision of the Department of the Interior.  30 C.F.R. § 1201.100.

Each year, ONRR collects an average of $10 billion dollars in royalties on oil, gas, and coal extracted from public lands.  *See* Intervenors-Appellees'

Supplemental Appendix ("Intervenors' Supp. App.") at 53.  A significant portion of this revenue is distributed to states through direct disbursements and grants.  30 U.S.C. § 191(a) (providing that 50 percent of federal royalties "shall be paid by the Secretary of the Treasury to the State . . . within the boundaries of which the leased lands or deposits are or were located"); Appellant's Appendix ("Aplt. App.") at 131.  These royalties fund public education, infrastructure projects, and other local and regional initiatives.  *See, e.g.*, N.M. Stat. Ann. § 22-8-34(A); Cal. Educ. Code § 12320; Utah Code § 35A-8-301 & Utah Admin. Code §§ R990-8-1, R900-8-2.

Because the amount of royalties that ONRR collects is derived from the value of the product sold, accurate commodity valuation is an essential component of royalty calculation and is governed by several federal statutes.  Under the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 181 *et seq*., ONRR must collect royalties for onshore oil and gas leases "at a rate of not less than 12.5 percent in amount or value of the production removed or sold from the lease." *Id*. § 226(b)(1)(A).  For offshore oil and gas leases, the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331 *et seq*., requires that lessees pay royalties at rates set by the Secretary, and in many cases at rates of "not less than 12 ½ per centum" of the "amount or value of the production saved, removed, or sold." *Id*. § 1337(a)(1).

Other provisions of federal law further promote the accurate valuation of natural resources derived from public lands. The Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. §§ 1701 *et seq*., requires ONRR to "establish a comprehensive inspection, collection and fiscal and production accounting and auditing system to provide the capability to accurately determine oil and gas royalties, . . . and to collect and account for such amounts in a timely manner." 30 U.S.C. § 1711(a); *see also id*. § 1701(a)(3) (deeming it "essential" that ONRR "initiate procedures to improve methods of accounting for such royalties and payments").

The Secretary of the Interior, acting through ONRR, is responsible for issuing regulations to carry out and accomplish these statutory purposes under MLA, FOGRMA, and OCSLA. *See* 30 U.S.C. § 189 ("Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter"); 30 U.S.C. § 1751(a) ("Secretary [of the Interior] shall prescribe such rules and regulations as he deems reasonably necessary to carry out this chapter"); 43 U.S.C. § 1334(a) (Secretary of the Interior "shall prescribe such rules and regulations as may be necessary to carry out" provisions "related to the leasing of the outer Continental Shelf").

3

## II.  FACTUAL BACKGROUND.

Prior to the promulgation of the Valuation Rule, the valuation of federal oil and gas royalties was largely governed by regulations adopted by the former Minerals Management Service in the late 1980s.  However, these rules have been modified on occasion to address changing circumstances and conditions.  For example, the 1980s regulations provided that in the case of arm's-length sales, the contract price conclusively determined the "value" of the transaction.  *See* 53 Fed. Reg. 1,230, 1,274 (Jan. 15, 1988) (promulgating 30 C.F.R. § 206.152(b)(1) (gas)); 53 Fed. Reg. 1,184, 1,220 (Jan. 15, 1988) (promulgating 30 C.F.R. § 206.102(b)(1) (oil)).  For non-arm's-length transactions, also referred to as "captive" transactions involving interested parties or affiliates, the regulations relied upon a "benchmark" system that looked to outside indicia of market value.  *See* 53 Fed. Reg. at 1,274-75 (promulgating 30 C.F.R. § 206.152(c)(1) (gas)); 53 Fed. Reg. at 1,220-21 (promulgating 30 C.F.R. § 206.102(c) (oil)).  After finding that the benchmark system no longer accurately valued oil, the agency replaced the benchmark system with an index-based method to value crude oil production.  *See* 65 Fed. Reg. 14,022, 14,022-24, 14,059 (Mar. 15, 2000).

In 2007, the Department of the Interior's Royalty Policy Committee Subcommittee on Royalty Management issued a report identifying pervasive problems with the existing regulations, which undermined ONRR's ability to

accurately calculate royalties. *See* Intervenors' Supp. App. at 26-39. For example, the report recommended that ONRR reconsider the use of the benchmark system for non-arm's-length transactions of natural gas and incorporate an index-based approach instead. *Id*. The report also recommended that ONRR clarify its regulations governing deductions that gas lessees are permitted to take for transportation and processing costs. *See id.*; *see also* Aplt. App. at 169. Because transportation costs are often bundled with reported sales prices, lessees could inflate their reported transportation costs with non-transportation expenses, greatly complicating ONRR's reviews and audits. *See* Intervenors' Supp. App. at 35; *see also* Aplt. App. at 109. Thus, the Royalty Policy Committee recommended revising these regulations "to address the cost-bundling issue" and "facilitate the calculation" of available deductions. Intervenors' Supp. App. at 36; *see also* Aplt. App. at 169.

Responding to these and other concerns, ONRR initiated what became a five-year rulemaking process to update and modernize its regulations. In 2011, the agency issued two Advance Notices of Proposed Rulemaking requesting public input on how to revise regulations governing the valuation of federal oil and gas (Intervenors' Supp. App. at 37) as well as coal (*id*. at 40), followed by six public workshops in the fall of 2011. The agency found that existing rules governing federal oil, gas, and coal "have not kept pace with significant changes that have

occurred in the domestic . . . market during the last 20-plus years." *Id*. (coal); *see id*. at 15 (stating that ONRR will "take into account the changes that have occurred in the oil and gas market over the past 20 years"). ONRR also stated that existing requirements for oil and gas were "costly and burdensome" for both the agency and lessees and impeded ONRR's enforcement efforts. *See id*. at 15.

On January 6, 2015, ONRR issued a consolidated proposal to amend its valuation regulations. Aplt. App. at 169 (the "Proposed Valuation Rule"). In the Proposed Valuation Rule, ONRR stated that "[t]he Secretary's responsibilities . . . require development of flexible valuation methodologies that lessees can accurately comply with in a timely manner." *Id*. ONRR further announced that it was "proposing proactive and innovative changes" to "increase the effectiveness and efficiency of our rules." *Id*. ONRR accepted public comment on the Proposed Valuation Rule over a 120-day period, during which the agency received more than 1,000 pages of written comments from over 300 commenters and 190,000 petition signatories, including "comments from industry, industry trade groups, Congress, State governors, States, local municipalities, two Tribes, local businesses, public interest groups, and individual commenters." Aplt. App. at 103. The agency "carefully considered all of the public comments . . . and, in some instances, revised the language of the final rule based on these comments." *Id*. As the agency later acknowledged, this comment period, "[c]oupled with the early

stakeholder engagement, ... allowed for a careful review of the many complexities contained in the proposed rule." Intervenors' Supp. App. at 60.

ONRR finalized the Valuation Rule on July 1, 2016. Aplt. App. at 103. ONRR's stated purposes for the Rule were:

> (1) to offer greater simplicity, certainty, clarity, and consistency in product valuation for mineral lessees and mineral revenue recipients; (2) to ensure that Indian mineral lessors receive the maximum revenues from coal resources on their land, consistent with the Secretary's trust responsibility and lease terms; (3) to decrease industry's cost of compliance and ONRR's cost to ensure industry compliance; and (4) to provide early certainty to industry and to ONRR that companies have paid every dollar due.

*Id*. To accomplish these purposes, the Rule eliminated the antiquated benchmark system for natural gas, and codified ONRR's long-standing position that "[t]he best indication of value is the gross proceeds received under an arm's-length contract between independent persons who are not affiliates and who have opposing economic interests regarding that contract." *Id*. at 104. ONRR directed lessees to calculate royalties for gas using methods such as the first arm's-length sale or an index-pricing option. *Id*. at 111.

The Rule also included a "default provision," which codified ONRR's ability to determine value for oil, gas, and coal in circumstances where the information provided by the lessee as to value is insufficient or unreliable and ONRR is unable to determine the correct value of production, such as when a lessee fails to supply documents or engages in misconduct. *Id.* at 105-06, 116, 121. Further, the

7

Valuation Rule made certain common-sense changes to the process for taking transportation deductions for oil and gas, including "requiring lessees to report transportation separately," rather than bundling these costs with the product sales price, to "facilitate transparency, audits, and reviews." *Id*. at 109.  The Rule also set hard caps on the transportation and processing deductions available to oil and gas lessees. *Id*. at 108, 118.  Similarly, the Rule rescinded the Deep Water Policy, which had allowed lessees to deduct certain gathering costs as transportation costs. *Id*. at 105.

ONRR estimated that the Rule would create an "annual increase in royalty collections of between $71.9 million and $84.9 million." *Id.* at 124.  In addition, ONRR estimated "that industry will experience reduced annual administrative costs of $3.61 million." *Id*.

Recognizing that lessees would likely need to change their accounting practices to comply with the new regime, ONRR delayed the Rule's effective date by six months from the date of the Rule's publication, to January 1, 2017. *See id.* at 103, 125.  Lessees' royalty reports and payments under the new Rule would then be due by February 28, 2017. *See* 30 C.F.R. §§ 1210.53(a), 1210.201(b)(1).  Prior to the Rule's effective date, ONRR held eleven training sessions, between October 17, 2016 and December 15, 2016, to assist the industry's transition to the new

valuation system, and invited companies to request additional guidance, as needed. *See* 82 Fed. Reg. 36,934, 36,935 (Aug. 7, 2017).

## III. PROCEDURAL HISTORY

In late-December 2016, almost six months after the Valuation Rule was finalized, several fossil fuel companies and industry trade associations filed petitions challenging the Rule in federal district court in Wyoming. *See Cloud Peak Energy v. U.S. Dep't of the Interior*, No. 16-cv-315-NDF (D. Wyo. filed Dec. 29, 2016); *Am. Petroleum Inst. v. U.S. Dep't of the Interior*, No. 16-cv-316-NDF (D. Wyo. filed Dec. 29, 2016); *Tri-State Generation & Transmission Ass'n v. Jewell*, No. 16-cv-319-NDF (D. Wyo. filed Dec. 29, 2016). Following the change in presidential administrations in January 2017, ONRR made two attempts to dismantle the Rule. Both were held to be illegal.

First, ONRR attempted to "postpone the effectiveness" of the Rule after it had already taken effect, asserting authority to do so under Section 705 of the APA, 5 U.S.C. § 705. 82 Fed. Reg. 11,823 (Feb. 27, 2017). This action was challenged by Intervenors-Appellees California and New Mexico in the U.S. District Court for the Northern District of California,[1] which found that the

---

[1] Contrary to Appellant American Petroleum Institute's characterization that Intervenors-Appellees "ventured to a different forum" to file this lawsuit, *see* Opening Brief of Appellant ("API Br.") at 9, there was no basis under the venue statute for California or New Mexico to bring this suit challenging a new final agency action in Wyoming. *See* 28 U.S.C. § 1391(e)(1).

postponement violated the statute's plain text and improperly circumvented the

APA's notice-and-comment requirements. *Becerra v. U.S. Dep't of the Interior*,

276 F. Supp. 3d 953, 964-66 (N.D. Cal. 2017).

ONRR also initiated a rulemaking to repeal the Valuation Rule in its

entirety. 82 Fed. Reg. 16,323 (Apr. 4, 2017). The agency finalized this rule just

four months later. 82 Fed. Reg. 36,934 (Aug. 7, 2017). Due to the repeal, the

District of Wyoming petitioners voluntarily dismissed their 2016 petitions for

review.

Intervenors-Appellees challenged this repeal rule in the Northern District of

California.[2] In March 2019, that court found that the agency had "committed a

number of serious violations of the APA and that its repeal of the Valuation Rule

was effectuated in a wholly improper manner." *State of California v. U.S. Dep't of*

*the Interior*, 381 F. Supp. 3d 1153, 1178 (N.D. Cal. 2019). Specifically, the court

determined that ONRR had failed to provide any reasoned explanation for

repealing the Valuation Rule and had failed to allow for meaningful public

---

[2] While Appellant asserts that ONRR acknowledged "problems" with the Rule as
part of this litigation, *see* API Br. at 8-9, these *post-hoc* litigation statements
provide no basis for this Court's ruling on the merits of the 2016 Valuation Rule.
*See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1576 (10th Cir. 1994)
(judicial review is limited to the administrative record "as it existed before the
agency" at the time of decision); *New Mexico ex rel. Richardson v. Bureau of Land*
*Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) ("we consider only the agency's
reasoning at the time of decisionmaking, excluding post-hoc rationalization
concocted by counsel in briefs or argument.").

comment on its rulemaking. *Id.* at 1178-79. Consequently, the court vacated the repeal rule, thereby allowing the Valuation Rule to take effect. *See id*. at 1179.

In June 2019, ONRR published a guidance letter confirming that the Valuation Rule is in effect and stating that "all federal oil and gas lessees and all federal and Indian coal lessees, should recalculate royalties under the 2016 Rule for oil, gas, and coal production from January 1, 2017, forward" and "submit corrected reporting and royalty payment for all production from and after January 2017, no later than January 1, 2020."[3]

Following the Valuation Rule's reinstatement, Appellant American Petroleum Institute ("API") and other petitioners filed new petitions in the District of Wyoming — the action now before this Court — and sought to preliminarily enjoin the Rule. Intervenors-Appellees intervened to defend the Rule. The district court granted petitioners' injunction motion with regard to the coal provisions, but denied it with regard to the oil and gas provisions. Aplt. App. at 61-62. Specifically, the district court found that, "[a]s to federal oil and gas, Petitioners have not shown the Valuation Rule is likely to be found arbitrary and capricious." *Id*. at 49 (in subsection heading). The district court then found that the petitioners

---

[3] ONRR, Dear Reporter Letter (June 13, 2019), https://www.onrr.gov/PDFDocs/Dear-Reporter-Letter-2016-Rule.pdf. ONRR then twice extended lessees' compliance deadline, to October 1, 2020. ONRR, Dear Reporter Letter (June 30, 2020), https://www.onrr.gov/PDFDocs/dear-reporter-letter-30-june-2020.pdf.

had shown a likelihood of success on the merits as to just one coal provision, which required lessees to value coal based on the gross proceeds of electricity sales where no prior non-arm's-length transaction existed. *Id*. at 58-59. The petitioners did not appeal the district court's denial of their preliminary injunction motion as to the oil and gas provisions of the Rule.[4]

Following production of the administrative record, the parties then filed cross-motions for summary judgment, which the district court granted in part and denied in part on September 8, 2021. In particular, the district court found that (1) the Rule's oil and gas provision were not shown to be arbitrary and capricious or contrary to law, but (2) reached the opposite conclusion with respect to the Rule's coal provisions. *Id.* at 63-97. Accordingly, the same day, the district court entered a Judgment upholding and affirming the Valuation Rule's oil and gas provisions, while vacating the Rule's coal provisions. *Id*. at 98-99.

## SUMMARY OF ARGUMENT

The five-year rulemaking process that led to the Valuation Rule represented a long-overdue effort by ONRR to update and modernize its regulations in response

---

[4] On October 1, 2020, ONRR published a proposed rule that would have eliminated several key requirements of the Valuation Rule "in order to return to the definitions and practices that had been in place since the 1980s." 85 Fed. Reg. 62,054 (Oct. 1, 2020). Although this proposal was finalized in January 2021, 86 Fed. Reg. 4,612 (Jan. 15, 2021), it never became effective and was ultimately withdrawn by the current administration. 86 Fed. Reg. 54,045 (Sept. 30, 2021).

to changes in oil and gas markets and findings that American taxpayers were not receiving adequate royalty returns from the sale of public resources. While API repeatedly asserts that the Valuation Rule upset "established tenets" of royalty valuation, API fails to show that ONRR violated its broad statutory mandates to accurately determine and collect royalties for the development of these public resources and to issue regulations accordingly.

Nor is there any merit to API's claim that the Valuation Rule's oil and gas provisions were otherwise arbitrary or unsupported by the record. To the contrary, the record demonstrates that the agency undertook a lengthy notice-and-comment process, addressed industry's concerns, and provided reasoned explanations for its decisions. Under well-established precedent, agencies are free to change course if they provide a reasoned basis for doing so, which ONRR did here.

## STANDARD OF REVIEW

This Court reviews district court decisions under the APA, including the question of whether an agency acted within the scope of its authority, *de novo*. *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1189 (10th Cir. 2014).

## ARGUMENT

### I.   THE DISTRICT COURT APPLIED THE CORRECT LEGAL STANDARDS IN UPHOLDING THE VALUATION RULE'S OIL AND GAS PROVISIONS.

There is no merit to API's claims that the district court failed to apply the appropriate standards or otherwise erred in reviewing challenges to the Valuation Rule. *See* API Br. at 19-27. While API acknowledges that the district court cited the proper legal test, *see id.* at 19, it claims that the district court misapplied this standard by "uncritically accepting ONRR's unsupported conclusions" and "impermissibly [giving] ONRR a pass" on APA compliance when promulgating the Valuation Rule. *Id*. at 19, 22. API is mistaken.

As the district court correctly stated, judicial review under the APA's arbitrary or capricious standard "focuses on the decision-making process, not on its wisdom or 'correctness.'" Aplt. App. at 70 (citing *Olenhouse*, 42 F.3d at 1575). "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse*, 42 F.3d at 1574. Under this "'narrow' standard of review, . . . 'a court is not to substitute its judgment for that of the agency.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

14

API is incorrect that the district court erred by "not hold[ing] ONRR to its burden of providing substantial evidence and reasoned explanations to justify" the Rule. API Br. at 19. Under the APA, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (citation omitted). In the proceedings below, the district court correctly held that API had failed to carry its burden of establishing that ONRR acted arbitrarily or capriciously, abused its discretion, or otherwise exceeded its authority in promulgating the Valuation Rule's oil and gas provisions. Aplt. App. at 71, 97.

There is also no basis for API's contention that ONRR somehow erred by departing from past agency practice or cannot justify its changes to valuation methodologies for oil and gas royalties. *See* API Br. at 4, 7, 13, 19. To the contrary, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). While an agency need not show that a new rule is "better" than the rule it replaced, it must demonstrate that it "is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *FCC v. Fox*, 556 U.S. at 515 (emphases omitted). Here, ONRR undertook a deliberate and

15

thorough five-year rulemaking process to develop the Valuation Rule in response to publicly identified deficiencies with its prior valuation regulations. *See supra* at 5-7.

Since API cannot plausibly claim that ONRR failed to provide a reasoned explanation for the Rule, it instead asserts that the entire justification consisted of "conclusory sentences" in the Rule's preamble, with no legal analysis or factual data to support the Rule. API Br. 13-14, 19-22. These assertions are baseless. As discussed below, as well as in the district court's order, ONRR provided ample justification and a reasoned explanation for each of the Valuation Rule's oil and gas provisions. *See infra* Part II; Aplt. App. at 71-89. Although API may dislike the changes to these "longstanding" provisions, *see* API Br. at 11, 19, that is not the standard by which agency action is evaluated. *See Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999) (declining to "question the wisdom of the [agency's] ultimate decision" despite plaintiffs' disagreement with it).

API fails to cite any authority to support its next contention that the district court erred "by deferring to the Rule's legal deficiencies as policy choices." API Br. at 22. Rather, it is entirely appropriate for courts "to defer to the agency's policy choice so long as that choice is reasonably consistent with the legislative scheme." *De Niz Robles v. Lynch*, 803 F.3d 1165, 1167 (10th Cir. 2015) (cleaned

16

up).  That is the case here.  In fact, throughout this litigation, API has failed to

present any credible argument to challenge ONRR's legal authority to promulgate

the Valuation Rule.  *See* Aplt. App. at 47-49, 71-72; *see also* 30 U.S.C. §§ 207(a),

226(b)(1)(A), 1701(b)(2).[5]

   While API makes reference to "core legal tenets of royalty valuation" and

"decades of consistent valuation principles," *see* API Br. at 13, 22, it fails to make

any showing that ONRR has violated the statutory scheme established by Congress

in promulgating the Valuation Rule.  To the contrary, the royalty "tenets" and

"principles" that API extolls, *see* API Br. at 23-25, are the product of prior agency

rulemaking, established by ONRR and its predecessors under a broad grant of

rulemaking authority.  *See* 30 U.S.C. § 189; 30 U.S.C. § 1751(a); 43 U.S.C.

§ 1334(a).  It follows that ONRR can alter them, so long as it provides a reasoned

explanation for the change.  *FCC v. Fox*, 556 U.S. at 515; *Am. Trucking Ass'ns v.

Atchison, Topeka, & Santa Fe Ry. Co.*, 387 U.S. 397, 416 (1967) (stating that

"[r]egulatory agencies do not establish rules of conduct to last forever").  ONRR

has done so here.

   Finally, the decision by the Northern District of California setting aside

ONRR's repeal of the Valuation Rule does not provide any basis for striking down

---

[5] Tellingly, API does not identify any specific statutory provisions that ONRR
allegedly violated in its "Statement of Issues Presented" or discuss the appropriate
standards for reviewing such claims.  *See* API Br. at 2-3.

the Valuation Rule itself. *Contra* API Br. at 26-27. The repeal rule represented a four-month, rushed-to-completion process, where the final rule was purportedly justified by rationales that were entirely absent from the proposal and were ungrounded in facts or supporting evidence. *California*, 381 F. Supp. 3d at 1173. Not only did the California court find that ONRR failed to provide a reasoned explanation for the repeal, but it also concluded that ONRR failed to provide the public with a meaningful opportunity to comment on the rulemaking. *Id*. at 1165-78. By contrast, the Valuation Rule was the product of a five-year rulemaking process, with ample opportunity for public comments, which were "carefully considered" by the agency, and ONRR provided detailed findings in support of the Rule. *Id*. at 1159-61, 1167-68. Consequently, the Valuation Rule's oil and gas provisions should be upheld.

## II.    THE VALUATION RULE'S OIL AND GAS PROVISIONS ARE LAWFUL.

Much as it did before the district court, API insists that ONRR violated "established, undisputed tenets of royalty valuation" in promulgating the oil and gas provisions of the Valuation Rule. API Br. at 13. These "tenets" however are the product of prior agency rulemaking by ONRR and its predecessors under the "rather sweeping authority" of the "mineral leasing statutes," *Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1039 (D.C. Cir. 2002), and ONRR can alter them so long as it provides a reasoned explanation for the change. ONRR did that

in the Valuation Rule.  API's arguments attempting to invalidate the Rule simply

dismiss or ignore the evidence and explanations that ONRR provided.

### A.    The Decision to End the Deep Water Policy is Within ONRR's Statutory Authority and was Supported by the Record.

The Valuation Rule brought an end to the Deep Water Policy, a temporary

policy allowing lessees to take extra deductions for deep water leases.  API now

argues that ONRR "fail[ed] to support either that all deepwater bulk movement is

necessarily 'gathering'" or that the Deep Water Policy "[is] now obsolete," API Br.

at 28, but glosses over ONRR's explanations for ending the policy in the Valuation

Rule.  In terminating the Deep Water Policy, ONRR acted within the bounds of its

statutory discretion, explained and justified its decision, and considered industry's

reliance interests.  The district court found that ONRR "acknowledged it was

changing its position" by ending the Policy, that "doing so was in its authority,"

and that ONRR considered lessees' reliance interests.  Aplt. App. at 74-75.

ONRR's decision should be upheld.

Congress delegated to ONRR the task of defining the value of oil and gas

production from a lease.  *See Amoco Prod. Co. v. Watson*, 410 F.3d 722, 728 (D.C.

Cir. 2005) (Roberts, J.) ("The phrase 'from the lease' is sufficiently broad to be

read as referring simply to the origin of the gas. . . .  The producers read the statute

as if it referred to gas 'sold *at* the lease,' but that is not the case.").  ONRR thus

possesses statutory discretion to both set and modify allowances for certain costs

incurred by lessees. Historically, ONRR has refused to set an allowance for costs related to gathering, defined as "the movement of lease production to a central accumulation or treatment point on the lease, unit, or communitized area." Aplt. App. at 185 (quoting 30 C.F.R. §§ 1206.101, 1206.151 (2015)). In 1999, however, the Associate Director of ONRR's predecessor agency created an exception—the Deep Water Policy—that allowed deductions for "the costs of moving bulk production from the subsea manifold to the platform where the oil and gas first surface," *i.e.*, for certain gathering costs. *See* Aplt. App. at 185. The Deep Water Policy was created by ONRR, and ONRR has "ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" *State Farm*, 463 U.S. at 42 (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 784 (1968)).

ONRR "cogently explain[ed]" its reasons for modifying the allowances previously available to deep water lessees. *See id.* at 48. Even when the Deep Water Policy was in effect, ONRR never modified its regulatory definition of "gathering." *See* 65 Fed. Reg. at 14,047-48. As a result, royalty regulations continued to reflect the view that gathering costs are not deductible. *See id.* In later proposing to revoke the Policy, ONRR explained that doing so would align industry practice with this prevailing view and with existing regulatory definitions. Aplt. App. at 184-85. ONRR also noted that it would put a stop to lessees' "attempt[s] to expand the Deep Water Policy" and claim additional gathering costs

20

as transportation allowances.  *Id*. at 185.  In promulgating the final Valuation Rule,

ONRR reiterated that rescinding the Deep Water Policy would "provide[] a more

consistent and reliable application of the regulations."  *Id*. at 105.

API complains that the Valuation Rule "simply presumes, without support,

that *no* subsea bulk movement of oil and gas . . . can ever qualify as

transportation," API Br. at 29, but ONRR explained in both the Proposed Rule and

the Final Rule that almost all of the movement that the Deep Water Policy allowed

producers to deduct as transportation costs in fact fit the regulatory definition of

gathering.  *See* Aplt. App. at 105 (explaining that the Deep Water Policy allowed

"lessees to deduct broader transportation costs than the regulations allowed."); *id*.

at 185.  And while API criticizes ONRR and the district court for supposedly

misapplying the Interior Board of Land Appeals' decision in *Kerr McGee*

*Corporation* in support of that argument, API Br. at 32-33, API misses the point

for which ONRR cited that case.  Under ONRR's regulations, movement of

production "across lease boundaries" to a place where it is treated and sold is

"properly regarded as gathering, not transportation."  *Kerr-McGee Corp.*, 147

IBLA 277, 283 (1999).

API also reads an implicit adjacency requirement into ONRR's regulations

on gathering to bolster its case for the Deep Water Policy, *see* API Br. at 31-33, but

the salient factor in ONRR's regulations has been where producers condition or

21

treat oil and gas for royalty purposes. *See* 53 Fed. Reg. at 1,240 (noting that operational regulations requiring placing production in marketable condition normally must be met prior to the production leaving the lease, and "when approval has been granted for the removal of production from a lease, unit, or communitized area for the purposes of treating the production or accumulating production for delivery to a purchaser prior to the requirements of the operational regulations having been met, [Minerals Management Service] does not believe that any allowances should be granted for costs incurred by a lessee in these instances."). The Deep Water Policy presumed that *all* movement from the wellhead qualified as transportation and ONRR never tried to reconcile that presumption with the regulations. In the Valuation Rule, ONRR explained that ending the Deep Water Policy "clarifies the meaning of gathering, which, in turn, provides a more consistent and reliable application of the regulations." Aplt. App. at 105. API's argument boils down to a plea for a continued exception to the regulations given the "[i]nherent physical and cost barriers" of the outer continental shelf, API Br. at 31, but ONRR has the statutory authority to set deductions and was not bound to agree with API that these deductions must be permitted. *Cf. Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 249-50 (2d Cir. 2021) (an agency is not obligated "to reconcile the rule with every comment submitted, much less to accept the validity of every such comment.").

ONRR also properly considered industry's reliance interests on the Deep

Water Policy, and nothing in API's brief establishes otherwise.  *Contra* API Br. at

35-36.  API plainly understood that the Deep Water Policy established an

exception to "traditional principles of gathering" and conflicted with existing

regulations when it was issued in 1999.  *See* Aplt. App. at 296 (API comment

letter).  That ONRR—only a year later—declined to incorporate the exception into

its regulations underscores the Policy's temporary nature.  *See* 65 Fed. Reg. at

14,047-48.  When ONRR first proposed to rescind the Deep Water Policy, Aplt.

App. at 185, it provided a 120-day public comment period to ensure all interested

parties—including API—could express their views, *id*. at 103.  When ONRR

finalized the Valuation Rule, it addressed concerns over reliance interests.  *See id*.

at 105.  ONRR also set the Rule's effective date at 180 days from its date of

publication to grant lessees additional time to adjust to the new royalty regime.  *Id*.

at 125.  All told, producers had two years' notice that ONRR would be ending the

Deep Water Policy.  Because ONRR gave lessees sufficient "notice that a policy

shift . . . might be in the offing," and "offered a reasonable explanation" for the

shift, its actions are neither arbitrary nor capricious.  *Qwest Corp. v. FCC*, 689

F.3d 1214, 1229-30 (10th Cir. 2012).[6]

---

[6] Nor is the Valuation Rule impermissibly retroactive.  *See infra* II.B.

This Court's decision in *In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014), confirms that Petitioners' reliance argument is meritless. There, the regulated parties argued that the agency's new regulations made "worthless substantial past investment" in telecommunications networks "incurred in reliance upon the prior rule." *Id.* at 1072 (citation omitted). The Court rejected the argument, asserting that the agency's new rule must be "upheld if it is reasonable" and finding that the rule cleared this bar because the agency had detailed its rationale for the change at issue. *Id.* (citation omitted). Similarly here, ONRR's decision to terminate the Deep Water Policy is reasonable because the agency detailed its rationales: aligning industry practice with existing regulations, balancing incentives for mineral development against a need to ensure a fair return to the public, and reducing reporting burdens.

Further, API's argument ignores that, in addition to offering "some incentive for development," ONRR must "protect the public's royalty interest" and may intervene when "minerals are being sold at less than reasonable value." *Cal. Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961); *see also id.* (declaring that the MLA "was intended to promote wise development of these natural resources," "not to obtain sales . . . at any price"). Lessees are not entitled to a certain level of profit under the mineral leasing statutes. *See* 30 U.S.C. §§ 207(a), 226(b)(1)(A) (setting *minimum* royalty rate of 12.5 percent); 43 U.S.C. § 1337(a)(1)(A), (C), (F) (same);

24

*see also Indep. Petroleum Ass'n*, 279 F.3d at 1037 (in exchange for leasing mineral rights, "lessees agree to bear the costs and risks of exploration and production"). The "unique" circumstances of offshore production, API Br. at 31, do not change that fact. *See Shell Oil Co.*, 52 IBLA 15, 25 (1981) (rejecting industry argument that rate of return for offshore investment should be higher because lessees' risks are higher).

### B.  ONRR Has Authority to Set the Valuation Rule's Hard Caps on Transportation and Processing Allowances and They Are Supported by the Record.

In the Valuation Rule, ONRR announced that it would no longer grant exceedances to the generous transportation and processing allowances provided under preexisting regulations and continued under the Valuation Rule.  Aplt. App. at 118, 121.  API protests that ONRR should continue to allow deduction of "actual" transportation and processing costs that exceed the hard caps, API Br. at 36-41, but does not cite to any source of law compelling ONRR to grant those deductions, nor does it demonstrate that ONRR acted arbitrarily and capriciously in setting the caps.  The caps should be upheld.

The district court found that the caps were within ONRR's statutory authority because neither the MLA nor OCSLA define "value," and the task of defining that term has been delegated to ONRR.  Aplt. App. at 78-79.  ONRR exercised its discretion in "permitting these allowances, and it exercised the same

discretion in capping" them. *Id.* at 79. The district court upheld the caps because ONRR has the expertise to determine reasonable allowances, the agency justified the caps by explaining that they will simplify royalty calculations, and ONRR acknowledged and explained its change of position. *Id.*

Because neither the MLA nor OCSLA define "value," they do not mandate deductions for transportation or processing costs. Instead, ONRR used its statutory discretion to make deductions available. *See* 30 U.S.C. § 189 (authorizing the Secretary of the Interior, under the MLA, to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter"); 43 U.S.C. § 1334(a) (similar as to OCSLA); *cf. Amoco*, 410 F.3d at 728 (finding that the statutory phrase "'from the lease' is sufficiently broad to be read as referring simply to the origin of the gas"). If ONRR can establish those deductions, it can also change them. *See Encino*, 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."); *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996).

The Valuation Rule's hard caps on transportation and processing allowances are consistent with ONRR's historical practice. Under previous regulations, ONRR limited allowances to "reasonable, actual costs" and capped them at 50 percent of the value of the product for transportation and 66.67 percent of the value

of the product for processing.  *See, e.g.*, 30 C.F.R. §§ 1206.109(a), (c)(1),

1206.158(a), (c)(2) (2015).  And although the agency permitted lessees to request

exceedances of these caps, ONRR did not guarantee lessees that it would grant

those requests.  *See, e.g.*, *id.* §§ 1206.109(c)(2), 1206.158(c)(3), (d)(2) (2015).  In

short, even under the old rules, ONRR constrained lessees' ability to take

deductions for transportation and processing costs.  *See Norman*, 126 IBLA 375,

379 (1993) (noting ONRR's "refus[al] to bind itself to an unwavering acceptance

of the proposition" that a lessee's costs "are necessarily the 'reasonable costs'

which must be allowed"); Aplt. App. at 108 ("The 50-percent limitation is . . . not a

statement that any cost up to 50 percent is reasonable.").  The Valuation Rule

maintains the 50- and 66.67-percent caps but disallows any exceedances.  *Id*. at

108, 118.

ONRR "considered all relevant factors" and provided a reasoned explanation

for the Valuation Rule's approach.  *See Olenhouse*, 42 F.3d at 1574.  ONRR cited

the Royalty Policy Committee recommendations, market and industry changes, and

enforcement obstacles as impetuses for reform.  Intervenors' Supp. App. at 38; *see*

*also* Aplt. App. at 169.  States and other commenters pushed ONRR to further

reform its royalty regulations and reconsider the deductions altogether.  *See*

Intervenors' Supp. App. at 42-43 (asserting that existing deductions are ill-suited to

the evolving market and effectively "reduc[e] the royalty rate below the minimum

lease rate set by Congress"); *id*. at 28 ("[A]llowances are a form of subsidy and should be repealed."); *id*. at 21 (noting that processing allowances, developed in the 1920s, do "not reflect current plant efficiencies," making them "obsolete"). ONRR declined to reform the regulations in the way that these commenters suggested and instead finalized the hard caps as proposed.  Aplt. App. at 108; *see also id*. at 185, 188 (observing that the caps provide adequate allowances in "the vast majority" of situations); *id*. at 188 (listing technological improvements as another justification for capping processing allowances).  ONRR reasoned that the caps provided "sufficient" allowances to lessees while also serving as a "check" on deductible costs and preserving the public's right to royalty revenue.  *Id*. at 108. And, as the agency had previously explained, the hard caps would improve ONRR's ability to process deductions, *id*. at 185—a significant consideration, in light of critiques of the agency's auditing performance by its Royalty Policy Committee, *see, e.g.*, Intervenors' Supp. App. at 27, 35; *see also id.* at 39 (stating that the former regulations "led to disputes between lessees and ONRR auditors, particularly in situations involving . . . transportation and gas processing allowances").

API argues that the Valuation Rule's hard caps do not recognize "[r]eal world market scenarios," API Br. at 38, but they do not demonstrate that the Valuation Rule is arbitrary and capricious or cite contrary evidence in the record.

As it did before the district court, API rehashes issues from the rulemaking process where ONRR either agreed with API, Aplt. App. at 108 (generally retaining available deductions), or addressed its comments, *see id*. at 108-09 (explaining why the Valuation Rule's changes are not retroactive and why the agency declined to adopt similar changes for Indian oil valuation).  API sees an "unexplained inconsistency" between the hard caps in the Valuation Rule and ONRR's decision not to impose such caps on Indian oil and coal, APR Br. at 40, but overlooks what ONRR said in the Final Rule:  that it has "never received a request to exceed the 50 percent limitation on transportation allowances for Indian oil," and that the Indian oil revisions were the result of a negotiated rulemaking in which the committee "did not recommend a change."  Aplt. App. at 109.  As for API's argument that failing to consider transportation and processing allowances that exceed the caps constitutes unjustified "disparate treatment," API Br. at 40, that contention elides ONRR's entire rationale:  these allowances are a subsidy that deducts from the public's royalty revenue, and ONRR is not obligated to extend them without limitation.  API's unhappiness with the balance that ONRR struck between the interests of the public and lessees does not make the Valuation Rule arbitrary and capricious.  *See Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1070 (D.C. Cir. 2003) (an agency may "balance[] competing interests in arriving at its decision," provided that it "explain[s] on the record the policies which guide it").

Finally, the hard caps on transportation and processing allowances are not "impermissibly retroactive." API Br. at 40-41. As ONRR explained, the Rule's changes apply only prospectively and do nothing to "modify 'the *past* legal consequences of past actions.'" Aplt. App. at 108 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219-20 (1998) (Scalia, J., concurring)). Lessees must apply the Valuation Rule's changes beginning on its effective date but they could continue to calculate deductions under preexisting regulations "for past production months." Aplt. App. at 109. That is entirely reasonable; an agency has no obligation to carry over legacy approvals to a new regulatory regime. *Cf. Indep. Petroleum Ass'n*, 279 F.3d at 1037 (stating that federal oil and gas leases generally "give controlling effect not merely to extant Department of Interior regulations but also to ones 'hereafter promulgated'"). Nor do past investments in offshore infrastructure, however large, preclude a change in regulations. "To conclude otherwise would hamstring . . . any agency whose decision affects the financial expectations of regulated entities." *In re FCC 11-161*, 753 F.3d at 1072 (quoting *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006)).

**C.    The Valuation Rule's Index Option for Valuing Gas is Not Arbitrary and Capricious.**

API also contests the Valuation Rule's introduction of an index-based option for valuing federal gas. API Br. at 41-46. ONRR had ample authority to establish the index-based option and justified its decision to do so. The Valuation Rule

aligns ONRR's federal gas royalty program with a similar index-based method that already existed for oil and Indian gas, and had also been used as part of the benchmark system for federal gas.  Intervenors' Supp. App. at 39.  ONRR's and lessees' experience and success in using these methods, along with improvements in the gas spot market, prompted ONRR to propose the use of index pricing for valuing federal gas.  *Id.*  Additionally, the Royalty Policy Committee had found that calculating deductions for federal gas had "become very difficult . . . thereby greatly complicating [agency] compliance review and audits."  *Id*. at 12.  ONRR later explained that it "must analyze literally hundreds of thousands of sales, transportation, and processing transactions each month," leading to "costly and burdensome" analyses and disputes with industry.  *Id*. at 15; *see also id.* at 16 (describing industry changes that "have made it difficult for lessees to obtain the information they need to comply with ONRR regulations").  Using index-based prices for gas valuation would ease this burden for both ONRR and lessees.  *See id.* at 16; *see also id.* at 13 (recommending index-based pricing for non-arm's-length gas sales).

The district court found that "ONRR provided a reasoned explanation for the creation and scope of this index pricing option."  Aplt. App. at 82.  An index "valuation option does not fully represent the realities of the situation," but in developing the index "ONRR freely admitted certain estimates and allowances

were necessarily included." *Id.* These decisions "were not arbitrary and were advanced with supporting data and reasons after a full consideration of the matter and the many comments to the proposed change." *Id.* Since that was "all that is required of ONRR," the district court upheld the index valuation option. *Id.* at 83.

In its brief, API decries the "upcharge" that the index-based option supposedly creates because it is based on market data rather than individual sale prices, API Br. at 42, and argues that there is no statutory authority for it, *id.* at 42-43, but the mere possibility that an index option will increase royalty revenue does not make it illegal. To the contrary, federal oil and gas legislation generally sets a *minimum* royalty rate of 12.5 percent, *see* 30 U.S.C. § 207(a); *id.* § 226(b)(1)(A), and demands that ONRR, in its role as "statutory guardian of th[e] public interest," obtain a "reasonable financial return on assets that 'belong' to the public." *Cal. Co.*, 296 F.2d at 388. The index-based option not only "protect[s] the interests of the Federal lessor," but also benefits lessees by reducing the burden of showing that their costs are properly deducted. Aplt. App. at 112. To reflect this simplified reporting burden, ONRR "designed the index-based valuation method to generally result in a value higher than gross proceeds." *Id.* Although API may disagree with this approach, that is not the standard by which agency action is evaluated. *Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 730 (9th Cir. 2004) ("solely being dissatisfied does not demonstrate the [agency's] decision

32

was arbitrary and capricious"); *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (a court's "task is complete" when it "find[s] that the agency has engaged in reasoned decisionmaking within the scope of its Congressional mandate").

API also takes issue with ONRR's selection of price points and location differentials, which they allege was done without evidence, API Br. at 42-44, but ONRR justified these selections and supported them with data.  In response to industry opposition to ONRR's use of the highest index price at a pricing point to which a lessee's gas "*could* flow" (versus where it actually flowed), ONRR explained that this approach avoided companies having to "trace production, potentially through a series of affiliated transactions, and determine what volumes of gas flowed to which index pricing points"—a process that "increases the burden for both industry and [the agency]."  Aplt. App. at 112; *see also id.* at 179 (describing burden of "track[ing] every resale of the lessee's gas during the production month, especially when those sales can involve several transactions hundreds of miles downstream from the lease").  ONRR also defended its use of the highest monthly bid week price, stating that "it generally represents the gross proceeds net of transportation allowances accruing to lessees that ONRR believes are most likely to choose this option" based on data reported to ONRR from 2007 to 2011.  *Id*. at 179.  ONRR likewise based the location differentials on

transportation rate data taken from six areas accounting for about 95 percent of all federal gas and detailed its calculations. *Id.* at 112, 126. ONRR's chosen methodology for the index-based option is reasonable. *See Gallegos v. Lyng*, 891 F.2d 788, 795 (10th Cir. 1989) ("The mere possibility that a different conclusion could have been sustained does not empower this court to overturn that decision.").

And if lessees do not wish to pay these higher royalties, there is a simple solution: they can elect *not* to use the index-based option. *See* Aplt. App. at 280 (API asserting in comments that "[o]ptionality allows companies to determine which valuation method actually provides the least administrative burden"). API now claims that this is "no answer," API Br. at 45, because lessees should not have to pay "an arbitrary premium" in those circumstances where "an index-based methodology presents advantages for *both* ONRR and lessees," *id.* at 46. But here API is demanding the best of both worlds: that ONRR offer lessees an administratively simple valuation option that will not result in a higher royalty payment. The Valuation Rule is not arbitrary and capricious merely because ONRR chose not to subsidize lessees in that way.

**D.   ONRR Provided a Reasoned Explanation for the Valuation Rule's Oil and Gas Default Provisions.**

API next contends that the district court erred by sustaining the Valuation Rule's oil and gas default provisions, asserting that these provisions raise several

contradictions that were not properly addressed by the district court.  API Br. at 46-50.  These arguments fail.

The default provisions reaffirm ONRR's statutory authority to audit values reported by lessees and to reassess those values if they do not conform to the regulations' requirements.  Aplt. App. at 106; 30 C.F.R. § 1206.104(a)(1).[7]  In particular, the mineral leasing statutes grant ONRR "rather sweeping authority 'to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the [statutes'] purposes.'"  *DeWitt*, 279 F.3d at 1039.  FOGRMA further directs the Secretary of the Interior to "establish a comprehensive . . . auditing system" to "accurately determine oil and gas royalties" and address the underreporting that was common under the government's previous system.  30 U.S.C. § 1711(a); *see Vastar Res*., 148 IBLA 107, 115 (1999) ("Congress, in enacting FOGRMA, sought to incorporate a verification system since the previous honor concept had led to under-reporting of production and sales." (citing H.R. Rep. No. 97-859, at 15-16 (1982))).  As the district court correctly summarized, "Congress delegated to ONRR a substantial amount of responsibility to collect and audit royalty payments, along with a substantial

---

[7] The Valuation Rule includes substantially identical default provisions for oil, 30 C.F.R. § 1206.105, gas, *id*. §§ 1206.143, 1206.144, federal coal, *id*. §§ 1206.253, 1206.254, and Indian coal, *id*. §§ 1206.453, 1206.454.  This brief generally cites only the default provision for oil, with the understanding that the same arguments apply to the other default provisions.

amount of discretion to accomplish the task." Aplt. App. at 88. The default provision—a provision designed to enable ONRR to more effectively carry out its auditing and accounting duties—falls squarely within that grant of authority. *See Pinney v. Nat'l Transp. Safety Bd.*, 993 F.2d 201, 202 (10th Cir. 1993) ("An agency with a general grant of rulemaking authority has jurisdiction to promulgate regulations reasonably related to the purposes of its enabling legislation.").

The need for such a provision is well established in the record, which revealed persistent problems in the royalty regulations. ONRR explained in the Proposed Rule that it "encounters a wide range of situations in which lessees have inaccurately calculated value." Aplt. App. at 182. The default provisions will address this problem by allowing ONRR to step in and reevaluate production values for royalty purposes in certain circumstances, such as when "[t]here is misconduct by or between the contracting parties" or when the lessee has breached its duty to bring its product to market by selling it at an "unreasonably low" price. 30 C.F.R. § 1206.104(c)(1)-(2); *see also* Aplt. App. at 106 ("The default provision addresses situations where circumstances result in [ONRR's] inability to reasonably determine the correct value of production."). The district court determined the default provisions are a "reasonable fallback method" that establish and use a reasonable value of production based on market-based transaction data, for when standard methods for valuation or auditing fail. Aplt. App. at 88-89.

Given that the default provisions did not give ONRR boundless discretion, constitute a reasonable fallback, were within ONRR's discretion to meet its statutory obligations, and that ONRR considered the many comments in response and provided rational reasons for adopting the default provisions, the district court properly determined ONRR did not act arbitrarily or capriciously, abuse its discretion, or exceed its lawful authority.  *Id.*

In its brief, API enumerates specific "problems and contradictions" within the default provisions, API Br. at 47, but each is unfounded.  *First*, API argues that the provisions will not lead to "greater simplicity, certainty, clarity, and consistency in product valuation," because the provisions will "devolve federal oil and gas royalty valuation into a high-stakes guessing game."  API Br. at 15, 47.  However, no support is provided for this contention.  As ONRR explained, and the district court agreed, the default provision clarifies "when, where, and how" the agency will apply its discretion to audit and reassess reported values, Aplt. App. at 87, 120, which is consistent with the Rule's purpose of providing greater certainty and clarity.  *Id*. at 103.  Specifically, the provisions clearly enumerate the circumstances in which ONRR may invoke them, 30 C.F.R. § 1206.104(c), specify when ONRR may find that a sale price is unreasonably low, *id.* § 1206.104(c)(2), clarify what is considered "misconduct" to invoke the provisions, *id.* § 1206.20, and list information ONRR will consider in recalculating value, *id.* § 1206.105.

ONRR has also stated that it will use the default provision "only in very specific cases." Aplt. App. at 106. Such clear listing can hardly be called a "guessing game." In fact, the previous valuation regulations similarly provided significant discretion for ONRR to audit and reassess lessees' reported royalties. *See* 30 C.F.R. § 1206.152(f) (2015) (providing that "the lessee shall pay the difference, if any, between royalty payments made based upon the value it has used and the royalty payments that are due based upon the value established by ONRR"). The Rule improves upon this approach by clarifying under what circumstances the default provision may be invoked and affirms that is reserved for very specific cases.

*Second*, API argues that the provision will countermand the "principle that valuation is the role of lessees, not ONRR." API Br. at 47. This is not accurate. The default provision does not provide ONRR with the ability to initially set values, but defines a specific set of circumstances in which ONRR may step in. As discussed above, those circumstances are clearly enumerated. In addition, as the district court properly recognized, the default provisions are not the standard, but are a "reasonable fallback method" when the primary methodologies fail. Aplt. App. at 88. That is entirely appropriate in light of ONRR's auditing and enforcement obligations under the mineral leasing statutes. *See supra* at 35-36. API's assertion that the "reservation of broad authority to second-guess valuation

38

[estimates] . . . deprives the lessee of the ability in the first instance to determine its royalty value," API Br. at 48, is merely speculation that ONRR will abuse its discretion.  Yet there is no evidence to suggest ONRR would do so, and ONRR has specifically stated that it "will not second guess arms'-length contracts to any greater or lesser degree than we have previously."  Intervenors' Supp. App. at 63.

*Third*, API argues that the district court did not justify why ONRR can use factors that the Rule withholds from lessees.  API Br. at 47.  Again, that ignores both ONRR's broad statutory authority and the purpose of the default provision, which is to provide a method for ONRR to determine value when other methods are inapplicable.  *See DeWitt*, 279 F.3d at 1039-40 (confirming that ONRR's authority includes "collecting royalties and determining the methods by which they are calculated").  The district court adequately explained that the default provision will "always establish a reasonable value of production using market-based transaction data, which has always been the basis for [ONRR's] royalty valuation rules," and that ONRR had "considered the many comments concerning the default provisions and provided rational reasons for adopting [them]."  Aplt. App. at 88-89.  As such, API's contention fails.

*Fourth*, API contends that "the Rule is unclear on who within ONRR and the audit agencies, and on what level, has authority to invoke the default provisions."  API Br. at 47.  This is immaterial.  API does not provide any reason why ONRR

39

acted arbitrarily and capriciously or unlawfully in not discussing internal agency management decisions in the Rule. *See* 5 U.S.C. § 553(a)(2), (b)(3)(A) (agency rulemaking requirements do not apply to matters "relating to agency management or personnel" or "rules of agency organization, procedure, or practice"). An agency is not required to provide every minute detail about the practicalities of a rule in a rulemaking; it need only provide a reasoned explanation to support its decision. *See FCC v. Fox*, 556 U.S. at 515. ONRR provided good reasons for the default provisions, including to address "valuation situations where circumstances result in the Secretary of the Interior's . . . inability to reasonably determine the correct value of production," Aplt. App. at 106, and to detect and address a "wide range of situations in which lessees have inaccurately calculated value," *id*. at 182. ONRR also provided a reasoned explanation for how it will exercise its discretion in applying the default provision to provide greater certainty and clarity in product valuation. *Id*. at 106, 120. The district court agreed that these provisions were justified. *Id*. at 86-89. Although API might prefer that ONRR offered more detail, API offers nothing to refute the district court's finding and does not show that ONRR acted arbitrarily or unlawfully by not providing this information.

*Fifth*, API contends that lessees should be "allowed to correct their own alleged valuation errors." API Br. at 47. This argument mischaracterizes the law and ONRR's bases for the default provision. As discussed previously, FOGRMA

40

directed the Secretary of the Interior to "establish a comprehensive . . . auditing system" to "accurately determine oil and gas royalties" and address the underreporting that was common under the government's previous honor system. 30 U.S.C. § 1711(a). The default provision is not meant to be used to correct simple mistakes, but is used only when a lessee has engaged in misconduct or sold its product at an unreasonably low price. 30 C.F.R. § 1206.104(c). Therefore, this argument falls short because it fails to recognize that the Rule provides for "very specific" cases where the default provision will apply, which does not include where simple mistakes are made. *See* Aplt. App. at 106.

*Sixth*, API contends that the Rule will allow "ONRR to substitute its preferred (ostensibly higher) value in nearly any situation," or "for any reason," such as "if a lessee so much as inadvertently inputs an incorrect product code . . . in the course of reporting" royalty data. API Br. at 47-48. These arguments are baseless. As described above, there is a specific set of circumstances in which ONRR will invoke the default provisions. *See* 30 C.F.R. § 1206.104(c). The Rule itself indicates the provision is a fallback, applying only when the gross proceeds "do not reflect reasonable consideration." *Id.* Further, the Rule provides the information that ONRR will consider in recalculating value, including the value of like-quality oil in the same field or nearby fields and public sources of price or market information. *Id.* § 1206.105. As ONRR explained in the preamble and the

41

district court agreed, value determinations under the default provisions "always" establish a reasonable value of production "using market-based transaction data, which has always been the basis for [ONRR's] royalty valuation rules," and a lessee's right to challenge such a determination remains available.  Aplt. App. at 88; *see id*. at 106.  Again, API's argument is mere speculation that ONRR will abuse its discretion, without reference to anything in the record to support it.

*Finally*, API argues that an administrative appeal pathway does not redeem the default provisions because ONRR is not compelled to share the basis for its substitute methodology with the lessee and may be precluded from doing so where the agency value is based on confidential sales information.  API Br. at 49-50. This concern has been addressed.  There is an opportunity to seek judicial review if ONRR abuses its discretion in applying the default provision.  30 C.F.R. § 1290.108 (providing for appeals to the Interior Board of Land Appeals). The district court also noted that "[a]ppeal rights under 30 CFR part 1290 will not change under this final rule."  Aplt. App. at 88.  Furthermore, the Interior Board of Land Appeals and federal courts have procedures for reviewing agency decisions that involve confidential information, should that situation arise.  *See* 43 C.F.R. § 4.31; *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 167 n.2 (D.D.C. 2018) (noting that "confidential business information" and "other proprietary data" were filed with the court under seal); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562,

567 (7th Cir. 2000) ("Litigation about trade secrets regularly is conducted in public; the district court seals only the secrets").

In sum, the Valuation Rule's default provisions are well supported by the record, and API's speculative allegations fail to show that the district court erred in sustaining these provisions.

### E.    The Valuation Rule's Triggers for the Default Provisions are Not Arbitrary or Capricious.

There is no merit to API's contention that the district court erred by upholding the Valuation Rule's provisions allowing ONRR to invoke the default valuation procedures. *See* API Br. at 50-53. To the contrary, these provisions are well supported by the record.

In particular, the Valuation Rule contains provisions requiring written, signed versions of all contracts, including written signatures. 30 C.F.R. §§ 1206.104(g) (federal oil sales), 1206.111(d) (federal oil transportation), 1206.143(g) (federal gas sales), 1206.153(d) (federal gas transportation), 1206.160(c) (federal gas processing). As part of the rulemaking, ONRR explained that it "found it difficult to verify the accuracy of lessees' royalty payments" when the agreements were not written, which, in turn, limited ONRR's ability to fulfill its statutory mandates. Aplt. App. at 107. The Rule also allows ONRR to invoke the default provision when a lessee reports "unreasonably low" sales prices or "unreasonably high"

43

transportation or processing costs, using a 10-percent variance that may be used to evaluate a lessee's reports. *Id*. at 106-07.

The district court found ONRR had asserted good reasons for requiring written contracts, and although API may disagree with them, those reasons are sufficient to show ONRR did not act arbitrarily or capriciously. Aplt. App. at 83-85. The district court further found the 10-percent variance that ONRR may use to be a "guide," and not an unreasonable one. *Id.* at 85-86. As such, the district court sustained these provisions. *Id*.

API asserts that the provision requiring written signatures "unconditionally refuses to recognize" contracts unless signed by all parties, and contends that this will allow ONRR to "trigger the default provisions and utilize whatever royalty value ONRR prefers." API Br. at 50-51. These allegations are unsupported. As the record demonstrates, ONRR can recognize the validity of oral agreements, while still requiring the agreements to be put in writing. 30 C.F.R. § 1206.20. ONRR's reasoning remains that tracking email exchanges or non-written agreements creates inefficiencies in accounting and auditing systems, and ONRR found it difficult to verify the accuracy of lessee's royalty payments when the lessees enter into oral contracts. Aplt. App. at 107. These difficulties interfered with ONRR's ability to meet its statutory obligations, and requiring written agreements would greatly assist the agency in carrying out its statutory audit

duties.  *Id.*  The district court found that reasoning sufficient, and API offers no

countervailing evidence.  *Id*. at 83-85.

Further, as explained in the above in Section II.D, API is incorrect that ONRR

will use "whatever royalty value [it] prefers" when the default provision is

invoked, because the Valuation Rule clearly enumerates the factors that may be

considered in determining that value, and permits lessees to challenge ONRR's

royalty determinations if they disagree with them.  30 C.F.R. §§ 1206.104(c),

1206.105, 1290.108.

API next argues that the 10 percent variance is circular and that ONRR does

not explain how the lowest reasonable price or highest reasonable allowance cost is

to be determined or who will make that determination.  API Br. at 51-52.  This is

incorrect.  First, the 10-percent variance is a tolerance that ONRR "*may* use" to

evaluate a lessee's reports.  Aplt. App. at 106-07.  The Rule does not indicate that

ONRR must use or will always use it.  Further, ONRR has "always used tolerances

to reflect what is reasonable," and API does not explain why this tolerance is now

unacceptable.  *See id* at 107.  The Rule also specifies factors that ONRR may

consider when determining what is "reasonable" and "unreasonable," including

index prices and prices reported to ONRR for like-quality products.  *See* 30 C.F.R.

§§ 1206.104(c)(2), 1206.143(c)(2); *see also, e.g.*, 30 C.F.R. §§ 1206.110(f)(2),

1206.152(g)(2) (providing that ONRR may consider reported allowances and

tariffs for gas products transported through the same system when determining whether transportation allowances are "unreasonably high").  And if lessees disagree with ONRR's determinations, *see* API Br. at 52, they can seek judicial recourse, as explained above.  In the proceedings below, the district court correctly determined that API's argument was "speculative and based more in hysteria than fact."  *Id*. at 86.  The district court found the "unreasonably low" determination was tied to the lowest reasonable measures of market price, and the 10-percent variance to be a mere guide for ONRR.  *Id.*  API fails to provide any reason why the district court erred with regard to this provision.

In sum, ONRR provided a reasoned explanation with regard to the triggers for the Valuation Rule's default provisions, and the decision of the district court should be affirmed.

## CONCLUSION

For these reasons, Intervenors-Appellees respectfully request that the Court affirm the district court's judgment and uphold the Valuation Rule's oil and gas provisions.

Dated:  March 30, 2022                    Respectfully submitted,

/s/ Thomas Zimpleman
THOMAS ZIMPLEMAN
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
Telephone: 202-513-6244
Email: TZimpleman@nrdc.org

*Attorney for Conservation Groups*

ROB BONTA
Attorney General of California
ED OCHOA
Senior Assistant Attorney General
DAVID ZONANA
Supervising Deputy Attorney General

/s/ George Torgun
GEORGE TORGUN
ADRIANNA LOBATO
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA  94612-0550
Telephone: (510) 879-1002
Email:  George.Torgun@doj.ca.gov

*Attorneys for the State of California*

HECTOR BALDERAS
Attorney General of New Mexico

/s/ William Grantham
WILLIAM GRANTHAM
Assistant Attorney General
408 Galisteo Street,
Santa Fe, NM 87501
wgrantham@nmag.gov
Telephone:  (505) 717-3520

*Attorneys for the State of New Mexico*

47

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Fed. R. App. P. 32(g)(1), that the foregoing Intervenors-Appellees' Joint Response Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), this document contains 11,008 words, as computed by Microsoft Word.

I further certify that this document complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) and 10th Cir. R. 32(A) because this document has been prepared in a proportionally spaced typeface of Times New Roman, 14 point font.

<u>/s/ George Torgun</u>
George Torgun